# EXHIBIT A

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

| | FOR COURT USE ONLY (SOLO PARA USO DE LA CORTE) |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

WALMART, INC.; and DOES 1 through 100, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

GREENPEACE, INC.

**FILED BY FAX**
ALAMEDA COUNTY

December 16, 2020

CLERK OF
THE SUPERIOR COURT

By Cheryl Clark, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Alameda County Superior Court

1225 Fallon Street
Oakland, CA 94612

| CASE NUMBER: (Número de Caso): |
|---|
| RG20082964 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Howard Hirsch, Lexington Law Group, 503 Divisadero Street, San Francisco, CA 94117. (415) 913-7800

DATE:
*(Fecha)* December 16, 2020

Clerk, by *(Secretario)* Cheryl Clark , Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):*

   under: ☒ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
American LegalNet, Inc.
www.FormsWorkflow.com

JAN 0 4 2021

1   LEXINGTON LAW GROUP
    Howard Hirsch, State Bar No. 213209
2   Ryan Berghoff, State Bar No. 308812
    Meredyth Merrow, State Bar No. 328337
3   503 Divisadero Street
    San Francisco, CA 94117
4   Telephone: (415) 913-7800
    Facsimile: (415) 759-4112
5   hhirsch@lexlawgroup.com
    rberghoff@lexlawgroup.com
6   mmerrow@lexlawgroup.com

7   LAW OFFICE OF GIDEON KRACOV
    Gideon Kracov, State Bar No. 179815
8   801 S. Grand Ave., 11th Floor
    Los Angeles, CA 90017
9   Telephone: (213) 629-2071
    Facsimile: (213) 623-7755
10  gk@gideonlaw.net

11  Attorneys for Plaintiff
    GREENPEACE, INC.
12

13

14                          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                                      **COUNTY OF ALAMEDA**

16

17

18  GREENPEACE, INC.,                                    Case No.

19                          Plaintiff,                   **COMPLAINT**

20              v.

21  WALMART, INC.; and DOES 1 through 100,
    inclusive,
22
                            Defendants.
23

24

25

26

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

                                            COMPLAINT

FILED BY FAX
ALAMEDA COUNTY

December 16, 2020

CLERK OF
THE SUPERIOR COURT
By Cheryl Clark, Deputy

CASE NUMBER:
**RG20082964**

1    Plaintiff Greenpeace, Inc. ("Plaintiff" or "Greenpeace"), based on information, belief, and

2    investigation of its counsel, except for information based on knowledge, hereby alleges:

3                                    **INTRODUCTION**

4    1.    The problems associated with plastic pollution are increasing on a local, national,

5    and global scale. This affects the amount of plastic in the ocean, in freshwater lakes and streams,

6    on land, and in landfills. Nearly 90% of plastic waste is not recycled, with billions of tons of

7    plastic becoming trash and litter.[1] According to a new study, at least 1.2 to 2.5 million tons of

8    plastic trash from the United States was dopped on lands, rivers, lakes and oceans as litter, were

9    illegally dumped, or shipped abroad and then not properly disposed of.[2] As consumers become

10   increasingly aware of the problems associated with plastic pollution, they are increasingly

11   susceptible to marketing claims reassuring them that the plastic used to make and package the

12   products that they purchase are recyclable. Many consumers concerned with the proliferation of

13   plastic pollution actively seek to purchase products that are either compostable or recyclable to

14   divert such waste from the ocean, their communities, landfills, and incinerators. Seeking to take

15   advantage of consumers' concerns, defendant Walmart, Inc. ("Defendant")[3] markets and sells a

16   variety of single-use plastic products that are labeled as recyclable, when the products are rarely,

17   if ever, recycled.

18   2.    This Complaint seeks to remedy Defendants' unlawful, unfair, and deceptive

19   business practices with respect to the advertising, marketing, and sales of plastic products or

20   plastic packaging that are: (A) made from plastics #3-7 or unidentified plastic; (B) sold under

[1] Tom Udall and Alan Lowenthal, *Op-Ed: More than 90% of U.S. plastic waste is never recycled. Here's how we can change that*, L.A. TIMES (Feb. 21, 2020, 3:01 AM), https://www.latimes.com/opinion/story/2020-02-21/plastic-waste-never-recycled-u-s (last accessed Dec. 7, 2020).

[2] Associated Press, *Study: 1 to 2 million tons a year of U.S. plastic trash goes astray*, L.A. TIMES (Oct. 30, 2020, 11:03 AM) https://www.latimes.com/world-nation/story/2020-10-30/study-1-to-2-million-tons-of-us-plastic-trash-goes-astray (last accessed Dec. 7, 2020).

[3] Defendant Walmart, Inc. and DOES 1-100 are collectively referred to herein as "Defendants."

DOCUMENT PREPARED
ON RECYCLED PAPER

-1-

1   Defendants' own private label brands;[4] and (C) labeled as "recyclable" (the "Products").[5]  The

2   Products are advertised, marketed, and sold as recyclable.  However, the Products are not in fact

3   recyclable because consumers do not have access to recycling programs that accept the Products,

4   the Products cannot be separated or recovered from the general waste stream and sorted into the

5   correct materials bale by material recovery facilities ("MRFs"), and there are no end markets to

6   reuse the Products or to convert the Products into a material that can be reused or used in

7   manufacturing or assembling another item.  Despite Defendants' marketing and advertising of the

8   Products as recyclable, most of the Products typically end up in landfills, incinerators,

9   communities, or the natural environment.  Defendants' representations that the Products are

10  recyclable are material, false, misleading, and likely to deceive members of the public.  These

11  representations also violate California's legislatively declared policy against misrepresenting the

12  environmental attributes of products.

13          3.      Defendants thus violated and continue to violate California's Unfair Competition

14  Law ("UCL"), Business and Profession Code § 17200, *et seq.*, based on fraudulent, unlawful and

15  unfair acts and practices, as well as the California False Advertising Law, Cal. Bus. & Prof. Code

16  § 17500, *et seq.* and the Environmental Marketing Claims Act, Cal. Bus. & Prof. Code § 17580.5.

17

18

19  [4] Examples of Defendants' private label brands include, but are not limited to: Great Value,
    Allswell, Atheletic Works, Bonobos, Equate, EV1, Everstart, George, Holiday Time, Mainstays,

20  Marketside, No Boundaries, Onn, Ozark Trail, Parent's Choice, Scoop, SwissTech, Time and
    Tru, and Wonder Nation.

21  [5] Non-exclusive examples of the Products include, but are not limited to: Great Value Organic
    Cinnamon Applesauce Cups, 24 oz, 6 Count, Walmart #556055661, UPC No. 0-7874213534-2,

22  Product No. 136051; Great Value Diced Mangos In 100% Juice, 4 oz, 4 Count, Walmart
    #562987172, UPC No. 0-7874215803-7, Product No. 142059; Great Value Organic Diced

23  Peaches & Pears, 16 oz., 4 Count, Walmart #562987178, UPC No. 0-7874223615-5, Product No.
    142059; Great Value Premium Forks, 48 Count, Walmart #438491, UPC No. 0-7874211675-4,

24  Product No. 042499; Great Value Premium Clear Cutlery Knives, 48 Count, Walmart #438505,
    UPC No. 0-7874211670-9, Product No. 042499; Great Value Premium Assorted Silver Cutlery,

25  36 count, Walmart #565175504; Great Value Snack Cups, 9 oz, 80 Count, Walmart #443461,
    UPC No. 0-681131925532, Manufacturer No. 6386717; Great Value Everyday Party Cups, 18 oz,

26  20 Count, Walmart #443482, UPC No. 0-78742049090, Manufacturer No. 6386484; Great Value
    Extra Virgin Olive Oil Cooking Spray, 7 oz., 3 Pack, UPC No. 0-7874206043-9, Product No.

27  928333; Great Value Ultimate Fresh Scent Booster, Blooming Lavender, 14.8 oz, Walmart
    #575777817, UPC No. 0-7874233153-9, Product No. 03604; and Great Value Plastic Party Cups,

28  18 oz, 120 Count, Walmart #557007144, UPC No. 0-7874218708-2, Product No. 437462.

1    4.    Plaintiff has no adequate remedy at law for the injuries currently being suffered as

2    an award of monetary damages would not prohibit Defendants' false, misleading, and deceptive

3    statements.  Thus, Plaintiff seeks an order enjoining Defendants' acts of unfair competition and

4    other fraudulent, unlawful, and unfair acts and practices.

5    **PARTIES**

6    5.    Plaintiff Greenpeace Inc. is a non-profit, public interest organization established

7    pursuant to section 501(c)(4) of the Internal Revenue Code, and headquartered in Washington,

8    D.C.  Greenpeace has worked to combat plastic pollution, protect California coasts and marine

9    life from myriad harms related to plastic pollution, and ensure that consumers are not misled by

10   environmental marketing claims.  Greenpeace has standing to bring this action because

11   Defendants' actions of misrepresenting the environmental benefits of their Products by marketing

12   and selling the Products as recyclable has frustrated Greenpeace's mission to protect the natural

13   environment and has caused Greenpeace to divert resources in response to that frustration of

14   purpose.  Thus, Greenpeace has lost money or property and has suffered an injury in fact due to

15   Defendants' actions of using false, misleading, and deceptive labels regarding the recyclability of

16   their Products.

17   6.    Greenpeace was formed in 1971 as a global, independent campaigning

18   organization that uses peaceful protest and creative communication to expose global

19   environmental problems and promote solutions that are essential to a green and peaceful future.

20   Greenpeace campaigns are science-based and centered on the core values of justice, equity, and

21   inclusion.  Greenpeace pursues its mission through research, reports, surveys, policy proposals,

22   government outreach and lobbying, coalition building and allyship, advocacy, education, public

23   demonstrations and rallies, protests, litigation, and press and public outreach.  Greenpeace also

24   has many supporters with whom Greenpeace communicates through blog posts, social media,

25   emails, phone calls, text messages, webinars, and dedicated supporter mobilization.

26   7.    A core aspect of Greenpeace's mission is to educate the public on issues that they

27   are either unaware of or misled on.  Nearly every Greenpeace campaign involves educating

28   consumers on the causes, impacts, and alternatives to products or processes that damage the

1    environment or public health.  Examples of such Greenpeace campaigns include, but are not

2    limited to educating the public with respect to the hazards of bleached paper products, chemical

3    additives in plastic toys and household products, mercury in fish, and ozone-depleting substances

4    in refrigerators.

5        8.    In addition to the many campaigns educating the public about products and

6    processes that harm public health, the environment, or human rights, for over three decades

7    Greenpeace has engaged in various efforts to expose corporate greenwashing that deceives

8    consumers into thinking their products or processes are environmentally friendly or benign.

9    Greenpeace has worked tirelessly to expose examples of corporate greenwashing to protect

10   consumers from false and misleading information related to the environmental benefits of

11   products.  Greenpeace has led campaigns against oil companies, electronic manufacturers, and

12   consumer good corporations and retailers for touting the environmental benefits of their products

13   when, in fact, the products manufactured and sold by such companies caused significant

14   environmental harm.  Greenpeace advocates for consumers to prevent corporate greenwashing

15   and educates the public on such greenwashing so that consumers have the information available

16   to make informed decisions about the environmental impacts of their purchases.

17       9.    Greenpeace has been working to prevent the proliferation of plastic pollution for

18   nearly four decades.  Greenpeace has had numerous campaigns related to plastic pollution,

19   including but not limited to educating consumers on greenwashing statements that certain plastic

20   was biodegradable or recyclable when it was not, exposing the shipment of plastic waste to

21   developing countries, seeking to replace polyvinyl chloride plastic with less toxic alternatives,

22   exposing the health problems associated with incinerating plastic, and reducing or eliminating

23   single-use plastic packaging because of its impacts on the marine ecosystem, the climate,

24   communities, and human health.

25       10.   Greenpeace's campaigns related to plastic holistically focus on the lifecycle of

26   plastic, from the harmful feedstock chemicals used to make plastic to the sheer amount of single-

27   use plastic generated and ultimately discarded.  Greenpeace cares deeply about the proliferation

28   of plastic because it has witnessed the harmful effects of plastic pollution on various ecosystems

1   and human health. The goals of Greenpeace's climate and oceans campaigns call for solutions

2   that include drastically reducing the use of single-use plastic and finding alternatives to plastic

3   products and packaging, reusing plastic products when no other alternatives are available, and

4   properly recycling products if they cannot be eliminated or reused.

5       11.     Greenpeace's current campaigns related to plastic include informing the public

6   about the low amount of plastic that is capable of being recycled and instead ends up in the

7   natural environment. To these ends, Greenpeace has published reports and surveys documenting

8   the low recycling rates of various plastic products, including a comprehensive U.S. Survey of

9   Plastics Recyclability entitled Circular Claims Fall Flat, published on February 18, 2020 (the

10  "CCFF Report").[6] The CCFF Report is a thorough survey of plastic product waste collection,

11  sortation, and reprocessing in the United States to determine the legitimacy of recyclable claims

12  and labels on consumer single-use plastic products. The survey was based on current conditions

13  in October 2019 to January 2020 and U.S. Federal Trade Commission guidelines. The survey

14  directly evaluated Defendants' packaging design guides for recyclability as well as numerous

15  other recycling guides.

16      12.     While Greenpeace was investigating the low recycling rates of plastic products, it

17  was simultaneously analyzing recyclable representations present on the labels of products sold by

18  major retailers and manufacturers. In 2019, following a survey sent directly to Defendants and

19  other retailers regarding plastic pollution, Greenpeace began investigating Defendants' recycling

20  initiatives and representations. A company's size and scope affect its plastic footprint, and due to

21  Defendants' large volume of products made from or packaged in plastic, Greenpeace determined

22  that Defendants are responsible for a significant amount of plastic pollution, which is highlighted

23  in the CCFF Report. Greenpeace began investigating Defendants by diverting resources to visit

24  Defendants' stores, photograph Defendants' products, investigate Defendants' corporate websites,

25

26  ───────────────
27  [6] John Hocevar, *Circular Claims Fall Flat: Comprehensive U.S. Survey of Plastics Recyclability*, GREENPEACE REPORTS, Feb. 18, 2020, https://www.greenpeace.org/usa/wp-content/uploads/2020/02/Greenpeace-Report-Circular-Claims-Fall-Flat.pdf (last accessed Dec. 7, 2020)

28

1  and analyze and report findings. Based on this information, Greenpeace determined that
2  Defendants' actions frustrated its mission to protect the environment by misleading consumers
3  with respect to the environmental benefits of recycling plastic.

4       13.    After initially diverting resources to specifically investigate Defendants'
5  recyclable representations, Greenpeace diverted additional resources to inform Defendants of
6  their false and misleading recycling representations. In October 2019, Greenpeace sent an email
7  to Defendants explicitly discussing the issues related to Defendants' misleading recycling
8  representations and informed Defendants that their labels do not meet the standards in the Green
9  Guides. In March 2020, Greenpeace sent Defendants a follow-up email regarding the
10  implications of the CCFF Report, which described the low rate of recyclability for products that
11  Defendants labeled as recyclable. Greenpeace then arranged for a meeting with Defendants and
12  various other retailers at an industry conference to discuss recyclable representations on plastic
13  products that was canceled due to the onset of the pandemic caused by COVID-19. Greenpeace
14  has since published press releases identifying Defendants' false and misleading recyclable
15  representations to inform the public of such issues.

16       14.    Greenpeace has also diverted significant time and resources organizing its
17  supporters to raise awareness of Defendants' contribution to the proliferation of plastic pollution.
18  For example, on February 6, 2019, Greenpeace organized a "day of action" in which supporters
19  photographed Defendants' plastic pollution in Los Angeles, California and St. Petersburg, Florida
20  to highlight the amount of single-use plastic pollution generated by Defendants. Greenpeace also
21  created a petition and paid for it to be circulated on Facebook through Facebook Ads requesting
22  Defendants to "ditch plastic packaging" and sent out numerous posts to its Twitter followers
23  regarding Defendants' failure to reduce single-use plastic.

24       15.    Because Greenpeace's mission involves ensuring consumers are not misled by
25  environmental marketing claims and protecting the natural environment from plastic pollution,
26  Defendants' use of false, misleading, and deceptive claims regarding the recyclability of their
27  Products has frustrated Greenpeace's purpose. Defendants' continued use of misleading and
28  deceptive recyclability claims serves to confuse the public about plastic products and packaging

1    and give them a false sense that they are doing something good for the environment when they

2    purchase Defendants' Products and then place them into the recycling bin. Defendants'

3    frustration of Greenpeace's purpose has forced Greenpeace to spend staff time and organizational

4    resources pressuring Defendants to stop using misleading labels on their single-use plastic

5    packaging, as well as to educate its supporters, the public, and the media that a product labeled by

6    Defendants as recyclable is actually unlikely to be recycled. These actions have caused

7    Greenpeace to lose money or property and it has therefore suffered an injury in fact.

8        16.    Absent relief from this Court, plastic pollution and the resulting harms to

9    California waters, coasts, communities, and marine life will continue to negatively impact

10   Greenpeace's efforts to protect these critical resources. In addition, relief from this Court is

11   necessary to further Greenpeace's mission of ensuring consumers are not misled by false

12   environmental marketing claims.

13       17.    Defendant Walmart, Inc. is a Delaware corporation with its principal place of

14   business in Bentonville, Arkansas. Defendant Walmart, Inc. manufactures, distributes, and sells

15   the Products in California.

16       18.    DOES 1 through 100 are persons or entities whose true names and capacities are

17   presently unknown to Plaintiff and members of the Class, and who therefore are sued by such

18   fictitious names. Plaintiff and members of the Class are informed and believe, and on that basis

19   allege, that each of the fictitiously named defendants perpetrated some or all of the wrongful acts

20   alleged herein and are responsible in some manner for the matters alleged herein. Plaintiff will

21   amend this Complaint to state the true names and capacities of such fictitiously named defendants

22   when ascertained.

23                              **JURISDICTION AND VENUE**

24       19.    This Court has jurisdiction over all causes of action asserted herein pursuant to the

25   California Constitution, Article VI, Section 10, because this case is a cause not given by statute to

26   other trial courts. This Court also has jurisdiction over certain causes of action asserted herein

27   pursuant to Business & Professions Code §§ 17203 and 17204, which allow enforcement in any

28   Court of competent jurisdiction.

DOCUMENT PREPARED
ON RECYCLED PAPER

-7-

1    20.    This Court has jurisdiction over Defendants because each is a corporation or other

2    entity that has sufficient minimum contacts in California, is a citizen of California, or otherwise

3    intentionally avails itself of the California market either through the distribution, sale or

4    marketing of the Products in the State of California or by having a facility located in California so

5    as to render the exercise of jurisdiction over it by the California courts consistent with traditional

6    notions of fair play and substantial justice.

7    21.    Venue in the County of Alameda is proper under Business & Professions Code

8    § 17203 and Code of Civil Procedure §§ 395 and 395.5 because this Court is a court of competent

9    jurisdiction and the Products are sold throughout this County.

10                                    **LEGAL BACKGROUND**

11    22.    In light of the significant amount of plastic that is labeled as recyclable and instead

12    ends up in landfills, incinerators, communities, and the natural environment, the Legislature of the

13    State of California has declared that "it is the public policy of the state that environmental

14    marketing claims, whether explicit or implied, should be substantiated by competent and reliable

15    evidence to prevent deceiving or misleading consumers about the environmental impact of plastic

16    products." Cal. Pub. Res. Code § 42355.5. The policy is based on the Legislature's finding that

17    "littered plastic products have caused and continue to cause significant environmental harm and

18    have burdened local governments with significant environmental cleanup costs." *Id.* § 42355.

19    23.    The California Business and Professions Code § 17580.5 makes it "unlawful for

20    any person to make any untruthful, deceptive, or misleading environmental marketing claim,

21    whether explicit or implied." Pursuant to that section, the term "environmental marketing claim"

22    includes any claim contained in the Guides for use of Environmental Marketing Claims published

23    by the FTC (the "Green Guides"). *Id.*; *see also* 16 C.F.R. § 260.1, *et seq.*

24    24.    Under the Green Guides, "[i]t is deceptive to misrepresent, directly or by

25    implication, that a product or package is recyclable. A product or package shall not be marketed

26    as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream

27    through an established recycling program for reuse or use in manufacturing or assembling another

28    item." 16 C.F.R. § 260.12(a). This definition encompasses the three prongs of recyclability that

DOCUMENT PREPARED
ON RECYCLED PAPER

-8-

1  are commonly used in the solid waste industry: (1) accessibility of recycling programs ("through

2  an established recycling program"); (2) sortability for recovery ("collected, separated, or

3  otherwise recovered from the waste stream"); and (3) end markets ("for reuse or use in

4  manufacturing or assembling another item").  The California Public Resources Code similarly

5  defines recycling as "the process of collecting, sorting, cleansing, treating, and reconstituting

6  materials that would otherwise become solid waste, and returning them to the economic

7  mainstream in the form of raw material for new, reused, or reconstituted products which meet the

8  quality standards necessary to be used in the marketplace." *Id.* § 40180.

9      25.    These definitions are consistent with reasonable consumer expectations.  For

10 instance, the dictionary defines the term "recycle" as: (1) convert (waste) into reusable material,

11 (2) return (material) to a previous stage in a cyclic process, or (3) use again.  Oxford Dictionary,

12 Oxford University Press 2020.  Accordingly, reasonable consumers expect that products

13 advertised, marketed, sold, labeled, or represented as recyclable will be collected, separated, or

14 otherwise recovered from the waste stream through an established recycling program for reuse or

15 use in manufacturing or assembling another item.

16     26.    Defendants have published their own Recycling Playbook that defines

17 recyclability in the same manner.[7]  The Playbook defines recyclability as a system of stages: "(1)

18 Collection (collection available for a substantial majority of consumers); (2) Sortation (packages

19 are separated and aggregated for further processing); (3) Processing (commercial processes

20 recover material); (4) End-Market (the recycled material is used in new products); and (5)

21 Recycling Rate (at least 30% recycling rate achieved for over 400 million inhabitants)."  Thus,

22 Defendants' own interpretation of recyclability requires access to recycling programs, sortability,

23 and end markets.

24

25

26

---

[7] *The Recycling Playbook,* WALMART, INC., last updated Oct. 25, 2019,
27 https://www.walmartsustainabilityhub.com/media-library/document/recycling-playbook-
november-2019/_proxyDocument?id=0000016e-384f-d8af-a96e-beff25150000 (last accessed on
28 Dec. 7, 2020).

27.     As reflected in the Green Guides' language and regulatory history, the FTC does not consider a product to be recyclable unless it can actually be recycled. For instance, the Green Guides provide that: (1) "[i]f any component significantly limits the ability to recycle the item, any recyclable claim would be deceptive;" and (2) "an item that is made from recyclable material, but, because of its shape, size, or some other attribute, is not accepted in recycling programs, should not be marketed as recyclable." 16 C.F.R. §§ 260.12(a) and (d); *see also id.*, § 260.12(d), Examples 2 and 6. And in promulgating the current recycling definition that encompasses accessibility, sortability and end markets, the FTC clarified that "[f]or a product to be called recyclable, there must be an established recycling program, municipal or private, through which the product *will be* converted into, or used in, another product or package." *See* 63 Fed. Reg. 84, 24247 (May 1, 1998) (emphasis added). As the FTC has stated, "while a product may be technically recyclable, if a program is not available allowing consumers to recycle the product, there is no real value to consumers." *Id.*, at 24243.

28.     The Green Guides also provide specific examples of recycling claims that the FTC considers deceptive, as well as examples of ways in which marketers can qualify those claims.[8] Compliance with the examples provided by the FTC qualifies as a defense to a claim under the EMCA. B&P Code § 17580.5(b). Under the Green Guides, a marketer may make an unqualified recyclable claim if a substantial majority of consumers or communities have access to recycling facilities for that item. 16 C.F.R. § 260.12(b)(1). A "substantial majority" means at least 60 percent of consumers or communities where the item is sold. *Id.* Absent such evidence, marketers are required to use qualifications that vary in strength depending on the degree of consumer access to recycling for an item. *Id.*, § 260.12(b)(2). For instance, if recycling facilities are available to slightly less than 60 percent of consumers or communities, the Green Guides recommend that a marketer should qualify the recyclable claim by stating "this product may not be recyclable in your area," or "recycling facilities for this product may not exist in your area."

---

[8] The examples in the Green Guides are specifically provided by the FTC as its "views on how reasonable consumers likely interpret certain claims." 16 C.F.R. § 260.1(d).

DOCUMENT PREPARED ON RECYCLED PAPER

1  *Id.* If recycling facilities are available only to a few consumers, the Green Guides recommend

2  that a marketer should qualify its recyclable claim by stating "this product is recyclable only in a

3  few communities that have appropriate recycling facilities." *Id.*

4       29.    The Green Guides specifically identify qualifications that may be misleading or

5  deceptive to a reasonable consumer. For instance, a "check locally" disclaimer is presumptively

6  deceptive. *See* 16 C.F.R. § 260.12, Example 4. The FTC made this determination based on a

7  survey it conducted in which it determined that "there was no statistical difference" between a

8  consumer's perception of an unqualified recyclable claim and a "check locally" disclaimer. *See*

9  63 Fed. Reg. 84, 24244 (May 1, 1998). Accordingly, the FTC concluded that a "check locally"

10  disclaimer is deceptive because it does not "adequately disclose the limited availability of

11  recycling programs," and removed the disclaimer as an example of a permissible qualification.

12  *See* 16 C.F.R. § 260.12, Example 4; 63 Fed. Reg. 84, 24244 (May 1, 1998).

13  **BACKGROUND FACTS**

14       30.    In the past decade humans across the globe have produced 8.3 billion metric tons

15  of plastic, most of it in disposable products and packaging that ends up as trash or pollution.[9] Of

16  the 8.3 billion metric tons produced, 6.3 billion metric tons have become plastic waste and only

17  9% of that has been recycled.[10] A third of the single-use plastic generated ends up in the natural

18  environment, accounting for 100 million metric tons of plastic pollution in 2016.[11] Current

19  estimates suggest that there are over 150 million tons of plastics in the ocean.[12] The

20  Environmental Protection Agency estimates that Americans alone disposed of more than 33

21  

22  [9] Roland Geyer, et al., *Production, use, and fate of all plastics ever made*, SCIENCE ADVANCES, Jul. 19, 2017, https://plasticoceans.org/wp-

23  content/uploads/2018/05/Production_use_and_fate_of_all_plastics_ever_made.pdf (last accessed Dec. 7, 2020).

24  [10] *Id.*

25  [11] *No Plastic in Nature: Accessing Plastic Ingestion From Nature to People*, WWF, June 2019, https://d2ouvy59p0dg6k.cloudfront.net/downloads/plastic_ingestion_web_spreads.pdf at p. 6 (last accessed Dec. 7, 2020).

26  

27  [12] *The New Plastics Economy Rethinking the Future of Plastics*, ELLEN MACARTHUR FOUNDATION AND MCKINSEY & COMPANY (2016), https://plasticoceans.org/wp-content/uploads/2018/05/EllenMacArthurFoundation_TheNewPlasticsEconomy_Pages.pdf at p.

28  17 (last accessed Dec. 7, 2020).

1  million tons of plastic in 2014, most of which was not recycled.[13]  While California had a goal to

2  achieve a 75% recycling rate by 2020, California's recycling rate is actually in decline.

3  According to CalRecycle, in 2014 California's recycling acceptance rate was 50%, dropping to

4  47% in 2015 and down to 44% in 2016.[14]

5       31.     Recent investigations into the proliferation of plastic pollution plaguing the natural

6  environment have revealed that the plastics industry has known for decades that most products

7  and packaging made from plastic would not be recycled.  On September 11, 2020, NPR published

8  an investigation on the plastic industry proving the industry's decades-long awareness that

9  recycling would not keep plastic products or packaging out of landfills, incinerators,

10  communities, or the natural environment.[15]  In a 1974 speech, one industry insider stated "there is

11  serious doubt that [recycling plastic] can ever be made viable on an economic basis."[16]  Larry

12  Thomas, former president of the Society of the Plastic Industry (known today as the Plastics

13  Industry Association), told NPR that "if the public thinks that recycling is working, then they are

14  not going to be as concerned about the environment."[17]  The NPR investigative report details the

15  length and expense that the plastics industry went to deceive consumers that plastic was easily

16  recyclable, despite knowledge that the cost of recycling would never be economical.  Similarly, a

17  recent CBC news report describes that even the recycling logo was used as a marketing tool to

18  improve the image of plastics after environmental backlash in the 1980s.[18]  "There was never an

19

20

21  [13] *Advancing Sustainable Materials Management: 2014 Fact Sheet*, U.S. EPA, Nov. 2016, https://www.epa.gov/sites/production/files/2016-11/documents/2014_smmfactsheet_508.pdf at p. 2 (last accessed Dec. 7, 2020).

22  [14] *California's Statewide Recycling Rate*, CALRECYCLE, last updated Mar. 3, 2020, https://www.calrecycle.ca.gov/75percent/recyclerate (last accessed Dec. 7, 2020).

23
[15] Lara Sullivan, *How Big Oil Misled The Public Into Believing Plastic Would be Recycled*.
24  NPR.ORG (Sep. 11, 2020, 5:00 AM), https://www.npr.org/2020/09/11/897692090/how-big-oil-misled-the-public-into-believing-plastic-would-be-recycled (last accessed Dec. 7, 2020).

25  [16] *Id.*

26  [17] *Id.*

27  [18] *Recycling was a lie – a big lie – to sell more plastic, industry experts say*, CBC.CA, Sep. 23, 2020, https://www.cbc.ca/documentaries/the-passionate-eye/recycling-was-a-lie-a-big-lie-to-sell-

28  more-plastic-industry-experts-say-1.5735618 (last accessed Dec. 7, 2020).

1   enthusiastic belief that recycling was ultimately going to work in a significant way," yet the

2   plastics industry spent millions on ads to deceive the public as to the efficacy of recycling.[19]

3      32.    After decades of deception from the plastics industry that plastic products and

4   packaging are recyclable, consumers have recently become more aware of the problems

5   associated with single-use plastic as plastic polluting the oceans and the natural environment have

6   become unavoidable.  The staggering amount of plastic pollution accumulating in the

7   environment is accompanied by an array of negative side effects.  For example, plastic debris is

8   frequently ingested by marine animals and other wildlife, which can be injurious, poisonous, and

9   deadly.[20]  Floating plastic is also a vector for invasive species,[21] and plastic that gets buried in

10  landfills can leach harmful chemicals into ground water that is absorbed by humans and other

11  animals.[22]  Plastic litter on the streets and in and around our parks and beaches also degrades the

12  quality of life for residents and visitors.  Scientists have also discovered that plastic releases large

13  amounts of methane, a powerful greenhouse gas, as it degrades.[23]  Thus, plastic pollution

14  contributes to global climate change, which affects California in the form of extreme drought, sea

15  level rise, and more frequent and severe wildfires.[24]

16

17

18  [19] Id.

19  [20] Amy Lusher, et al., *Microplastics in Fisheries and Aquaculture: Status of knowledge on their occurrence and implications for aquatic organisms and food safety*, FAO Fisheries and
20  Aquaculture Technical Paper No. 615, Rome, Italy, 2017 http://www.fao.org/3/a-i7677e.pdf (last accessed Dec. 7, 2020).

21  [21] *Report on Marine Debris as a Potential Pathway for Invasive Species*, NOAA, March 2017, Silver Spring, MD; https://marinedebris.noaa.gov/sites/default/files/publications-
22  files/2017_Invasive_Species_Topic_Paper.pdf (last accessed Dec. 7, 2020)

23  [22] Emma L. Teuten, et *al., Transport and release of chemicals from plastics to the environment and to wildlife*, PHILIOS TRANS R. SOC. LOND. B. BIOL. SCI, July. 27, 2009,
24  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2873017/ (last accessed Dec. 7, 2020).

25  [23] Sarah-Jeanne Rover. et al.. *Production of methane and ethylene from plastic in the environment*, Aug. 1, 2018, PLoS ONE 13(8) e0200574,
26  https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0200574 (last accessed Dec. 7, 2020).

27  [24] *What Climate Change Means for California*, U.S. EPA, Aug. 2016, EPA 430-F-16-007, https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-
28  ca.pdf (last accessed Dec. 7, 2020)

33.     There are various types of plastic resin that are used to produce single-use plastic products and packaging. All rigid plastic bottles and containers sold in California are required to include a molded label code that indicates the resin used to produce the plastic bottle or container. Cal. Pub. Res. Code § 18015. The code generally consists of a number placed inside a triangle to reflect the resin used to make the bottle or container. *Id.* This code is referred to as a Resin Identification Code ("RIC") and can be used to identify seven types of plastic.

34.     PET (plastic #1) and HDPE (plastic #2) are widely considered to be the most recyclable forms of plastic; however, studies indicate that even products and packaging made from these resins often end up in landfills, incinerators, communities, or the natural environment.[25] This is because MRFs in the United States cannot process the sheer volume of single-use plastic that is submitted to recycling facilities on an annual basis.[26] The labor and cost required to sort, melt, and reconstitute the approximately 33 million tons of single-use plastic produced in the United States every year is insurmountable. A recent study by Greenpeace revealed that U.S. recycling facilities can process no more than 23% of PET#1 plastic produced each year and no more than 13% of HDPE#2.[27] More alarmingly, plastics #3-7, which are widely considered to be low-value plastics, are rarely, if ever recycled. The Greenpeace study revealed that MRFs can process only a negligible percentage of plastics #3-7.[28]

35.     Due to the availability of cheap raw materials to make "virgin plastic," there is no market demand for most types of recycled plastic. Using virgin plastic to package and make products is cheaper than other materials because virgin plastic is derived from oil and natural gas. Recognizing the market potential from plastic production, major oil and natural gas companies are increasingly integrating their operations to include production of plastic resins and products,

---

[25] *Facts and Figures about Materials, Waste and Recycling*, U.S. EPA, https://www.epa.gov/facts-and-figures-about-materials-waste-and-recycling/plastics-material-specific-data (last accessed Dec. 7, 2020).

[26] Michael Corkery, *As Costs Skyrocket, More U.S. Cities Stop Recycling*, N.Y. TIMES, Mar. 16, 2019, https://www.nytimes.com/2019/03/16/business/local-recycling-costs.html (last accessed Dec. 7, 2020).

[27] John Hocevar, *supra* note 6.

[28] *Id.*

DOCUMENT PREPARED ON RECYCLED PAPER

1  which further drives down the price of "virgin plastic."[29] As a result, recycling facilities cannot

2  afford the cost of breaking down and reconstituting recycled plastic because there are almost no

3  buyers of the resulting plastic, pellets, or scrap materials.

4      36.    Historically, recycling facilities in the United States shipped plastic scrap to China

5  for recycling. But tons of that shipped plastic waste were never recycled. Instead, they were

6  burned or entered into waterways, where they were carried into the ocean.[30] For years, tons of

7  plastic that U.S. consumers dutifully sorted and transported to recycling facilities ultimately

8  ended up in the ocean or the natural environment. For example, in 2015 China's Yangtze river

9  ranked highest for plastic entering the oceans.[31] That year, 333,000 tons of plastic were deposited

10  into the ocean from the Yangtze river, more than double the amount for the river with the next

11  highest amount.[32]

12      37.    In February 2013, based on the high amounts of low-value and contaminated

13  plastics shipped there, China enacted Operation Green Fence, an aggressive inspection effort

14  aimed at curtailing the amount of contaminated recyclables and waste that was being sent to

15  China.[33] China began inspecting 70 percent of imported containers filled with recyclables and

16  started cracking down on shippers and recyclers for shipping low-value and contaminated plastic

17

18

19  [29] *Fueling Plastics: Fossils, Plastics, & Petrochemical Feedstocks.* CIEL.ORG (Sep. 2017)
20  https://www.ciel.org/wp-content/uploads/2017/09/Fueling-Plastics-Fossils-Plastics-
    Petrochemical-Feedstocks.pdf (last accessed Dec. 7, 2020).
21  [30] Christopher Joyce, *Where Will Your Plastic Trash Go Now that China Doesn't Want it?*,
    NPR.ORG (Mar. 13, 2019, 4:28 PM ET),
22  https://www.npr.org/sections/goatsandsoda/2019/03/13/702501726/where-will-your-plastic-trash-
    go-now-that-china-doesnt-want-it (last accessed Dec. 7, 2020); *see also Discarded: Communities*
23  *on the Frontlines of the Global Plastic Crisis,* GAIA, Apr. 2019, https://wastetradestories.org/wp-
    content/uploads/2019/04/Discarded-Report-April-22.pdf (last accessed Dec. 7, 2020).
24  [31] Laurent C.M. Lebreton, et al., *River plastic emissions to the world's oceans*, NAT. COMMUN.
25  Jun. 7, 2017, 8:15611, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5467230/ (last accessed
    Dec. 7, 2020).
26  [32] *Id.*
27  [33] *What Operation Green Fence Has Meant for Recycling*, WASTE 360,
    https://www.waste360.com/business/what-operation-green-fence-has-meant-recycling (last
28  accessed Dec. 7, 2020).

waste.[34] Despite manufacturers' and recyclers' awareness of China's refusal to accept low-value and contaminated plastic, the U.S. continued to export most of its plastic waste to China. By 2016, the U.S. was exporting almost 700,000 tons a year of plastic waste to China.[35]

38. In February 2017, in response to the continued shipment of low-value and contaminated plastic waste, China announced its National Sword policy, which banned the importation of certain solid waste and set strict contamination limits on recyclable material. Because of the National Sword policy, end markets for recycling plastics #3-7 have essentially vanished.[36] One year after China's National Sword Policy, China's plastics imports plummeted by 99 percent.[37] Recycling companies can no longer sell used plastic at prices that cover their processing cost, providing them with no incentive to do so.

39. The writing has been on the wall that China would refuse to accept low-value and contaminated plastic waste since 2013. Nonetheless, aware of consumers' interests in protecting the environment, Defendants have increased their labeling of Products as recyclable. Defendants have done so despite widespread acknowledgment that end markets for plastic waste have been shrinking and that the majority of plastic labeled as recyclable ends up in landfills, incinerators, communities, and the natural environment. Defendants have announced that they are working with their suppliers to achieve 100% recyclable, reusable, or industrially compostable packaging in all of their private brand products by 2025.[38] By seeking to label many of their private brand

---

[34] *Id.*

[35] Christopher Joyce, *supra* note 30.

[36] Liz Zarka, *Recycling's Sword of Damocles*, EAST BAY EXPRESS, Mar. 21, 2019, https://m.eastbayexpress.com/oakland/recyclings-sword-of-damocles/Content?oid=26354842 (last accessed Dec. 7, 2020); *see also* Cheryl Katz., *Piling Up: How China's Ban on Importing Waste Has Stalled Global Recycling*, YALE ENVIRONMENT 360, Mar. 7, 2019, *available at:* https://e360.yale.edu/features/piling-up-how-chinas-ban-on-importing-waste-has-stalled-global-recycling (last accessed Dec. 7, 2020).

[37] Cheryl Kats, *supra* note 36.

[38] *Environmental Highlights*, WALMART, INC., https://corporate.walmart.com/esgreport/environmental/#our-environmental-goals, (last accessed Dec. 7, 2020); *see also Walmart Announces New Plastics Packaging Waste Reduction Commitments*, WALMART, INC., https://corporate.walmart.com/newsroom/2019/02/26/walmart-announces-new-plastic-packaging-waste-reduction-commitments. (last accessed Dec. 7, 2020)

1  products as recyclable, and by announcing their initiatives to label their Products as recyclable to

2  consumers, Defendants are actively participating and controlling the false, misleading, and

3  deceptive practices alleged herein.

4       40.    In their haste to lure customers to environmentally friendly products and

5  packaging, Defendants are making environmental marketing claims that are false, misleading, and

6  deceptive.  The claims made by Defendants that the Products are recyclable are consistent and are

7  material to a reasonable consumer.  Because the claims are false and misleading, ordinary

8  consumers are likely to be deceived by such representations.

9       41.    Below are examples of recyclable representations on the labels of Products made

10  from plastics #3-7:





DOCUMENT PREPARED
ON RECYCLED PAPER

1      42.     Products made from plastics #3-7 are not recyclable because such Products are

2  rarely, if ever, recycled.  The inability for MRFs in the United States to recycle plastics #3-7 is

3  well documented.[39]  According to survey data, less than 5% of polypropylene ("PP" or plastic #5)

4  tubs are reprocessed into recyclable material.[40]  The majority of MRFs in the United States group

5  plastics #3-7 into bales of mixed plastic because such plastics have little value, especially when

6  compared to plastics #1 and #2.  Thus, MRFs do not sort individual materials, such as PP or

7  polystyrene ("PS" or plastic #6), into separate bales.  And since the value of plastics #3-7 is so

8  low, there is no end market to reuse such plastic or convert such plastic into reusable material that

9  can be used to manufacture or assemble other goods.  Ultimately, the majority of plastics #3-7 are

10  sent to the landfill.  For example, ReThink Waste, a public agency that operates the Shoreway

11  MRF in San Carlos, California stated that "plastics #3-7 are all versions of hard plastic that are

12  very difficult to recycle," because "there is currently no market for the material when it is

13  deconstructed."[41]  The Shoreway MRF continues to accept plastics #3-7 but states that the

14  collected material is sent to the landfill.[42]

15      43.     Although MRFs may still accept plastics #3-7, the reality is that the Products are

16  not recycled.  One reason MRFs accept items even though they are not recyclable is due to

17  pressure from local authorities to meet solid waste diversion goals.  This phenomenon has been

18  recognized by the FTC.  In promulgating the most recent version of the Green Guides, the FTC

19  stated (under the heading "Packages Collected for Public Policy Reasons but Not Recycled"),

20  "The Commission agrees that unqualified recyclable claims for categories of products that

---

[39] John Hocevar, *supra* note 6; *America's 'recycled' plastic waste is clogging landfills, survey finds*. THE GUARDIAN, Feb. 18, 2020, https://www.theguardian.com/us-news/2020/feb/18/americas-recycled-plastic-waste-is-clogging-landfills-survey-finds (last accessed Dec. 7, 2020); *Americans' plastic recycling is dumped into landfills, investigation shows*, THE GUARDIAN, Jun. 21, 2019, https://www.theguardian.com/us-news/2019/jun/21/us-plastic-recycling-landfills (last accessed Dec. 7, 2020); Gwynn Guilford, *A lot of US plastic isn't actually being recycling since China put up its Green Fence*, QUARTZ, Sep. 16, 2013, https://qz.com/122003/plastic-recycling-china-green-fence/ (last accessed Dec. 7, 2020).
[40]John Hocevar, *supra* note 6.

[41] *Id.* at p. 8.

[42] *Id.*

DOCUMENT PREPARED
ON RECYCLED PAPER

1   municipal recycling programs collect, but do not actually recycle, may be deceptive.  To make a

2   non-deceptive unqualified claim, a marketer should substantiate that a substantial majority of

3   consumers or communities have access to facilities that will actually recycle, not accept and

4   ultimately discard, the product.  As part of this analysis, a marketer should not assume that

5   consumers or communities have access to a particular recycling program merely because the

6   program will accept a product."[43]  Thus, although the Products may be accepted for recycling by

7   some curbside programs, MRFs do not collect, sort, and separate such low-value plastics because

8   there is no end market to reuse such items or convert them into reusable material

9       44.   Because the Products are rarely, if ever, recycled, Defendants cannot make any

10  recycling claims as to these Products.  However, at a minimum, Defendants are required to

11  clearly and prominently qualify recyclable claims to avoid deception about the availability of

12  recycling programs and collection sites to consumers.  16 C.F.R. § 260.12(b).  Under the Green

13  Guides, marketers may qualify recyclable claims by stating the percentage of consumers or

14  communities that have access to facilities that recycle the item.  *Id.* § 260.12(b)(2).  In the

15  alternative, marketers may use qualifications that vary in strength depending on facility

16  availability.  *Id.*  Thus, the strength of the qualification depends on the level of access to an

17  appropriate facility capable of actually recycling the Product.  A marketer may only make an

18  unqualified recyclable claim if a substantial majority of consumers or communities have access to

19  recycling facilities capable of recycling the items.[44]  *Id.* § 260.12(b)(1).  Because few, if any,

20  consumers have access to recycling facilities capable of recycling the Products, Defendants must

21  provide an unequivocally strong qualification for any recyclability claim regarding such Products.

22      45.   Here, Defendants provided no qualifications for some of the Products.  For other

23  Products, Defendants provided the same two fine print qualifications for each Product: "check

24  locally" and "not recycled in all communities."  As an initial matter, the fine print is

---

[43] FED. TRADE COMM'N, The Green Guides Statement of Basis and Purpose, (2012) *available at*:
https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf (referenced in 77 Fed. Reg. 197, 62122 (Oct. 11, 2012)), at pp. 174-175.

[44] A "substantial majority" means at least 60 percent.  16 C.F.R. § 260.12(b)(1).

approximately 2-point font, making it difficult for consumers to notice, yet alone read.  In

addition, as stated above, a "check locally" disclaimer is per se deceptive under the Green Guides.

*Id.,* § 260.12(d), Example 4.  Moreover, the "not recycled in all communities" qualification does

not satisfy the safe harbor examples in the Green Guides because it does not inform consumers of

the limited availability of recycling programs for the Products.  *Id.*  A reasonable consumer is

likely to believe that if their community has a recycling program, then the Products are likely

recyclable in their community.  By including the language "check locally" and "not recycled in

all communities" together, Defendants are incorrectly implying that consumers need only check

locally to determine whether recycling facilities exist in their community, not whether the

recycling facilities in their community actually recycle the Products.  The FTC has explicitly

stated such an implication is deceptive. *See* 63 Fed. Reg. 84, 24244 (May 1, 1998); 16 C.F.R. §

260.12(b)(2).  Worse yet, even if a consumer followed Defendants' directive to check locally to

determine whether a facility actually recycled the Products, many recycling facilities (which are

often operated by private companies) have no duty to provide such information and are unwilling

to answer detailed consumer inquiries about their recycling capabilities.  In sum, Defendants'

recyclable representations on the Products are false, misleading, and deceptive to reasonable

consumers.

46.     Defendants also sell Products that do not contain a RIC and are therefore made

from unidentified plastic.  Nonetheless, Defendants also state that these Products are recyclable.

Below is an example of a false, misleading, and deceptive label on a Product sold by Defendants

that is made from an unidentified plastic:



DOCUMENT PREPARED
ON RECYCLED PAPER

47.     Here, the unidentified plastic contains the fine print qualifications "check locally" and "not recycled in all communities." These fine print qualifications are deceptive because even if a consumer understood the qualifications to mean that they are required to check with their local recycling facilities to determine whether the Products can be recycled, it is impossible for them to take such actions because there is no way for a consumer to determine what type of plastic resin the Products are made from. And even if a MRF was willing to answer a consumer's questions, a consumer would not be able to ask whether an unidentified plastic material is recyclable. Without a RIC, a MRF could not accept the Product for recycling nor could it properly collect, sort, or segregate such Products from the waste stream. And since a MRF could not accept or sort the Product, there is no end market for unidentified plastics. In sum, representations that unidentified plastic Products are recyclable and that consumers need only "check locally" to determine whether the Products are recyclable are deceptive.

48.     Some of Defendants' Products are packaged in a shrink sleeve that prevent the Products from being recyclable. Below is an example of a recyclable representation on a Product packaged in a shrink sleeve:



49.     These Products are not recyclable because the plastic shrink sleeve cannot be recycled. The Green Guides are clear: "if any component significantly limits the ability to recycle the item, any recyclable claim would be deceptive. An item that is made from recyclable material, but because of its shape, size or some other attribute is not accepted in recycling

1  programs, should not be marketed as recyclable." 16 C.F.R. § 260.12(d).  Here, these Products

2  contain a plastic shrink sleeve that is not recyclable and that is difficult and dangerous to remove.

3  The shrink sleeves are wrapped tightly around the Products, thereby requiring consumers to use a

4  knife or sharp object to cut the shrink sleeve free from the Products.  Due to the difficulty in

5  removing the shrink sleeves, most consumers are unwilling to remove the shrink sleeves from the

6  Products prior to placing the Products in their recycling bins.  And if consumers do not cut the

7  shrink sleeve from the Products, recycling programs will not accept the Products for recycling,

8  and therefore the Products will not be sorted nor are end markets available.  Most consumers

9  believe that if their municipality offers recycling services, then all products marketed as

10  "recyclable" can be recycled.  Thus, most consumers will place the Products in the recycling bin

11  without removing the shrink sleeve under the false impression that the Products can be recycled,

12  when the Products cannot in fact be recycled with the plastic shrink sleeve.  Representing that

13  Products packaged in a shrink sleeve are recyclable is therefore deceptive to reasonable

14  consumers.

15      50.      Lastly, Defendants sell numerous Products packaged in plastic film that contain a

16  store drop-off representation despite the limited availability of such programs.  Below is an

17  example of a recyclable representation on such a Product:



DOCUMENT PREPARED
ON RECYCLED PAPER

1      51.     These Products cannot be recycled by established recycling programs.  Rather, the
2    packaging must be dropped off at participating stores.  This is because plastic bags and film
3    cannot be separated for recycling.  The Green Guides specifically warn about plastic trash bags:
4    "Because trash bags ordinarily are not separated from other trash at the landfill or incinerator for
5    recycling, they are highly unlikely to be used again for any purpose.  Even if the bag is
6    technically capable of being recycled, the claim is deceptive since it asserts an environmental
7    benefit where no meaningful benefit exists."  16 C.F.R. § 260.3(c), Example 2.  Although the fine
8    print representations on these Products communicate that the Products must be "dropped off" to
9    be recyclable, many of Defendants' stores do not accept the Products for recycling.  In the past,
10    California required supermarkets of a certain size to maintain a plastic carryout bag collection
11    bin, but that rule expired on January 1, 2020.  *See* California Public Resources Code § 42257.
12    Consequently, many retail stores in California, including Defendants' stores, no longer accept
13    plastic bags for drop-off recycling.  For instance, according to an informal survey, 6 of 8 of
14    Defendants' stores in South Orange County do not have takeback bins to recycle plastic film.
15    According to Defendants' own data, they only provide access to in-store plastic bag and film
16    recycling bins in approximately half of their stores (Defendants maintain roughly 5,353 retail
17    stores nationwide, but only provide drop-off locations at approximately 2,900 locations).[45]

18      52.     In addition, a 2017 report on Film Recycling Investment found that only 7% of
19    retail bags that are available for recycling are returned by residents for recycling.[46]  That report
20    further found that of the approximately 300 million pounds of plastic film that MRFs receive a
21    year, only 10 million pounds (approximately 3%) are able to be marketed due to the poor quality
22    of plastic film and the lack of recycling markets for such low-value plastic.  Due to the lack of
23    recycling markets for plastic film, 93% of California MRFs do not even accept it, and the MRFs
24    that do accept it do not have the capacity to recycle large quantities of plastic film.  Based on
25

26   [45] *2020 Environmental, Social and Governance Report*, WALMART, INC.,
https://cdn.corporate.walmart.com/90/0b/2271 5fd34947927eed86a72c788e/walmart-esg-report-
2020.pdf, (last accessed Dec. 7, 2020).
27
[46] *Film Recycling Investment Report*, prepared by RSE USA, THE CLOSED LOOP FOUNDATION
28   (2017), at p. 19.

these data, even if more consumers returned plastic bag film for drop-off recycling, California MRFs do not have the capacity to sort and recycle it. Thus, the representation that these Products are recyclable if dropped off fails to communicate the limited availability of both drop-off sites and programs capable of actually recycling the Products in violation of the Green Guides. Ultimately, Products packaged in plastic film are not accepted by most MRFs nor can they be collected, sorted, or separated from the general waste stream. Consequently, there is no end market to recycle such Products.

53.     One of the major problems associated with mislabeling Products as recyclable is that this can lead to contaminating the recycling stream with unrecyclable materials that will hinder the ability of recycling facilities to process items that are legitimately recyclable. For instance, according to the Recycling Partnership, "plastic bags cause MRF operators to shut down the recycling line many times a day to cut off bags that have wrapped around equipment. This maintenance shut down reduces throughput for a facility, raises cost of labor to sort materials and maintain equipment, increases waste coming out of the MRF, and puts workers at risk of injury when they are performing maintenance."[47] By encouraging consumers to place the Products in recycling bins, Defendants are contaminating the recycling stream with unrecyclable materials that prevents legitimately recyclable materials from being recycled. Environmentally motivated consumers who purchase the Products in the belief that they are recyclable are thus unwittingly hindering recycling efforts.

54.     Many environmentally motivated consumers purchase the Products from Defendants based on the belief that the Products will be recycled. These consumers have no way of knowing whether the Products are actually segregated from the general waste stream, cleaned of contamination, or reused or converted into a material that can be reused or used in manufacturing or assembling another item. These consumers place a high priority on environmental concerns in general, and on the negative consequences regarding the proliferation

---

[47] Asami Tanimoto, *West Coast Contamination Initiative Research Report*, THE RECYCLING PARTNERSHIP, Apr. 2020, https://recyclingpartnership.org/wp-content/uploads/2020/04/The-Recycling-Partnership_WCCI-Report_April-2020_Final.pdf at p. 13 (last accessed Dec. 7, 2020).

1  of plastic pollution in particular.  Based on the labeling and advertising of Defendants' Products,

2  reasonable consumers believe that the Products are recyclable.  Defendants' representations that

3  the Products are recyclable are thus material to reasonable consumers.

4     55.    Greenpeace's mission is to protect the natural environment and expose

5  environmental harms to the public.  Given that many consumers actively seek to purchase

6  recyclable products because they are environmentally conscious and reasonable consumers

7  believe that Products labeled as recyclable will likely be recycled, Defendants' false, misleading,

8  and deceptive recyclable claims on the Products have frustrated Greenpeace's mission.

9  Greenpeace has diverted significant resources and staff time in response to this frustration of

10 purpose by evaluating the problems associated with the proliferation of plastic pollution,

11 investigating Defendants' recyclable representations, publishing a report on Defendants'

12 recyclable label initiative, communicating with Defendants, and informing its supporters and the

13 public with respect to Defendants' false, misleading, and deceptive recycling labels.

14    56.    Defendants are aware that the Products are not recyclable, including under their

15 own definition of recyclability, yet Defendants have not undertaken any effort to notify their

16 customers of the problem.  Defendants' failure to disclose that the Products are not recyclable is

17 an omission of fact that is material to reasonable consumers.

18 **FIRST CAUSE OF ACTION**

19 **(Plaintiff Alleges Violations of California Business & Professions Code § 17200,**
   **_et seq._ Based on Fraudulent Acts and Practices)**

20

21    57.    Plaintiff incorporates by reference the allegations set forth above.

22    58.    Under Business & Professions Code § 17200, any business act or practice that is

23 likely to deceive members of the public constitutes a fraudulent business act or practice.

24    59.    Defendants have engaged and continue to engage in conduct that is likely to

25 deceive members of the public.  This conduct includes, but is not limited to, representing that the

26 Products are recyclable.

27

28

-25-

COMPLAINT

1    60.    Plaintiff has no adequate remedy at law for the injuries currently being suffered as

2    an award of monetary damages would not prohibit Defendants' false, misleading, and deceptive

3    statements.

4    61.    Defendants' claims that the Products are recyclable are material, untrue, and

5    misleading. These recyclable claims are prominent on all of Defendants' marketing, advertising,

6    and labeling materials, even though Defendants are aware that the claims are false and

7    misleading. Defendants' claims are thus likely to deceive a reasonable consumer. Greenpeace

8    investigated Defendants' recyclable representations because part of Greenpeace's mission is to

9    ensure that consumers are not misled by environmental marketing claims. In furtherance of this

10   mission and as part of Greenpeace's investigation, Greenpeace diverted resources from other

11   programs in order to specifically investigate Defendants' representations that the Products are

12   recyclable. In particular, Greenpeace utilized extensive staff time and expended substantial

13   resources to understand the issue of plastic pollution and investigate Defendants' role in the

14   proliferation of plastic waste. Greenpeace would not have diverted such resources but for

15   Defendants' false representations that the Products are recyclable. Greenpeace has thus suffered

16   injury in fact and lost money or property as a direct result of Defendants' misrepresentations and

17   material omissions.

18   62.    By committing the acts alleged above, Defendants have engaged in fraudulent

19   business acts and practices, which constitute unfair competition within the meaning of Business

20   & Professions Code § 17200.

21   63.    An action for injunctive relief is specifically authorized under Business &

22   Professions Code § 17203.

23   Wherefore, Plaintiff prays for judgment against Defendants, as set forth hereafter.

24   **SECOND CAUSE OF ACTION**

25   **(Plaintiff Alleges Violations of California Business & Professions Code § 17200, *et seq.*
     Based on Commission of Unlawful Acts)**

26

27   64.    Plaintiff incorporates by reference the allegations set forth above.

28

1    65.    The violation of any law constitutes an unlawful business practice under Business

2  & Professions Code § 17200.

3    66.    Defendants' conduct violates Section 5 of the Federal Trade Commission Act

4  ("FTC Act"), 15 U.S.C. § 45, which prohibits unfair methods of competition and unfair or

5  deceptive acts or practices in or effecting commerce.  By misrepresenting that the Products are

6  recyclable, Defendants are violating Section 5 of the FTC Act.

7    67.    Defendants' conduct also violates California Business & Professions Code

8  § 17500, which prohibits knowingly making, by means of any advertising device or otherwise,

9  any untrue or misleading statement with the intent to sell a product or to induce the public to

10  purchase a product.  By misrepresenting that the Products are recyclable, Defendants are violating

11  Business & Professions Code § 17500.

12    68.    Defendants' conduct also violates California Business & Professions Code

13  § 17580.5, which makes it unlawful for any person to make any untruthful, deceptive, or

14  misleading environmental marketing claim.  Pursuant to § 17580.5, the term "environmental

15  marketing claim" includes any claim contained in the Green Guides. 16 C.F.R. § 260.1, *et seq.*

16  Under the Green Guides, "[i]t is deceptive to misrepresent, directly or by implication, that a

17  product or package is recyclable.  A product or package shall not be marketed as recyclable

18  unless it can be collected, separated, or otherwise recovered from the waste stream through an

19  established recycling program for reuse or use in manufacturing or assembling another item." 16

20  C.F.R. § 260.12(a).  By misrepresenting that the Products are recyclable as described above,

21  Defendants are violating Business & Professions Code § 17580.5.

22    69.    By violating the FTC Act, Business & Professions Code §§ 17500 and 17580.5,

23  and the California Public Resources Code, Defendants have engaged in unlawful business acts

24  and practices which constitute unfair competition within the meaning of Business & Professions

25  Code § 17200.

26    70.    Plaintiff has no adequate remedy at law for the injuries currently being suffered as

27  an award of monetary damages would not prohibit Defendants' unlawful acts.

28

DOCUMENT PREPARED
ON RECYCLED PAPER

71.     Greenpeace investigated Defendants' recyclable representations because part of Greenpeace's mission is to ensure that consumers are not misled by environmental marketing claims. In furtherance of this mission and as part of Greenpeace's investigation, Greenpeace diverted resources from other programs in order to specifically investigate Defendants' representations that the Products are recyclable. In particular, Greenpeace utilized extensive staff time and expended substantial resources to understand the issue of plastic pollution and investigate Defendants' role in the proliferation of plastic waste. Greenpeace would not have diverted such resources but for Defendants' false representations that the Products are recyclable. Greenpeace has thus suffered injury in fact and lost money or property as a direct result of Defendants' misrepresentations and material omissions.

72.     An action for injunctive relief is specifically authorized under Business & Professions Code § 17203.

Wherefore, Plaintiff prays for judgment against Defendants, as set forth hereafter.

## THIRD CAUSE OF ACTION

**(Plaintiff Alleges Violations of California Business & Professions Code § 17200, *et seq.* Based on Unfair Acts and Practices)**

73.     Plaintiff incorporates by reference the allegations set forth above.

74.     Under California Business & Professions Code § 17200, any business act or practice that is unethical, oppressive, unscrupulous, or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

75.     Defendants have engaged and continue to engage in conduct which is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. This conduct includes, but is not limited to, advertising and marketing the Products as recyclable when they are not. By taking advantage of consumers concerned about the environmental impacts of plastic pollution, Defendants' conduct, as described herein, far outweighs the utility, if any, of such conduct.

76.     Defendants have engaged and continue to engage in conduct that violates the legislatively declared policy of Cal. Pub. Res. Code § 42355.5 against deceiving or misleading consumers about the environmental impact of plastic products.

77.     Defendants' conduct also violates the policy of the Green Guides. The Green Guides mandate that "[a] product or package shall not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item." 16 C.F.R. § 260.12(a). It further states that "[a]n item that is made from recyclable material, but because of its shape, size or some other attribute is not accepted in recycling programs, should not be marketed as recyclable." 16 C.F.R. § 260.12(d). As explained above, the Products cannot be recycled or are rarely, if ever, recycled. Nonetheless, some recycling facilities may accept the Products even though they send the Products to a landfill. The FTC has recognized that facilities may accept Products for recycling even though they end up in a landfill because of pressure from local authorities to meet solid waste diversion goals.[48] It is unfair for Defendants to make a recyclable claim based on the fact that some recycling facilities may accept the Products, despite the recycling facilities' inability to actually recycle the Products. Moreover, consumers believe that products are recyclable when they are accepted by a recycling program, even if the recycling facilities end up sending the products to a landfill. It is also unfair for Defendants to represent that some Products are recyclable via store drop-off, without actually requiring a significant amount of their retail stores to maintain a store drop-off bin. Taking advantage of consumer perception in this manner violates the policy of the Green Guides.

78.     Defendants' conduct, including failing to disclose that the Products will end up in landfills, incinerators, communities, and the natural environment and not be recycled, is substantially injurious to consumers. Such conduct has caused and continues to cause substantial injury to consumers because consumers would not have purchased the Products but for Defendants' representations that the Products are recyclable. Consumers are concerned about

---

[48] FED. TRADE COMM'N, *supra* note 43.

DOCUMENT PREPARED
ON RECYCLED PAPER

1   environmental issues in general and plastic pollution in particular and Defendants' representations

2   are therefore material to such consumers.  Misleading consumers causes injury to such consumers

3   that is not outweighed by any countervailing benefits to consumers or competition.  Indeed, no

4   benefit to consumers or competition results from Defendants' conduct.  Defendants gain an unfair

5   advantage over their competitors, whose advertising must comply with Cal. Pub. Res. Code §

6   42355.5, the FTC Act, Cal. Business & Professions Code § 17508, and the Green Guides.  Since

7   consumers reasonably rely on Defendants' representations of the Products and injury results from

8   ordinary use of the Products, consumers could not have reasonably avoided such injury.

9       79.    Although Defendants know that the Products are not ultimately recycled,

10  Defendants failed to disclose that fact to their customers.

11      80.    By committing the acts alleged above, Defendants have engaged in unfair business

12  acts and practices which constitute unfair competition within the meaning of California Business

13  & Professions Code § 17200.

14      81.    Plaintiff has no adequate remedy at law for the injuries currently being suffered as

15  an award of monetary damages would not prohibit Defendants' unfair business acts and practices.

16      82.    An action for injunctive relief is specifically authorized under California Business

17  & Professions Code § 17203.

18      83.    Greenpeace investigated Defendants' recyclable representations because part of

19  Greenpeace's mission is to ensure that consumers are not misled by environmental marketing

20  claims.  In furtherance of this mission and as part of Greenpeace's investigation, Greenpeace

21  diverted resources from other programs in order to specifically investigate Defendants'

22  representations that the Products are recyclable.  In particular, Greenpeace utilized extensive staff

23  time and expended substantial resources to understand the issue of plastic pollution and

24  investigate Defendants' role in the proliferation of plastic waste.  Greenpeace would not have

25  diverted such resources but for Defendants' false representations that the Products are recyclable.

26  Greenpeace has thus suffered injury in fact and lost money or property as a direct result of

27  Defendants' misrepresentations and material omissions.

28      Wherefore, Plaintiff prays for judgment against Defendants, as set forth hereafter.

1

## **PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiff has no adequate remedy at law and prays for judgment and relief

3  against Defendants as follows:

4      A.      That the Court preliminarily and permanently enjoin Defendants from conducting

5  their business through the unlawful, unfair, or fraudulent business acts or practices, untrue and

6  misleading advertising, and other violations of law described in this Complaint;

7      B.      That the Court order Defendants to conduct a corrective advertising and

8  information campaign advising consumers that the Products do not have the characteristics, uses,

9  benefits, and qualities Defendants have claimed;

10      C.      That the Court order Defendants to cease and refrain from marketing and

11  promotion of the Products that state or imply that the Products are recyclable;

12      D.      That the Court order Defendants to implement whatever measures are necessary to

13  remedy the unlawful, unfair, or fraudulent business acts or practices, untrue and misleading

14  advertising, and other violations of law described in this Complaint;

15      E.      That the Court grant Plaintiff its reasonable attorneys' fees and costs of suit

16  pursuant to California Code of Civil Procedure § 1021.5, the common fund doctrine, or any other

17  appropriate legal theory; and

18      F.      That the Court grant such other and further relief as may be just and proper.

19

20

21

22

23

24

25

26

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

COMPLAINT

1

## JURY DEMAND

2

Plaintiff demands a trial by jury on all causes of action so triable.

3

4      Dated:     December 14, 2020                    Respectfully submitted,

5
                                                       LEXINGTON LAW GROUP
6

7

8                                                      Howard Hirsch (State Bar No. 213209)
                                                       Ryan Berghoff (State Bar No. 308812)
9                                                      Meredyth Merrow (State Baw No. 328337)
                                                       LEXINGTON LAW GROUP
10                                                     503 Divisadero Street
                                                       San Francisco, CA 94117
11                                                     Telephone: (415) 913-7800
                                                       Facsimile: (415) 759-4112
12                                                     hhirsch@lexlawgroup.com
                                                       rbergoff@lexlawgroup.com
13                                                     mmerrow@lexlawgroup.com
14
                                                       Attorneys for Plaintiff
15                                                     GREENPEACE, INC.
16

17

18

19

20

21

22

23

24

25

26

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

COMPLAINT