1   LEXINGTON LAW GROUP
    Howard Hirsch, State Bar No. 213209
2   Ryan Berghoff, State Bar No. 308812
    Meredyth Merrow, State Bar No. 328337
3   503 Divisadero Street
    San Francisco, CA 94117
4   Telephone: (415) 913-7800
    Facsimile: (415) 759-4112
5   hhirsch@lexlawgroup.com
    rberghoff@lexlawgroup.com
6   mmerrow@lexlawgroup.com

7   LAW OFFICE OF GIDEON KRACOV
    Gideon Kracov, State Bar No. 179815
8   801 S. Grand Ave., 11th Floor
    Los Angeles, CA 90017
9   Telephone: (213) 629-2071
    Facsimile: (213) 623-7755
10  gk@gideonlaw.net

11  Attorneys for Plaintiff
    GREENPEACE, INC.

12

13

14              **UNITED STATES DISTRICT COURT**

15      **NORTHERN DISTRICT OF CALIFORNIA - OAKLAND**

16

17

    GREENPEACE, INC.,                    Case No. 3:21-CV-00754-MMC
18
                    Plaintiff,           **FIRST AMENDED COMPLAINT**
19
        v.
20
    WALMART INC,
21
                    Defendant.
22

23

24

25

26

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

1    Plaintiff Greenpeace, Inc. ("Plaintiff" or "Greenpeace"), based on information, belief, and

2    investigation of its counsel, except for information based on knowledge, hereby alleges:

3    **<u>INTRODUCTION</u>**

4    1.    The problems associated with plastic pollution are increasing on a local, national,

5    and global scale.  This affects the amount of plastic in the ocean, in freshwater lakes and streams,

6    on land, and in landfills.  Nearly 90% of plastic waste is not recycled, with billions of tons of

7    plastic becoming trash and litter.[1]  According to a new study, at least 1.2 to 2.5 million tons of

8    plastic trash from the United States were dropped on lands, rivers, lakes and oceans as litter, were

9    illegally dumped, or were shipped abroad and then not properly disposed of.[2]  As consumers

10    become increasingly aware of the problems associated with plastic pollution, they are

11    increasingly susceptible to marketing claims reassuring them that the plastic used to make and

12    package the products that they purchase is recyclable.  Many consumers concerned with the

13    proliferation of plastic pollution actively seek to purchase products and packaging that are either

14    compostable or recyclable to divert such waste from the ocean, their communities, landfills, and

15    incinerators.  Seeking to take advantage of consumers' concerns, defendant Walmart, Inc.

16    ("Defendant") markets and sells a variety of single-use plastic products and packaging that are

17    labeled as recyclable, when such plastic is rarely, if ever, recycled.

18    2.    This Complaint seeks to remedy Defendant's unlawful, unfair, and deceptive

19    business practices with respect to the advertising, marketing, and sales of plastic products or

20    plastic packaging that are: (A) made from plastics #3-7 or unidentified plastic; (B) sold under

---

[1] Tom Udall and Alan Lowenthal, *Op-Ed: More than 90% of U.S. plastic waste is never recycled. Here's how we can change that*, L.A. TIMES (Feb. 21, 2020, 3:01 AM) https://www.latimes.com/opinion/story/2020-02-21/plastic-waste-never-recycled-u-s (last accessed Dec. 7, 2020).

[2] Associated Press, *Study: 1 to 2 million tons a year of U.S. plastic trash goes astray*, L.A. TIMES (Oct. 30, 2020, 11:03 AM) https://www.latimes.com/world-nation/story/2020-10-30/study-1-to-2-million-tons-of-us-plastic-trash-goes-astray (last accessed Dec. 7, 2020).

DOCUMENT PREPARED ON RECYCLED PAPER

Defendant's own private label brands;[3] and (C) labeled as "recyclable" (the "Products").[4]  The Products are advertised, marketed, and sold as recyclable.  However, the Products are not in fact recyclable because consumers do not have access to recycling programs that accept the Products, the Products cannot be separated or recovered from the general waste stream and sorted into the correct materials bale by material recovery facilities ("MRFs"), and there are no end markets to reuse the Products or to convert the Products into a material that can be reused or used in manufacturing or assembling another item.  Despite Defendant's extensive marketing and advertising of the Products as recyclable, most of the Products typically end up in landfills, incinerators, communities, or the natural environment.  Defendant's representations that the Products are recyclable are material, false, misleading, and likely to deceive members of the public.  These representations also violate California's legislatively declared policy against misrepresenting the environmental attributes of products.

3.    Defendant thus violated and continues to violate California's Unfair Competition Law ("UCL"), Business and Profession Code § 17200, *et seq.*, based on fraudulent, unlawful and unfair acts and practices, as well as the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* and the Environmental Marketing Claims Act, Cal. Bus. & Prof. Code § 17580.5.

---

[3] Examples of Defendant's private label brands include, but are not limited to: Great Value, Allswell, Atheletic Works, Bonobos, Equate, EV1, Everstart, George, Holiday Time, Mainstays, Marketside, No Boundaries, Onn, Ozark Trail, Parent's Choice, Scoop, SwissTech, Time and Tru, and Wonder Nation.

[4] Non-exclusive examples of the Products include, but are not limited to: Great Value Organic Cinnamon Applesauce Cups, 24 oz, 6 Count, Walmart #556055661, UPC No. 0-7874213534-2, Product No. 136051; Great Value Diced Mangos In 100% Juice, 4 oz, 4 Count, Walmart #562987172, UPC No. 0-7874215803-7, Product No. 142059; Great Value Organic Diced Peaches & Pears, 16 oz., 4 Count, Walmart #562987178, UPC No. 0-7874223615-5, Product No. 142059; Great Value Premium Forks, 48 Count, Walmart #438491, UPC No. 0-7874211675-4, Product No. 042499; Great Value Premium Clear Cutlery Knives, 48 Count, Walmart #438505, UPC No. 0-7874211670-9, Product No. 042499; Great Value Premium Assorted Silver Cutlery, 36 count, Walmart #565175504; Great Value Snack Cups, 9 oz, 80 Count, Walmart #443461, UPC No. 0-681131925532, Manufacturer No. 6386717; Great Value Everyday Party Cups, 18 oz, 20 Count, Walmart #443482, UPC No. 0-78742049090, Manufacturer No. 6386484; Great Value Extra Virgin Olive Oil Cooking Spray, 7 oz., 3 Pack, UPC No. 0-7874206043-9, Product No. 928333; Great Value Ultimate Fresh Scent Booster, Blooming Lavender, 14.8 oz, Walmart #575777817, UPC No. 0-7874233153-9, Product No. 03604; and Great Value Plastic Party Cups, 18 oz, 120 Count, Walmart #557007144, UPC No. 0-7874218708-2, Product No. 437462.

4.     Plaintiff has no adequate remedy at law for the injuries currently being suffered as an award of monetary damages would not prohibit Defendant's false, misleading, and deceptive statements in California.  If an injunction is not granted, Plaintiff will suffer irreparable injury because it will continue to spend money, staff time and other organizational resources to combat Defendant's false and misleading representations in California and to inform the public that the Products are not recyclable in California.  In addition, plastic pollution caused by Defendant's sale of the Products in California and the resulting harms to California waters, coasts, communities, and marine life will continue to negatively impact Greenpeace's efforts to protect these critical resources.  California consumers may also contaminate the recycling stream by unknowingly placing the Products in their recycling bins, preventing legitimately recyclable products from being recycled.  Thus, Plaintiff seeks an order enjoining Defendant's acts of unfair competition and other fraudulent, unlawful, and unfair acts and practices in California, which serves the public interest by protecting the environment and the integrity of the recycling stream and by preventing Defendant from gaining an unfair advantage over companies that do not misrepresent their products as recyclable.

## PARTIES

5.     Plaintiff Greenpeace Inc. is a non-profit, public interest organization established pursuant to section 501(c)(4) of the Internal Revenue Code, and headquartered in Washington, D.C.  Greenpeace has worked to combat plastic pollution, to protect California coasts and marine life from myriad harms related to plastic pollution, and to ensure that consumers are not misled by environmental marketing claims.  Greenpeace has standing to bring this action because Defendant's actions of misrepresenting the environmental benefits of its Products by marketing and selling the Products as recyclable in California have frustrated Greenpeace's mission to protect the natural environment and have caused Greenpeace to spend money, staff time, and other organizational resources in California in response to that frustration of purpose.  Thus, Greenpeace has lost money or property and has suffered an injury in fact due to Defendant's actions of using false, misleading, and deceptive labels regarding the recyclability of its Products in California.

DOCUMENT PREPARED
ON RECYCLED PAPER

6.     Greenpeace was formed in 1971 as a global, independent campaigning organization that uses peaceful protest and creative communication to expose global environmental problems and promote solutions that are essential to a green and peaceful future. Greenpeace campaigns are science-based and centered on the core values of justice, equity, and inclusion.  Greenpeace pursues its mission through research, reports, surveys, policy proposals, government outreach and lobbying, coalition building and allyship, advocacy, education, public demonstrations and rallies, protests, litigation, and press and public outreach.  Greenpeace also has many supporters with whom Greenpeace communicates through blog posts, social media, emails, phone calls, text messages, webinars, and dedicated supporter mobilization.

7.     A core aspect of Greenpeace's mission is to educate the public on issues that they are either unaware of or misled about.  Nearly every Greenpeace campaign involves educating consumers on the causes, impacts, and alternatives to products or processes that damage public health, the environment, or human rights.  Examples of such Greenpeace campaigns include, but are not limited to, educating the public with respect to the hazards of bleached paper products, chemical additives in plastic toys and household products, mercury in fish, and ozone-depleting substances in refrigerators.

8.     As part of its many educational campaigns, for over three decades Greenpeace has engaged in various efforts to expose corporate greenwashing that deceives consumers into thinking their products or processes are environmentally friendly or benign.  Greenpeace has worked tirelessly to expose examples of corporate greenwashing to protect consumers from false and misleading information related to the environmental benefits of products.  Greenpeace has led campaigns against oil companies, electronic manufacturers, and consumer good corporations and retailers for touting the environmental benefits of their products when, in fact, the products manufactured and sold by such companies caused significant environmental harm.  Greenpeace advocates for consumers to prevent corporate greenwashing and educates the public on such greenwashing so that consumers have the information available to make informed decisions about the environmental impacts of their purchases.

Document Prepared
on Recycled Paper

-4-

9.      Greenpeace has been working to prevent the proliferation of plastic pollution for nearly four decades.  Greenpeace has had numerous campaigns related to plastic pollution, including but not limited to educating consumers on greenwashing statements that certain plastic was biodegradable or recyclable when it was not, exposing the shipment of plastic waste to developing countries, seeking to replace polyvinyl chloride plastic with less toxic alternatives, exposing the health problems associated with incinerating plastic, and reducing or eliminating single-use plastic packaging because of its impacts on the marine ecosystem, the climate, communities, and human health.

10.      Greenpeace's campaigns related to plastic holistically focus on the lifecycle of plastic, from the harmful feedstock chemicals used to make plastic to the sheer amount of single-use plastic generated and ultimately discarded.  Greenpeace cares deeply about the proliferation of plastic because it has witnessed the harmful effects of plastic pollution on various ecosystems and human health.  The goals of Greenpeace's climate and oceans campaigns call for solutions that include drastically reducing the use of single-use plastic and finding alternatives to plastic products and packaging, reusing plastic products when no other alternatives are available, and properly recycling products if they cannot be eliminated or reused.

11.      Greenpeace's campaigns related to plastic pollution also include educating the public about false environmental marketing claims, such as informing the public about the low amount of plastic that is actually recycled and instead ends up in landfills, incinerators, communities, or the natural environment.  Thus, while investigating the low recycling rates of plastic products, Greenpeace has simultaneously analyzed recyclable representations present on the labels of products sold by major retailers and manufacturers.  Greenpeace has spent, and continues to spend, substantial time and money engaging with retailers and consumer product companies to encourage them to reduce the amount of non-recyclable plastic used in their products and packaging, and to discourage them from misleading consumers about the recyclability of the plastic they do use.  Many of these campaign activities have been based in California, and many of those California-based activities have been directed at Defendant.

12.     A company's size and scope affect its plastic footprint, and due to Defendant's large volume of products made from or packaged in plastic, Greenpeace determined that Defendant is responsible for a substantial amount of plastic pollution.  In late 2018, Greenpeace began research on the plastic and recycling policies and practices of Defendant and other retailers, leading to the June 2019 release of Packaging Away the Planet.[5]  Packaging Away the Planet was a report published by Greenpeace, including significant input from Greenpeace's California-based staff, that evaluated the plastic footprint of major U.S. grocery retailers, including Defendant. During the time period that Greenpeace was preparing the Packaging Away the Planet report, Greenpeace spent money, staff time, and other resources organizing its supporters to raise awareness of Defendant's contribution to the proliferation of plastic pollution.  For example, on February 6, 2019, Greenpeace organized a "day of action" in which supporters photographed Defendant's plastic pollution in Los Angeles, California and St. Petersburg, Florida to highlight the amount of single-use plastic pollution generated by Defendant.  Greenpeace also created a petition and paid for it to be circulated on Facebook through Facebook Ads requesting Defendant to "ditch plastic packaging" and sent out numerous posts to its Twitter followers regarding Defendant's failure to reduce single-use plastic.  Greenpeace spent approximately $43,430 on the advertisements, which included advertisements in California.

13.     Greenpeace's investigation of Defendant's recycling representations has largely been based in California.  Greenpeace has five staff members located in California that were heavily involved in investigating Defendant and exposing its practice of misrepresenting the recyclability of the Products, including its Senior Oceans Campaigner (formerly the Senior Plastics Campaigner), two National Mobilization Organizers, Senior National Organizer, and Program Operations Specialist.  Each one of these staff members spent a significant amount of time in California to counter Defendant's false recycling representations present on the labels of

---

[5] David Pinsky and James Mitchell, *Packaging Away the Planet: U.S. Grocery Retailers and the Plastic Pollution Crisis*, GREENPEACE REPORTS, June 11, 2019, https://www.greenpeace.org/usa/reports/packaging-away-the-planet-2019/ (last accessed Mar. 25, 2021).

Products it sold in California.  For example, Greenpeace's California-based staff drafted a survey which was sent by Greenpeace staff from California to various companies, including Defendant. That survey asked Defendant to respond to questions regarding its plastic use policies and practices, including questions regarding its labeling practices with respect to the recyclability of single-use plastics.  Following that survey, California-based Greenpeace staff had other written and verbal communications with Defendant regarding its responses to the survey.

14.     For example, Greenpeace's Senior Plastics Campaigner spent scores of hours of his time engaging with Defendant on plastics issues, including communications to discourage Defendant from mislabeling the Products as recyclable.  Greenpeace's Senior Plastics Campaigner—who was based in Oakland, California from September 2017 to January 2021— was the lead author on Greenpeace's Packaging Away the Planet report, which included a ranking of Defendant's plastic pollution footprint.  The Senior Plastics Campaigner communicated with Defendant to share the survey mentioned above, answer questions, provide updates, and seek clarification on issues related to Defendant's plastic footprint.  In October 2019, Greenpeace's Senior Plastics Campaigner sent an email from California to Defendant explicitly discussing the issues related to Defendant's misleading recycling representations and informed Defendant that its labels do not meet the standards in the Green Guides.  Accordingly, Greenpeace's Senior Plastics Campaigner, as well as Greenpeace's other California-based staff members, diverted a significant amount of time in California to engage with Defendant on plastics issues instead of spending their time on Greenpeace's multitude of other plastic pollution campaigns.

15.     Likewise, Greenpeace's Truth in Recyclable Labels Campaign involves the participation of Greenpeace's entire plastic campaign team, including several California-based staff.  That campaign, which is ongoing, seeks to ensure that corporate marketing efforts aimed at representing the recyclability of products and packaging to consumers are accurate and legal. Greenpeace uncovered evidence of problematic marketing claims with respect to recyclability in California and elsewhere in the United States involving several retailers and consumer goods companies, including Defendant.   Greenpeace staff in California shared documentation with

1  companies and set up conversations to discuss its findings and to ensure appropriate changes were

2  made.

3        16.    For instance, in August 2019, Greenpeace hired a recycling consultant for its Truth

4  in Recyclable Labels Campaign.  The contract for the consultant ran from August 8, 2019 to

5  December 31, 2019, and Greenpeace paid the consultant $25,000 for her work.  The consultant's

6  deliverables included: (1) a recycling briefing document (in PowerPoint) which describes the U.S.

7  federal regulatory approach, existing product industry programs, recycling market changes,

8  current lawsuits and the technical basis for claiming deceptive labeling; and (2) campaign briefs

9  (in PowerPoint with photos) to enable Greenpeace to engage with product and retail companies to

10  correct labeling of plastic products.  For the second deliverable, Greenpeace requested that the

11  consultant identify three companies for campaigns based on egregious labeling practices on

12  plastic products that are not recyclable.  Defendant was subsequently identified as one of the three

13  companies to target, and the consultant and Greenpeace staff (including California-based

14  Greenpeace staff) spent a significant amount of time and resources analyzing and investigating

15  Defendant's recyclability representations on the labels of Products sold in California.

16  Approximately 15% of the consultant's time was dedicated to investigating Defendant.

17        17.    Greenpeace spent money, staff time, and other organizational resources managing

18  the consultant.  For example, Greenpeace's Oceans Campaign Director was responsible for

19  managing the consultant and dedicated at least ten hours of his time working with the consultant

20  to investigate Defendant.  Greenpeace's Oceans Campaign Director and the consultant had

21  several discussions regarding conducting research on retailers and manufacturers large enough to

22  be significant players in addressing the plastic pollution crisis, including Defendant.

23        18.    On October 6, 2019, as part of the work for Greenpeace under the contract, the

24  consultant visited a Walmart store located at 30491 Av. De Las Flores, Rancho Santa Margarita,

25  CA 92688.  The consultant took numerous photographs of the Products, including the following:

26  Great Value Organic Cinnamon Applesauce Cups, 24 oz, 6 Count, Walmart #556055661, UPC

27  No. 0-7874213534-2, Product No. 136051; Great Value Diced Mangos In 100% Juice, 4 oz, 4

28  Count, Walmart #562987172, UPC No. 0-7874215803-7, Product No. 142059; Great Value

Organic Diced Peaches & Pears, 16 oz., 4 Count, Walmart #562987178, UPC No. 0-7874223615-5, Product No. 142059; Great Value Premium Forks, 48 Count, Walmart #438491, UPC No. 0-7874211675-4, Product No. 042499; Great Value Premium Clear Cutlery Knives, 48 Count, Walmart #438505, UPC No. 0-7874211670-9, Product No. 042499; Great Value Premium Assorted Silver Cutlery, 36 count, Walmart #565175504; Great Value Snack Cups, 9 oz, 80 Count, Walmart #443461, UPC No. 0-681131925532, Manufacturer No. 6386717; Great Value Everyday Party Cups, 18 oz, 20 Count, Walmart #443482, UPC No. 0-78742049090, Manufacturer No. 6386484; Great Value Extra Virgin Olive Oil Cooking Spray, 7 oz., 3 Pack, UPC No. 0-7874206043-9, Product No. 928333; Great Value Ultimate Fresh Scent Booster, Blooming Lavender, 14.8 oz, Walmart #575777817, UPC No. 0-7874233153-9, Product No. 03604; and Great Value Plastic Party Cups, 18 oz, 120 Count, Walmart #557007144, UPC No. 0-7874218708-2, Product No. 437462.

19.     On October 27, 2019, the consultant prepared a 20-page PowerPoint report for Greenpeace required by her contract that included many of the photographs taken at the Walmart store located in Rancho Santa Margarita, CA.  The report was based on the consultant's investigation in California.  Greenpeace staff located in California then spent a significant amount of time reviewing the report and further investigating Defendant in California.

20.     Based on the consultant's work and the time spent by Greenpeace staff members, including the staff members located in California, Greenpeace determined that Defendant frustrated Greenpeace's purpose by misleading consumers about the environmental benefits of the Products.  But for the report prepared by the consultant based on recyclable representations on the labels of Products sold by Defendant in California and the time spent by Greenpeace staff members located in California, Greenpeace would not have included Defendant in its Truth in Recyclable Labels Campaign.  Thus, Greenpeace diverted money, staff time, and other organizational resources to fund and manage the consultant and further investigate Defendant's recycling representations, which would have been used for Greenpeace's other campaigns, including its other plastic campaigns.

21.     Further investigation of Defendant by Greenpeace staff members, including staff members located in California, revealed that the Products identified by the consultant were just the tip of the iceberg.  Greenpeace determined that Defendant had an extensive and long-term campaign misrepresenting the recyclability of Products in California.  Defendant has misrepresented the recyclability of the Products in California since at least 2019 and sells the Products at all its stores in California and on its website, which sells Products to California consumers.

22.     Greenpeace has also published reports and surveys documenting the low recycling rates of various plastic products, including a comprehensive U.S. Survey of Plastics Recyclability entitled Circular Claims Fall Flat, published on February 18, 2020 (the "CCFF Report").[6]  The CCFF Report is a thorough survey of plastic product waste collection, sortation, and reprocessing in the United States to determine the legitimacy of recyclable claims and labels on consumer single-use plastic products.  The survey was based on current conditions in October 2019 to January 2020 and U.S. Federal Trade Commission guidelines.  The survey directly evaluated Defendant's recyclability labels and Defendant's packaging design guides for recyclability, as well as numerous other recycling guides.  A portion of the CCFF Report analyzes the recyclability of single-use plastic in California, which was prepared with the help of Greenpeace staff located in California.

23.     After initially spending money, staff time, and other organizational resources to specifically investigate Defendant's recyclable representations in California, Greenpeace diverted additional resources to inform Defendant of its false and misleading recycling representations.  For instance, in March 2020, Greenpeace's Senior Plastics Campaigner drafted and sent an email in California to Defendant regarding the implications of the CCFF Report, which described the low rate of recyclability for products that Defendant labeled as recyclable.  From California,

---

[6] John Hocevar, *Circular Claims Fall Flat: Comprehensive U.S. Survey of Plastics Recyclability*, GREENPEACE REPORTS, Feb. 18, 2020, https://www.greenpeace.org/usa/wp-content/uploads/2020/02/Greenpeace-Report-Circular-Claims-Fall-Flat.pdf (last accessed Dec. 7, 2020).

DOCUMENT PREPARED
ON RECYCLED PAPER

Greenpeace's Senior Plastics Campaigner then arranged for a meeting with Defendant and various other retailers at an industry conference to discuss recyclable representations on plastic products. Greenpeace has since published press releases identifying Defendant's false and misleading recyclable representations to inform the public of such issues.

24.     Because Greenpeace's mission involves ensuring consumers are not misled by environmental marketing claims and protecting the natural environment from plastic pollution. Defendant's use of false, misleading, and deceptive claims regarding the recyclability of its Products in California and elsewhere in the United States has frustrated Greenpeace's purpose. Defendant's continued use of misleading and deceptive recyclability claims serves to confuse consumers about plastic products and packaging and gives them a false sense that they are doing something good for the environment when they purchase Defendant's Products and then place them into their recycling bins. Defendant's frustration of Greenpeace's purpose has forced Greenpeace to spend money, staff time, and other organizational resources pressuring Defendant to stop using misleading labels on its single-use plastic packaging. Greenpeace also spent a significant amount of money, staff time, and other organizational resources to educate its supporters, the public, and the media that a Product labeled by Defendant as recyclable is actually unlikely to be recycled in California or elsewhere in the United States. Greenpeace would have used its money, staff time, and organizational resources on other campaigns related to plastic pollution, but the large number of Defendant's false recycling representations in California required Greenpeace to focus its attention on Defendant's actions in California. These actions have caused Greenpeace to lose money or property and it has therefore suffered an injury in fact.

25.     Absent relief from this Court, Plaintiff will suffer irreparable injury because it will continue to spend money, staff time, and other organizational resources to combat Defendant's false and misleading representations in California and to inform the public that the Products are not recyclable in California. In addition, plastic pollution caused by Defendant's sale of the Products in California and the resulting harms to California waters, coasts, communities, and marine life will continue to negatively impact Greenpeace's efforts to protect these critical resources. Thus, relief from this Court is in the public interest and is necessary to further

DOCUMENT PREPARED
ON RECYCLED PAPER

-11-

Greenpeace's mission of ensuring consumers are not misled by false environmental marketing claims in California.

26.     Defendant Walmart, Inc. is a Delaware corporation with its principal place of business in Bentonville, Arkansas.  Defendant Walmart, Inc. manufactures, distributes, markets, and sells the Products in California.  Defendant has a significant presence in California, with 142 Supercenters, 71 Discount Stores, 78 Neighborhood Markets and other small formats, and 29 Clubs.[7]  In total, Defendant has 320 locations in California, making California its third largest market.

## JURISDICTION AND VENUE

27.     By removing this case to federal court, Defendant has alleged that this Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1441.  *See* Notice of Removal, filed Jan. 29, 2021 [ECF Docket No. 1].

28.     This Court has jurisdiction over Defendant because it is a corporation or other entity that has sufficient minimum contacts in California, is a citizen of California, or otherwise intentionally avails itself of the California market either through the distribution, sale or marketing of the Products in the State of California or by having a facility located in California so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.  Because California is Defendant's third largest market with approximately 320 locations, Defendant purposefully directs its activities toward California and purposefully avails itself of the privileges of conducting activities in California.

29.     In addition, the claims in this case arise out of Defendant's California-related activities.  Defendant markets and sells the Products in California at its 320 California locations as well as its website, which sells the Products to California consumers.  While the Products are marketed and sold in California by Defendant, the Products are not recyclable in California.

---

[7] *Walmart Inc. Form 10-K for Fiscal Year Ended Jan. 31, 2021*, EDGAR U.S. S.E.C. Ann. Rep. 202, Commission File No. 001-06991 at p. 24, available at: https://www.sec.gov/ix?doc=/Archives/edgar/data/104169/000010416921000033/wmt-20210131.htm#.

Greenpeace has spent significant money, staff time, and other organizational resources in California to counter Defendant's false and misleading recyclability representations on Products sold in California.  Thus, Greenpeace's claim that Defendant deceptively markets, advertises, and sells Products in California labeled as recyclable that are, in fact, not recyclable in California arise out of Defendant's activities in California.

30.      Venue in the County of Alameda is proper pursuant to 28 U.S.C. § 1391(a) because Defendant is a resident of this District pursuant to 28 U.S.C. § 1391(c), and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

31.      **Intradistrict Assignment (L.R. 3-2(c) and (d) and 3-5(b))**:  This action arises in Alameda County, in that a substantial part of the events which give rise to the claims asserted herein occurred in Alameda County.  Pursuant to L.R. 3-2(c), all civil actions which arise in Alameda County shall be assigned to the San Francisco Division or the Oakland Division.

## LEGAL BACKGROUND

32.      In light of the significant amount of plastic that is marketed and labeled as recyclable and instead ends up in landfills, incinerators, communities, and the natural environment, the Legislature of the State of California has declared that "it is the public policy of the state that environmental marketing claims, whether explicit or implied, should be substantiated by competent and reliable evidence to prevent deceiving or misleading consumers about the environmental impact of plastic products."  Cal. Pub. Res. Code § 42355.5.  The policy is based on the Legislature's finding that "littered plastic products have caused and continue to cause significant environmental harm and have burdened local governments with significant environmental cleanup costs."  *Id.* § 42355.

33.      The California Business and Professions Code § 17580.5 makes it "unlawful for any person to make any untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied."  Pursuant to that section, the term "environmental marketing claim" includes any claim contained in the Guides for use of Environmental Marketing Claims published by the FTC (the "Green Guides").  *Id.*; *see also* 16 C.F.R. § 260.1, *et seq.*

Document Prepared
on Recycled Paper

-13-

34.     Under the Green Guides, "[i]t is deceptive to misrepresent, directly or by implication, that a product or package is recyclable.  A product or package shall not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item."  16 C.F.R. § 260.12(a).  This definition encompasses the three prongs of recyclability that are commonly used in the solid waste industry: (1) accessibility of recycling programs ("through an established recycling program"); (2) sortability for recovery ("collected, separated, or otherwise recovered from the waste stream"); and (3) end markets ("for reuse or use in manufacturing or assembling another item").  The California Public Resources Code similarly defines recycling as "the process of collecting, sorting, cleansing, treating, and reconstituting materials that would otherwise become solid waste, and returning them to the economic mainstream in the form of raw material for new, reused, or reconstituted products which meet the quality standards necessary to be used in the marketplace."  *Id*. § 40180.

35.     These definitions are consistent with reasonable consumer expectations.  For instance, the dictionary defines the term "recycle" as: (1) convert (waste) into reusable material, (2) return (material) to a previous stage in a cyclic process, or (3) use again.  Oxford Dictionary, Oxford University Press 2020.  Accordingly, reasonable consumers expect that products advertised, marketed, sold, labeled, or represented as recyclable will be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item.

36.     Defendant has published its own Recycling Playbook that defines recyclability in a similar manner.[8]  The Playbook defines recyclability as a system of stages: "(1) Collection (collection available for a substantial majority of consumers); (2) Sortation (packages are separated and aggregated for further processing); (3) Processing (commercial processes recover

---

[8] *The Recycling Playbook,* WALMART, INC., last updated Oct. 25, 2019, https://www.walmartsustainabilityhub.com/media-library/document/recycling-playbook-november-2019/_proxyDocument?id=0000016e-384f-d8af-a96e-beff25150000 (last accessed on Dec. 7, 2020).

DOCUMENT PREPARED
ON RECYCLED PAPER

material); (4) End-Market (the recycled material is used in new products); and (5) Recycling Rate (at least 30% recycling rate achieved for over 400 million inhabitants)."  Thus, Defendant's own interpretation of recyclability requires access to recycling programs, sortability, and end markets.

37.     As reflected in the Green Guides' language and regulatory history, the FTC does not consider a product to be recyclable unless it can actually be recycled.  For instance, the Green Guides provide that: (1) "[i]f any component significantly limits the ability to recycle the item, any recyclable claim would be deceptive;" and (2) "an item that is made from recyclable material, but, because of its shape, size, or some other attribute, is not accepted in recycling programs, should not be marketed as recyclable."  16 C.F.R. §§ 260.12(a) and (d); *see also id.*, § 260.12(d), Examples 2 and 6.  And in promulgating the current recycling definition that encompasses accessibility, sortability and end markets, the FTC clarified that "[f]or a product to be called recyclable, there must be an established recycling program, municipal or private, through which the product *will be* converted into, or used in, another product or package."  *See* 63 Fed. Reg. 84, 24247 (May 1, 1998) (emphasis added).  As the FTC has stated, "while a product may be technically recyclable, if a program is not available allowing consumers to recycle the product, there is no real value to consumers."  *Id*., at 24243.

38.     The Green Guides also provide specific examples of recycling claims that the FTC considers deceptive, as well as examples of ways in which marketers can qualify those claims.[9] Compliance with the examples provided by the FTC qualifies as a defense to a claim under the EMCA.  B&P Code § 17580.5(b).  Under the Green Guides, a marketer may make an unqualified recyclable claim if a substantial majority of consumers or communities have access to recycling facilities for that item.  16 C.F.R. § 260.12(b)(1).  A "substantial majority" means at least 60 percent of consumers or communities where the item is sold.  *Id.*  Absent such evidence, marketers are required to use qualifications that vary in strength depending on the degree of consumer access to recycling for an item.  *Id.*, § 260.12(b)(2).  For instance, if recycling facilities

---

[9] The examples in the Green Guides are specifically provided by the FTC as its "views on how reasonable consumers likely interpret certain claims."  16 C.F.R. § 260.1(d).

DOCUMENT PREPARED
ON RECYCLED PAPER

are available to slightly less than 60 percent of consumers or communities, the Green Guides recommend that a marketer should qualify the recyclable claim by stating "this product may not be recyclable in your area," or "recycling facilities for this product may not exist in your area." *Id*. If recycling facilities are available only to a few consumers, the Green Guides recommend that a marketer should qualify its recyclable claim by stating "this product is recyclable only in a few communities that have appropriate recycling facilities." *Id*.

39.     The Green Guides specifically identify qualifications that may be misleading or deceptive to a reasonable consumer. For instance, a "check locally" disclaimer is presumptively deceptive. *See* 16 C.F.R. § 260.12, Example 4. The FTC made this determination based on a survey it conducted in which it determined that "there was no statistical difference" between a consumer's perception of an unqualified recyclable claim and a "check locally" disclaimer. *See* 63 Fed. Reg. 84, 24244 (May 1, 1998). Accordingly, the FTC concluded that a "check locally" disclaimer is deceptive because it does not "adequately disclose the limited availability of recycling programs," and removed the disclaimer as an example of a permissible qualification. *See* 16 C.F.R. § 260.12, Example 4; 63 Fed. Reg. 84, 24244 (May 1, 1998).

40.     California law and the Green Guides also require that marketers substantiate environmental marketing claims. California law requires marketers to maintain "in written form" records supporting the validity of environmental representations. B&P § 17580(a). This requirement includes records regarding whether consumer goods conform with the Green Guides' use of the terms "recycled" and "recyclable." *Id*., § 17580(a)(5). It was the specific intent of the California Legislature that the information and documentation supporting the validity of environmental marketing representations "shall be fully disclosed to the public." *Id*., § 17580(d). Likewise, the Green Guides require marketers to ensure that their claims are supported by a reasonable basis prior to making the claim. 16 C.F.R. § 260.2. A reasonable basis is defined as competent and reliable scientific evidence, such as "tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results." *Id*. Such evidence should be sufficient in quality and quantity. *Id*.

DOCUMENT PREPARED
ON RECYCLED PAPER

1

**BACKGROUND FACTS**

2

      41.     In the past decade humans across the globe have produced 8.3 billion metric tons

3

of plastic, most of it in disposable products and packaging that ends up as trash or pollution.[10]  Of

4

the 8.3 billion metric tons produced, 6.3 billion metric tons have become plastic waste and only

5

9% of that has been recycled.[11]  A third of the single-use plastic generated ends up in the natural

6

environment, accounting for 100 million metric tons of plastic pollution in 2016.[12]  Current

7

estimates suggest that there are over 150 million tons of plastics in the ocean.[13]  The

8

Environmental Protection Agency estimates that Americans alone disposed of 35.7 million tons

9

of plastic in 2018, 91.3% of which was not recycled.[14]  While California had a goal to achieve a

10

75% recycling rate by 2020, California's recycling rate is actually in decline.  According to

11

CalRecycle, in 2014 California's recycling rate was 50%, dropping to 47% in 2015 and down to

12

44% in 2016.[15] According to the California Statewide Commission on Recycling Markets and

13

Curbside Recycling, the state's recycling rate dropped to 37% in 2019.[16]

14

15

16

[10] Roland Geyer, et al., *Production, use, and fate of all plastics ever made*, SCIENCE ADVANCES,

17

Jul. 19, 2017, https://plasticoceans.org/wp-content/uploads/2018/05/Production_use_and_fate_of_all_plastics_ever_made.pdf (last accessed Dec. 7, 2020).

18

[11] *Id.*

19

[12] *No Plastic in Nature: Accessing Plastic Ingestion From Nature to People*, WWF, June 2019,

20

https://d2ouvy59p0dg6k.cloudfront.net/downloads/plastic_ingestion_web_spreads.pdf at p. 6 (last accessed Dec. 7, 2020).

21

[13] *The New Plastics Economy Rethinking the Future of Plastics*, ELLEN MACARTHUR

22

FOUNDATION AND MCKINSEY & COMPANY (2016), https://plasticoceans.org/wp-content/uploads/2018/05/EllenMacArthurFoundation_TheNewPlasticsEconomy_Pages.pdf at p. 17 (last accessed Dec. 7, 2020).

23

[14] 14 EPA, *2018 Advancing Sustainable Materials Management: Facts and Figures Report –*

24

Tables and Figures. (https://www.epa.gov/sites/production/files/2021-01/documents/2018_tables_and_figures_dec_2020_fnl_508.pdf (last accessed Feb. 14, 2021).

25

[15] *California's Statewide Recycling Rate,* CALRECYCLE, last updated Mar. 3, 2020,

https://www.calrecycle.ca.gov/75percent/recyclerate (last accessed Dec. 7, 2020).

26

[16] California Statewide Commission on Recycling Markets and Curbside Recycling Policy

27

Recommendations, CALRECYCLE, https://drive.google.com/drive/folders/17URSu4dubsoX4qV0qH3KciSWZhV595o5

28

(last accessed Feb. 14, 2021).

DOCUMENT PREPARED ON RECYCLED PAPER

42.     Recent investigations into the proliferation of plastic pollution plaguing the natural environment have revealed that the plastics industry has known for decades that most products and packaging made from plastic would not be recycled.  On September 11, 2020, National Public Radio ("NPR") published an investigation illustrating the plastic industry's decades-long awareness that recycling would not keep plastic products or packaging out of landfills, incinerators, communities, or the natural environment.[17]  In a 1974 speech, one industry insider stated "there is serious doubt that [recycling plastic] can ever be made viable on an economic basis."[18]  Larry Thomas, former president of the Society of the Plastic Industry (known today as the Plastics Industry Association), told NPR that "if the public thinks that recycling is working, then they are not going to be as concerned about the environment."[19]  The NPR investigative report details the length and expense that the plastics industry went to deceive consumers that plastic was easily recyclable, despite knowledge that the cost of recycling would never be economical.  Similarly, a recent Canadian Broadcasting Corporation news report describes that even the recycling logo was used as a marketing tool to improve the image of plastics after environmental backlash in the 1980s.[20]  "There was never an enthusiastic belief that recycling was ultimately going to work in a significant way," yet the plastics industry spent millions on ads to deceive the public as to the efficacy of recycling.[21]

43.     After decades of industry deception that plastic products and packaging are recyclable, consumers have recently become even more aware of the problems associated with single-use plastics polluting the oceans and the natural environment.  The staggering amount of plastic pollution accumulating in the environment is accompanied by an array of negative side

---

[17] Lara Sullivan, *How Big Oil Misled The Public Into Believing Plastic Would be Recycled*. NPR.ORG (Sep. 11, 2020, 5:00 AM), https://www.npr.org/2020/09/11/897692090/how-big-oil-misled-the-public-into-believing-plastic-would-be-recycled (last accessed Dec. 7, 2020).

[18] *Id.*

[19] *Id.*

[20] *Recycling was a lie – a big lie – to sell more plastic, industry experts say*, CBC.CA, Sep. 23, 2020, https://www.cbc.ca/documentaries/the-passionate-eye/recycling-was-a-lie-a-big-lie-to-sell-more-plastic-industry-experts-say-1.5735618 (last accessed Dec. 7, 2020).

[21] *Id.*

DOCUMENT PREPARED
ON RECYCLED PAPER

effects.  For example, plastic debris is frequently ingested by marine animals and other wildlife, which can be injurious, poisonous, and deadly.[22]  Floating plastic is also a vector for invasive species,[23] and plastic that gets buried in landfills can leach harmful chemicals into ground water that is absorbed by humans and other animals.[24]  Plastic litter on the streets and in and around our parks and beaches also degrades the quality of life for residents and visitors.  Scientists have also discovered that plastic releases large amounts of methane, a powerful greenhouse gas, as it degrades.[25]  Thus, plastic pollution contributes to global climate change, which affects California in the form of extreme drought, sea level rise, and more frequent and severe wildfires.[26]

44.     There are various types of plastic resin that are used to produce single-use plastic products and packaging.  All rigid plastic bottles and containers sold in California are required to include a molded label code that indicates the resin used to produce the plastic bottle or container.  Cal. Pub. Res. Code § 18015.  The code generally consists of a number placed inside a triangle to reflect the resin used to make the bottle or container.  *Id.*  This code is referred to as a Resin Identification Code ("RIC") and can be used to identify seven types of plastic.

45.     PET (plastic #1) and HDPE (plastic #2) are widely considered to be the most recyclable forms of plastic; however, studies indicate that even products and packaging made from these resins often end up in landfills, incinerators, communities, or the natural

---

[22] Amy Lusher, et al., *Microplastics in Fisheries and Aquaculture: Status of knowledge on their occurrence and implications for aquatic organisms and food safety*, FAO Fisheries and Aquaculture Technical Paper No. 615, Rome, Italy, 2017 http://www.fao.org/3/a-i7677e.pdf (last accessed Dec. 7, 2020).

[23] *Report on Marine Debris as a Potential Pathway for Invasive Species*, NOAA, March 2017, Silver Spring, MD; https://marinedebris.noaa.gov/sites/default/files/publications-files/2017_Invasive_Species_Topic_Paper.pdf (last accessed Dec. 7, 2020)

[24] Emma L. Teuten, et *al., Transport and release of chemicals from plastics to the environment and to wildlife*, Philos Trans R. Soc. Lond. B. Biol. Sci, July. 27, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2873017/ (last accessed Dec. 7, 2020).

[25] Sarah-Jeanne Rover, et al., *Production of methane and ethylene from plastic in the environment*, Aug. 1, 2018, PLoS ONE 13(8) e0200574, https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0200574 (last accessed Dec. 7, 2020).

[26] *What Climate Change Means for California*, U.S. EPA, Aug. 2016, EPA 430-F-16-007, https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-ca.pdf (last accessed Dec. 7, 2020)

Document Prepared
on Recycled Paper

environment.[27]  This is because MRFs and plastic reprocessing plants in the United States cannot

collect, sort, and process the sheer volume of plastic that is generated by consumer product

companies on an annual basis.[28]  The labor and cost required to collect, sort, grind, melt, and

reconstitute the approximately 35 million tons of single-use plastic produced in the United States

every year is insurmountable.  A recent Greenpeace study revealed that U.S. plastic reprocessing

facilities can process no more than 23% of PET#1 plastic produced each year and no more than

13% of HDPE#2.[29]  More alarmingly, plastics #3-7, which are widely considered to be low-value

plastics, are rarely, if ever recycled.  The Greenpeace study revealed that MRFs can process only

a negligible percentage of plastics #3-7.[30]  Additionally, reprocessing plastic creates a significant

amount of plastic waste that must be landfilled or incinerated.  According to the National

Association for PET Container Resources ("NAPCOR"), processing "easy-to-recycle" PET

bottles results in 28% material loss.[31]

46.    Due to the availability of cheap raw materials to make "virgin plastic," there is

essentially no market demand for most types of recycled plastic.  Virgin plastic is derived from

oil and natural gas and has a higher quality than recycled plastic.  Recognizing the market

potential from plastic production, major oil and natural gas companies have greatly expanded

their petrochemical operations to increase production of plastic resins and products, which drives

down the price of virgin plastic.[32]  As a result, using virgin plastic to produce plastic products or

---

[27] *Facts and Figures about Materials, Waste and Recycling*, U.S. EPA, https://www.epa.gov/facts-and-figures-about-materials-waste-and-recycling/plastics-material-specific-data (last accessed Dec. 7, 2020).

[28] Michael Corkery, *As Costs Skyrocket, More U.S. Cities Stop Recycling,* N.Y. TIMES, Mar. 16, 2019, https://www.nytimes.com/2019/03/16/business/local-recycling-costs.html (last accessed Dec. 7, 2020).

[29] John Hocevar, *supra* note 6.

[30] *Id.*

[31] NAPCOR, Report on Postconsumer PET Container Recycling Activity in 2017, https://napcor.com/wp-content/uploads/2018/11/NAPCOR_2017RateReport_FINAL.pdf (last accessed Feb. 14, 2021)

[32] *Fueling Plastics: Fossils, Plastics, & Petrochemical Feedstocks*. CIEL.ORG (Sep. 2017) https://www.ciel.org/wp-content/uploads/2017/09/Fueling-Plastics-Fossils-Plastics-Petrochemical-Feedstocks.pdf (last accessed Dec. 7, 2020).

DOCUMENT PREPARED
ON RECYCLED PAPER

packaging is cheaper than using recycled plastic.  Recycling facilities no longer have an incentive to collect, sort, clean and reprocess waste plastic because there are almost no buyers of the resulting plastic, pellets, or scrap materials.

47.     Historically, recycling facilities in the United States shipped plastic scrap to China and other countries in the Far East for recycling.  But millions of pounds of that exported plastic waste was never recycled.[33]  Instead, this plastic was burned or dumped into waterways, where it was carried into the ocean.[34]  For years, tons of plastic that U.S. consumers dutifully sorted and transported to recycling facilities ultimately ended up in the ocean or the natural environment.  For example, in 2015 China's Yangtze river ranked highest for plastic entering the oceans.[35]  That year, 333,000 tons of plastic were deposited into the ocean from the Yangtze river, more than double the amount for the river with the next highest amount.[36]

48.     In February 2013, based on the high amounts of low-value and contaminated plastics shipped there, China enacted Operation Green Fence, an aggressive inspection effort aimed at curtailing the amount of contaminated "recyclables" and waste that was being sent to China.[37]  China began inspecting 70 percent of imported containers filled with "recyclables" and started cracking down on shippers and recyclers for shipping low-value and contaminated plastic

---

[33] Kara Lavender Law, et al. *The United States' contribution of plastic waste to land and ocean*, SCI. ADV., Oct. 30, 2020, Vol. 6, no. 44.   https://advances.sciencemag.org/content/6/44/eabd0288 (last accessed Feb 24, 2021)

[34] Christopher Joyce, *Where Will Your Plastic Trash Go Now that China Doesn't Want it?*, NPR.ORG (Mar. 13, 2019, 4:28 PM ET), https://www.npr.org/sections/goatsandsoda/2019/03/13/702501726/where-will-your-plastic-trash-go-now-that-china-doesnt-want-it (last accessed Dec. 7, 2020); *see also Discarded: Communities on the Frontlines of the Global Plastic Crisis,* GAIA, Apr. 2019, https://wastetradestories.org/wp-content/uploads/2019/04/Discarded-Report-April-22.pdf (last accessed Dec. 7, 2020).

[35] Laurent C.M. Lebreton, et al., *River plastic emissions to the world's oceans*, NAT. COMMUN. Jun. 7, 2017, 8:15611, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5467230/ (last accessed Dec. 7, 2020).

[36] *Id.*

[37] *What Operation Green Fence Has Meant for Recycling*, WASTE 360, https://www.waste360.com/business/what-operation-green-fence-has-meant-recycling (last accessed Dec. 7, 2020).

1   waste.[38]  Despite manufacturers' and recyclers' awareness of China's refusal to accept low-value

2   and contaminated plastic, the U.S. continued to export most of its plastic waste to China.  By

3   2016, the U.S. was exporting almost 700,000 tons a year of plastic waste to China.[39]

4           49.     In February 2017, in response to the continued shipment of low-value and

5   contaminated plastic waste, China announced its National Sword policy, which banned the

6   importation of certain solid waste and set strict contamination limits on recyclable material.

7   Because of the National Sword policy, end markets for recycling plastics #3-7 have essentially

8   vanished.[40]  One year after China's National Sword Policy, China's plastics imports plummeted

9   by 99 percent.[41]  Following enactment of the National Sword Policy other countries in the Far

10  East followed suit by banning imports of low-value and contaminated plastics that had long been

11  polluting their environments.[42]  In May 2019, 187 countries decided to significantly restrict

12  international trade in plastic scrap and waste to help address the improper disposal of plastic

13  pollution, which are known as the Basel Convention Plastic Waste Amendments.[43]  The Basel

14  Convention Plastic Waste Amendments prohibit export of mixed plastic waste to countries who

---

[38] *Id.*

[39] Christopher Joyce, *supra* note 34.

[40] Liz Zarka, *Recycling's Sword of Damocles*, East Bay Express, Mar. 21, 2019, https://m.eastbayexpress.com/oakland/recyclings-sword-of-damocles/Content?oid=26354842 (last accessed Dec. 7, 2020); *see also* Cheryl Katz., *Piling Up: How China's Ban on Importing Waste Has Stalled Global Recycling*, Yale Environment 360, Mar. 7, 2019, https://e360.yale.edu/features/piling-up-how-chinas-ban-on-importing-waste-has-stalled-global-recycling (last accessed Dec. 7, 2020).

[41] Cheryl Katz, *supra* note 40.

[42] *Why Some Countries Are Shipping Back Plastic Waste*, BBC News, https://www.bbc.com/news/world-48444874 (last accessed February 9, 2021); *see also International Policies Affecting Global Commodity Markets*, Cal Recycle, https://www.calrecycle.ca.gov/markets/nationalsword/globalpolicies (last accessed February 9, 2021).

[43] *New International Requirements For The Export And Import of Plastic Recyclables And Waste*, U.S. EPA,  last updated February 17, 2021, https://www.epa.gov/hwgenerators/new-international-requirements-export-and-import-plastic-recyclables-and-waste#:~:text=the%20Basel%20Convention.-,What%20are%20the%20Basel%20plastic%20scrap%20and%20waste%20amendments%3F,most%20plastic%20scrap%20and%20waste.&text=Prior%20notice%20and%20consent%20is%20required%20for%20Basel%20Y48,hazardous%20plastic%20scrap%20and%20waste (last accessed February24, 2021).

Document Prepared
on Recycled Paper

-22-

are not members of the Organization for Economic Co-operation and Development.[44]  Due to increased regulations and restrictions on importing plastic waste, recycling companies can no longer sell many types of used plastic at prices that cover their transportation and processing costs, providing them with no incentive to do so.

50.     The writing has been on the wall that China would refuse to accept low-value and contaminated plastic waste since 2013.  Nonetheless, aware of consumers' interests in protecting the environment, Defendant has increased its labeling of Products as recyclable in California and elsewhere in the United States.  Defendant has done so despite widespread acknowledgment that end markets for plastic waste have been shrinking and that the majority of plastic labeled as recyclable in California and other regions in the United States ends up in landfills, incinerators, communities, and the natural environment.  Defendant has announced that it is working with its suppliers to achieve 100% recyclable, reusable, or industrially compostable packaging for all its private brand products by 2025.[45]  By seeking to label many of its private brand products as recyclable in California and elsewhere, and by announcing its initiatives to label its Products as recyclable to consumers, Defendant is actively participating and controlling the false, misleading, and deceptive practices alleged herein.

51.     In its haste to lure customers to environmentally friendly products and packaging, Defendant is making environmental marketing claims that are false, misleading, and deceptive. The claims made by Defendant that the Products are recyclable in California are consistent, uniform and are material to a reasonable consumer.  Because the claims are false and misleading, ordinary consumers are likely to be deceived by such representations.  In addition, Defendant's

---

[44] *Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and Their Disposal*, open for signature Mar. 23, 1989, adopted May 5, 1992, U.N.T.S. vol. 1673, Amendments to Annexes II, VII and IX, *Plastic Waste Amendments*, effective Jan. 1, 2021, http://www.basel.int/Implementation/Plasticwaste/PlasticWasteAmendments/Overview/tabid/8426/Default.aspx (last accessed Feb. 24, 2021).

[45] *Environmental Highlights*, WALMART, INC., https://corporate.walmart.com/esgreport/environmental#our-environmental-goals, (last accessed Dec. 7, 2020); *see also Walmart Announces New Plastics Packaging Waste Reduction Commitments*, WALMART, INC., https://corporate.walmart.com/newsroom/2019/02/26/walmart-announces-new-plastic-packaging-waste-reduction-commitments. (last accessed Dec. 7, 2020).

DOCUMENT PREPARED
ON RECYCLED PAPER

practice of misrepresenting the recyclability of the Products in California is long-term and

extensive.  Defendant has been misrepresenting the recyclability of the Products in California

since at least 2019, and the Products are sold at all of Defendant's 320 California locations, as

well as Defendant's website, which sells Products to California consumers.  Defendant's

misrepresentations are located directly on the Product's labels in a uniform and consistent

manner.  Photographs of the recyclable representations on the labels of the Products which were

taken in California are depicted below.

52.     Below are examples of recyclable representations on the labels of Products made

from plastics #3-7 sold by Defendant in California:





53.     Products made from plastics #3-7 are not recyclable in California because such

Products are rarely, if ever, recycled.  The inability for MRFs in California and elsewhere in the

United States to recycle plastics #3-7 is well documented.[46]  According to survey data, less than

5% of polypropylene ("PP" or plastic #5) tubs are reprocessed into recyclable material.[47]  To the

extent they sort them at all, the majority of MRFs in California and elsewhere in the United States

group plastics #3-7 into bales of mixed plastic because such plastics have little value, especially

when compared to plastics #1 and #2.  Thus, MRFs do not sort individual materials, such as PP or

polystyrene ("PS" or plastic #6), into separate bales.  And since the value of plastics #3-7 is so

low, there is no end market to reuse such plastic or convert such plastic into reusable material that

can be used to manufacture or assemble other goods.  Ultimately, the majority of plastics #3-7 in

California and elsewhere in the United States are sent to landfills.  For example, ReThink Waste,

a public agency that operates the Shoreway MRF in San Carlos, California stated that "plastics

#3-7 are all versions of hard plastic that are very difficult to recycle," because "there is currently

no market for the material when it is deconstructed."[48]  The Shoreway MRF continues to accept

plastics #3-7 but states that the collected material is sent to a landfill.[49]

54.     Although California MRFs may still accept plastics #3-7, the reality is that the

Products are not recycled in California.  One reason MRFs accept items even though they are not

recyclable is due to pressure from local authorities to meet solid waste diversion goals.  This

phenomenon has been recognized by the FTC.  In promulgating the most recent version of the

Green Guides, the FTC stated (under the heading "Packages Collected for Public Policy Reasons

but Not Recycled"), "The Commission agrees that unqualified recyclable claims for categories of

products that municipal recycling programs collect, but do not actually recycle, may be deceptive.

---

[46] John Hocevar, *supra* note 6; *America's 'recycled' plastic waste is clogging landfills, survey finds*. THE GUARDIAN, Feb. 18, 2020, https://www.theguardian.com/us-news/2020/feb/18/americas-recycled-plastic-waste-is-clogging-landfills-survey-finds (last accessed Dec. 7, 2020); *Americans' plastic recycling is dumped into landfills, investigation shows*, THE GUARDIAN, Jun. 21, 2019, https://www.theguardian.com/us-news/2019/jun/21/us-plastic-recycling-landfills (last accessed Dec. 7, 2020); Gwynn Guilford, *A lot of US plastic isn't actually being recycling since China put up its Green Fence*, QUARTZ, Sep. 16, 2013, https://qz.com/122003/plastic-recycling-china-green-fence/ (last accessed Dec. 7, 2020).

[47] John Hocevar, *supra* note 6.

[48] *Id.* at p. 8.

[49] *Id.*

DOCUMENT PREPARED
ON RECYCLED PAPER

To make a non-deceptive unqualified claim, a marketer should substantiate that a substantial majority of consumers or communities have access to facilities that will actually recycle, not accept and ultimately discard, the product.  As part of this analysis, a marketer should not assume that consumers or communities have access to a particular recycling program merely because the program will accept a product."[50]  Thus, although the Products may be accepted for recycling by some curbside programs in California, MRFs do not collect, sort, and separate such low-value plastics because there is no end market to reuse such items or convert them into reusable material.

55.     Because the Products are rarely, if ever, recycled in California, Defendant cannot make any recycling claims as to these Products in California.  However, at a minimum, Defendant is required to clearly and prominently qualify recyclable claims to avoid deception about the availability of recycling programs and collection sites to consumers in California.  16 C.F.R. § 260.12(b).  Under the Green Guides, marketers may qualify recyclable claims by stating the percentage of consumers or communities that have access to facilities that recycle the item.  *Id*. § 260.12(b)(2).  In the alternative, marketers may use qualifications that vary in strength depending on facility availability.  *Id*.  Thus, the strength of the qualification depends on the level of access to an appropriate facility that actually recycles a product.  A marketer may only make an unqualified recyclable claim if a substantial majority of consumers or communities have access to recycling facilities that actually recycle the items.[51]  *Id*. § 260.12(b)(1).  Because few, if any, consumers have access to recycling facilities that actually recycle the Products in California, Defendant must provide an unequivocally strong qualification for any recyclability claim regarding such Products in California.

56.     Here, Defendant provided no qualifications for some of the Products.  For other Products, Defendant provided the same two fine print qualifications for each Product: "check locally" and "not recycled in all communities."  As an initial matter, the fine print is

---

[50] FED. TRADE COMM'N, The Green Guides Statement of Basis and Purpose, (2012) available at: https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf (referenced in 77 Fed. Reg. 197, 62122 (Oct. 11, 2012)), at pp. 174-175.

[51] A "substantial majority" means at least 60 percent.  16 C.F.R. § 260.12(b)(1).

DOCUMENT PREPARED ON RECYCLED PAPER

approximately 2-point font, making it difficult for consumers to notice, yet alone read.  In

addition, as stated above, a "check locally" disclaimer is per se deceptive under the Green Guides.

*Id.*, § 260.12(d), Example 4.  Moreover, the "not recycled in all communities" qualification does

not satisfy the safe harbor examples in the Green Guides because it does not inform consumers of

the limited availability of recycling programs for the Products.  *Id*.  A reasonable consumer is

likely to believe that if their community has a recycling program, then the Products are likely

recyclable in their community.  By including the language "check locally" and "not recycled in

all communities" together, Defendant is incorrectly implying that consumers need only check

locally to determine whether recycling facilities exist in their community, not whether the

recycling facilities in their community actually recycle the Products.  The FTC has explicitly

stated such an implication is deceptive.  *See* 63 Fed. Reg. 84, 24244 (May 1, 1998); 16 C.F.R. §

260.12(b)(2).  Worse yet, even if a consumer followed Defendant's directive to check locally to

determine whether a facility actually recycled the Products, many recycling facilities in California

(which are often operated by private companies) have no duty to provide such information and

are unwilling to answer detailed consumer inquiries about their recycling capabilities.  In sum,

Defendant's recyclable representations on the Products sold in California are false, misleading,

and deceptive to reasonable consumers.

57.     Defendant also sells Products that do not contain a RIC and are therefore made

from unidentified plastic.  Nonetheless, Defendant also states that these Products are recyclable.

Below is an example of a false, misleading, and deceptive label on a Product sold by Defendant in

California that is made from an unidentified plastic:





Document Prepared
on Recycled Paper

-27-

58.     Here, the unidentified plastic contains the fine print qualifications "check locally" and "not recycled in all communities."  These fine print qualifications are deceptive for the reasons stated above.  In addition, even if a consumer understood the qualifications to mean that they are required to check with their local recycling facilities to determine whether the Products can be recycled, it is impossible for them to take such actions because there is no way for a consumer to determine what type of plastic resin the Products are made from.  And even if a MRF was willing to answer a consumer's questions, a consumer would not be able to ask whether an unidentified plastic material is recyclable.  In sum, representations that unidentified plastic Products are recyclable in California and that consumers need only "check locally" to determine whether the Products are recyclable are deceptive.

59.     Some of Defendant's Products are packaged in a shrink sleeve that prevent the Products from being recyclable in California and elsewhere in the United States.  Below is an example of a recyclable representation on a Product packaged in a shrink sleeve sold by Defendant in California:



60.     These Products are not recyclable in California and elsewhere in the United States because the plastic shrink sleeve cannot be recycled.  The Green Guides are clear: "if any component significantly limits the ability to recycle the item, any recyclable claim would be deceptive.  An item that is made from recyclable material, but because of its shape, size or some other attribute is not accepted in recycling programs, should not be marketed as recyclable."  16

DOCUMENT PREPARED
ON RECYCLED PAPER

-28-

C.F.R. § 260.12(d).  Here, these Products contain a plastic shrink sleeve that is not recyclable and that is difficult and dangerous to remove.  The shrink sleeves are wrapped tightly around the Products, thereby requiring consumers to use a knife or sharp object to cut the shrink sleeve free from the Products.  Due to the difficulty in removing the shrink sleeves, most consumers are unwilling to remove the shrink sleeves from the Products prior to placing the Products in their recycling bins.  Furthermore, most consumers believe that if their municipality offers recycling services, then all products marketed as "recyclable" can be recycled.  Thus, most consumers will place the Products in the recycling bin without removing the shrink sleeve under the false impression that the Products can be recycled, when the Products cannot in fact be recycled with the plastic shrink sleeve.  This is problematic because few, if any, recycling programs in California and elsewhere in the United States accept Products with shrink sleeves for recycling, Products with shrink sleeves cannot be sorted because they are made from mixed materials, and shrink sleeves contaminate the recycling stream and may damage recycling machinery.  Due to these issues, there is no end market for Products with shrink sleeves and most of these Products end up in landfills, incinerators, communities, or the natural environment.  Representing that Products packaged in a shrink sleeve are recyclable in California is therefore deceptive.

61.     Lastly, Defendant sells numerous Products packaged in plastic film that contain a store drop-off representation despite the limited availability of such programs in California and elsewhere in the United States.  Below is an example of a recyclable representation on such a Product sold by Defendant in California:



DOCUMENT PREPARED
ON RECYCLED PAPER

62.     These Products cannot be recycled by established recycling programs.  Rather, the packaging must be dropped off at participating stores.  This is because plastic bags and film cannot be separated for recycling.  The Green Guides specifically warn about plastic trash bags: "Because trash bags ordinarily are not separated from other trash at the landfill or incinerator for recycling, they are highly unlikely to be used again for any purpose.  Even if the bag is technically capable of being recycled, the claim is deceptive since it asserts an environmental benefit where no meaningful benefit exists."  16 C.F.R. § 260.3(c), Example 2.  Although the fine print representations on these Products communicate that the Products must be "dropped off" to be recyclable, many of Defendant's stores in California do not accept the Products for recycling.  In the past, California required supermarkets of a certain size to maintain a plastic carryout bag collection bin, but that rule expired on January 1, 2020.  *See* California Public Resources Code § 42257.  Consequently, many retail stores in California, including Defendant's stores, no longer accept plastic bags for drop-off recycling.  For instance, according to an informal survey, 0 of 8 of Defendant's stores in South Orange County, California have takeback bins to recycle plastic film.  According to Defendant's own data, it only provides access to in-store plastic bag and film recycling bins in approximately half of its stores (Defendant maintains roughly 5,353 retail stores nationwide, but only provides drop-off locations at approximately 2,900 locations).[52]

63.     In addition, a 2017 report on Film Recycling Investment found that only 7% of retail bags that are available for recycling are returned by residents for recycling.[53]  That report further found that of the approximately 300 million pounds of plastic film that reprocessing facilities receive a year, only 10 million pounds (approximately 3%) are able to be marketed due to the poor quality of plastic film and the lack of recycling markets for such low-value plastic.  Due to the lack of recycling markets for plastic film, 93% of California MRFs do not even accept it, and the reprocessing facilities that do accept it do not have the capacity to recycle large

---

[52] *2020 Environmental, Social and Governance Report*, WALMART, INC., https://cdn.corporate.walmart.com/90/0b/2271 5fd34947927eed86a72c788e/walmart-esg-report-2020.pdf, (last accessed Dec. 7, 2020).

[53] *Film Recycling Investment Report*, prepared by RSE USA, THE CLOSED LOOP FOUNDATION (2017), at p. 19.

DOCUMENT PREPARED ON RECYCLED PAPER

1    quantities of plastic film.  Based on these data, even if more consumers returned plastic bag film

2    for drop-off recycling, California MRFs do not have the capacity to sort and recycle it.  Thus, the

3    representation that these Products are recyclable if dropped off fails to communicate the limited

4    availability of both drop-off sites and programs that can actually recycle the Products in violation

5    of the Green Guides.  Ultimately, Products packaged in plastic film are not accepted by most

6    MRFs nor can they be collected, sorted, or separated from the general waste stream.

7    Consequently, there is no end market to recycle such Products in California.

8       64.    Many environmentally motivated consumers purchase the Products from

9    Defendant based on the belief that the Products will be recycled.  These consumers have no way

10   of knowing whether the Products are actually segregated from the general waste stream, cleaned

11   of contamination, or reused or converted into a material that can be reused or used in

12   manufacturing or assembling another item.  These consumers place a high priority on

13   environmental concerns in general, and on the negative consequences regarding the proliferation

14   of plastic pollution in particular.  Based on the labeling and advertising of Defendant's Products,

15   reasonable consumers believe that the Products are recyclable.  Defendant's representations that

16   the Products are recyclable are thus material to reasonable consumers.

17      65.    One of the major problems associated with mislabeling the Products as recyclable

18   is that this can lead to contaminating the recycling stream with unrecyclable materials that will

19   hinder the ability of recycling facilities to process items that are legitimately recyclable.  For

20   instance, according to the Recycling Partnership, "plastic bags cause MRF operators to shut down

21   the recycling line many times a day to cut off bags that have wrapped around equipment.  This

22   maintenance shut down reduces throughput for a facility, raises cost of labor to sort materials and

23   maintain equipment, increases waste coming out of the MRF, and puts workers at risk of injury

24   when they are performing maintenance."[54]  By encouraging consumers to place the Products in

25   recycling bins, Defendant is contaminating the recycling stream with unrecyclable materials that

26

27   _____
      [54] Asami Tanimoto, *West Coast Contamination Initiative Research Report*, THE RECYCLING
28   PARTNERSHIP, Apr. 2020, https://recyclingpartnership.org/wp-content/uploads/2020/04/The-Recycling-Partnership_WCCI-Report_April-2020_Final.pdf at p. 13 (last accessed Dec. 7, 2020).

prevents legitimately recyclable materials from being recycled.  Environmentally motivated consumers who purchase the Products in the belief that they are recyclable are thus unwittingly hindering recycling efforts.

66.    Greenpeace's mission is to protect the natural environment and expose environmental harms to the public.  Given that many consumers actively seek to purchase recyclable products because they are environmentally conscious, and given that reasonable consumers believe that Products labeled as recyclable will likely be recycled, Defendant's false, misleading, and deceptive recyclable claims on the Products have frustrated Greenpeace's mission.  Greenpeace has spent money, staff time, and other organizational resources, in response to this frustration of purpose by evaluating the problems associated with the proliferation of plastic pollution, investigating Defendant's recyclable representations in California, publishing a report on Defendant's recyclable label initiative, communicating with Defendant in California, and informing its supporters and the public in California with respect to Defendant's false, misleading, and deceptive recycling labels.  Most of this work was conducted in California by Greenpeace's California-based staff.

67.    Defendant is aware that the Products are not recyclable in California, including under its own definition of recyclability, yet Defendant has not undertaken any effort to notify its customers of the problem.  Defendant's failure to disclose that the Products are not recyclable in California is an omission of fact that is material to reasonable consumers.

68.    Plaintiff seeks an order enjoining Defendant from making false, misleading, and deceptive claims regarding the recyclability of its Products in California.  If an injunction is not granted, Plaintiff will suffer irreparable injury because it will continue to spend money, staff time, and other organizational resources to combat Defendant's false, misleading, and deceptive representations in California and to inform the public that the Products are not actually recyclable in California.  Thus, Plaintiff has no adequate remedy at law for the injuries currently being suffered as an award of monetary damages would not prohibit Defendant's false, misleading, and deceptive statements in California.  In addition, plastic pollution caused by Defendant's sale of the Products in California and the resulting harms to California waters, coasts, communities, and

DOCUMENT PREPARED
ON RECYCLED PAPER

marine life will continue to negatively impact Greenpeace's efforts to protect these critical

resources.  California consumers may also contaminate the recycling stream by unknowingly

placing the Products in their recycling bins, preventing legitimately recyclable products from

being recycled.  Accordingly, an injunction prohibiting Defendant's recycling representations will

serve the public interest.

## FIRST CAUSE OF ACTION

**(Plaintiff Alleges Violations of California Business & Professions Code § 17200,
*et seq*. Based on Fraudulent Acts and Practices)**

69.      Plaintiff incorporates by reference the allegations set forth above.

70.      Under Business & Professions Code § 17200, any business act or practice that is

likely to deceive members of the public constitutes a fraudulent business act or practice.

71.      Defendant has engaged and continues to engage in conduct that is likely to deceive

members of the public.  This conduct includes, but is not limited to, representing that the Products

are recyclable in California.

72.      Plaintiff has no adequate remedy at law for the injuries currently being suffered as

an award of monetary damages would not prohibit Defendant's false, misleading, and deceptive

statements.  If an injunction is not granted, Plaintiff will suffer irreparable injury because it will

continue to spend money, staff time, and other organizational resources to combat Defendant's

false and misleading representations in California and to inform the public that the Products are

not actually recyclable in California.

73.      Defendant's claims that the Products are recyclable are material, untrue, and

misleading.  These recyclable claims are prominent on all of Defendant's marketing, advertising,

and labeling materials for the Products in California.  Because part of Greenpeace's mission is to

ensure that consumers are not misled by environmental marketing claims, Greenpeace spent

money, staff time, and other organizational resources investigating Defendant's recycling

representations.  But for Defendant's egregious labeling practices in California and elsewhere in

the United States, Greenpeace would have used that money, staff time, and organizational

resources for other campaigns, including its other plastic campaigns.  Greenpeace has thus

1   suffered injury in fact and lost money or property as a direct result of Defendant's

2   misrepresentations and material omissions occurring in California.

3       74.    By committing the acts alleged above, Defendant has engaged in fraudulent

4   business acts and practices, which constitute unfair competition within the meaning of Business

5   & Professions Code § 17200.

6       75.    An action for injunctive relief is specifically authorized under Business &

7   Professions Code § 17203.

8       Wherefore, Plaintiff prays for judgment against Defendant, as set forth hereafter.

9   ## SECOND CAUSE OF ACTION

10  **(Plaintiff Alleges Violations of California Business & Professions Code § 17200, *et seq.*
    Based on Commission of Unlawful Acts)**

11

12      76.    Plaintiff incorporates by reference the allegations set forth above.

13      77.    The violation of any law constitutes an unlawful business practice under Business

14  & Professions Code § 17200.

15      78.    Defendant's conduct violates Section 5 of the Federal Trade Commission Act

16  ("FTC Act"), 15 U.S.C. § 45, which prohibits unfair methods of competition and unfair or

17  deceptive acts or practices in or effecting commerce.  By misrepresenting that the Products are

18  recyclable, Defendant is violating Section 5 of the FTC Act.

19      79.    Defendant's conduct also violates California Business & Professions Code

20  § 17500, which prohibits knowingly making, by means of any advertising device or otherwise,

21  any untrue or misleading statement with the intent to sell a product or to induce the public to

22  purchase a product.  By misrepresenting that the Products are recyclable, Defendant is violating

23  Business & Professions Code § 17500.

24      80.    Defendant's conduct also violates California Business & Professions Code

25  § 17580.5, which makes it unlawful for any person to make any untruthful, deceptive, or

26  misleading environmental marketing claim.  Pursuant to § 17580.5, the term "environmental

27  marketing claim" includes any claim contained in the Green Guides.  16 C.F.R. § 260.1, *et seq*.

28  Under the Green Guides, "[i]t is deceptive to misrepresent, directly or by implication, that a

product or package is recyclable.  A product or package shall not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item." 16 C.F.R. § 260.12(a).  By misrepresenting that the Products are recyclable as described above, Defendant is violating Business & Professions Code § 17580.5.

81.     By violating the FTC Act and Business & Professions Code §§ 17500 and 17580.5, Defendant has engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Business & Professions Code § 17200.

82.     Plaintiff has no adequate remedy at law for the injuries currently being suffered as an award of monetary damages would not prohibit Defendant's unlawful acts.  If an injunction is not granted, Plaintiff will suffer irreparable injury because it will continue to spend money, staff time, and other organizational resources to combat Defendant's false and misleading representations in California and to inform the public that the Products are not actually recyclable in California.

83.     Defendant's claims that the Products are recyclable are material, untrue, and misleading.  These recyclable claims are prominent on all of Defendant's marketing, advertising, and labeling materials for the Products in California.  Because part of Greenpeace's mission is to ensure that consumers are not misled by environmental marketing claims, Greenpeace spent money, staff time, and other organizational resources investigating Defendant's recycling representations.  But for Defendant's egregious labeling practices in California and elsewhere in the United States, Greenpeace would have used that money, staff time, and organizational resources for other campaigns, including its other plastic campaigns.  Greenpeace has thus suffered injury in fact and lost money or property as a direct result of Defendant's misrepresentations and material omissions occurring in California.

84.     An action for injunctive relief is specifically authorized under Business & Professions Code § 17203.

Wherefore, Plaintiff prays for judgment against Defendant, as set forth hereafter.

### THIRD CAUSE OF ACTION

**(Plaintiff Alleges Violations of California Business & Professions Code § 17200, *et seq*. Based on Unfair Acts and Practices)**

85.    Plaintiff incorporates by reference the allegations set forth above.

86.    Under California Business & Professions Code § 17200, any business act or practice that is unethical, oppressive, unscrupulous, or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

87.    Defendant has engaged and continues to engage in conduct which is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.  This conduct includes, but is not limited to, advertising and marketing the Products as recyclable in California when they are not.  By taking advantage of consumers concerned about the environmental impacts of plastic pollution, Defendant's conduct, as described herein, far outweighs the utility, if any, of such conduct.

88.    Defendant has engaged and continues to engage in conduct that violates the legislatively declared policy of Cal. Pub. Res. Code § 42355.5 against deceiving or misleading consumers about the environmental impact of plastic products.

89.    Defendant's conduct also violates the policy of the Green Guides.  The Green Guides mandate that "[a] product or package shall not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item."  16 C.F.R. § 260.12(a).  It further states that "[a]n item that is made from recyclable material, but because of its shape, size or some other attribute is not accepted in recycling programs, should not be marketed as recyclable."  16 C.F.R. § 260.12(d).  As explained above, the Products are rarely, if ever, recycled because consumers do not have access to recycling programs that accept the Products, the Products cannot be separated or recovered from the general waste stream and sorted into the correct materials bale by MRFs, and there are no end markets to reuse the Products or to convert the Products into a material that can be reused or used in manufacturing or assembling another item.  Nonetheless, some recycling facilities may accept the Products even though they

send the Products to a landfill.  The FTC has recognized that facilities may accept Products for recycling even though they end up in a landfill because of pressure from local authorities to meet solid waste diversion goals.[55]  It is unfair for Defendant to make a recyclable claim based on the fact that some recycling facilities may accept the Products, despite the recycling facilities' inability to actually recycle the Products.  Moreover, consumers believe that products are recyclable when they are accepted by a recycling program, even if the recycling facilities end up sending the products to a landfill.  It is also unfair for Defendant to represent that some Products are recyclable via store drop-off, without actually requiring a significant amount of its retail stores to maintain a store drop-off bin.  Taking advantage of consumer perception in this manner violates the policy of the Green Guides.

90.     Defendant's conduct, including failing to disclose that the Products will end up in landfills, incinerators, communities, and the natural environment and not be recycled, is substantially injurious to consumers.  Worse yet, by encouraging consumers to place the Products in recycling bins, Defendant is contaminating the recycling stream with unrecyclable materials that prevents legitimately recyclable materials from being recycled.  Such conduct has caused and continues to cause substantial injury to consumers because many consumers would not have purchased the Products but for Defendant's representations that the Products are recyclable.  Consumers are concerned about environmental issues in general and plastic pollution in particular, and Defendant's representations are therefore material to such consumers.  Misleading consumers causes injury to such consumers that is not outweighed by any countervailing benefits to consumers or competition.  Indeed, no benefit to consumers or competition results from Defendant's conduct.  Defendant gains an unfair advantage over its competitors, whose advertising must comply with Cal. Pub. Res. Code § 42355.5, the FTC Act, Cal. Business & Professions Code § 17508, and the Green Guides.  Since consumers reasonably rely on Defendant's representations of the Products as recyclable, consumers could not have reasonably avoided such injury.

---

[55] FED. TRADE COMM'N, *supra* note 50.

91.     Although Defendant knows that the Products are not ultimately recycled, Defendant failed to disclose that fact to its customers.

92.     By committing the acts alleged above, Defendant has engaged in unfair business acts and practices which constitute unfair competition within the meaning of California Business & Professions Code § 17200.

93.     Plaintiff has no adequate remedy at law for the injuries currently being suffered as an award of monetary damages would not prohibit Defendant's unfair business acts and practices. If an injunction is not granted, Plaintiff will suffer irreparable injury because it will continue to spend money, staff time, and other organizational resources to combat Defendant's false and misleading representations in California and to inform the public that the Products are not actually recyclable in California.

94.     Defendant's claims that the Products are recyclable are material, untrue, and misleading.  These recyclable claims are prominent on all of Defendant's marketing, advertising, and labeling materials for the Products in California.  Because part of Greenpeace's mission is to ensure that consumers are not misled by environmental marketing claims, Greenpeace spent money, staff time, and other organizational resources investigating Defendant's recycling representations.  But for Defendant's egregious labeling practices in California and elsewhere in the United States, Greenpeace would have used that money, staff time, and organizational resources for other campaigns, including its other plastic campaigns.  Greenpeace has thus suffered injury in fact and lost money or property as a direct result of Defendant's misrepresentations and material omissions occurring in California.

95.     An action for injunctive relief is specifically authorized under California Business & Professions Code § 17203.

Wherefore, Plaintiff prays for judgment against Defendant, as set forth hereafter.

1

## **PRAYER FOR RELIEF**

2    WHEREFORE, Plaintiff has no adequate remedy at law and prays for judgment and relief

3 against Defendant as follows:

4    A.  That the Court preliminarily and permanently enjoin Defendant from conducting

5 its business through the unlawful, unfair, or fraudulent business acts or practices, untrue and

6 misleading advertising, and other violations of law described in this Complaint;

7    B.  That the Court order Defendant to conduct a corrective advertising and

8 information campaign advising consumers that the Products do not have the characteristics, uses,

9 benefits, and qualities Defendant has claimed;

10    C.  That the Court order Defendant to cease and refrain from marketing and promotion

11 of the Products that state or imply that the Products are recyclable in California;

12    D.  That the Court order Defendant to implement whatever measures are necessary to

13 remedy the unlawful, unfair, or fraudulent business acts or practices, untrue and misleading

14 advertising, and other violations of law described in this Complaint;

15    E.  That the Court grant Plaintiff its reasonable attorneys' fees and costs of suit

16 pursuant to California Code of Civil Procedure § 1021.5, the common fund doctrine, or any other

17 appropriate legal theory; and

18    F.  That the Court grant such other and further relief as may be just and proper.

19

20

21

22

23

24

25

26

27

28

1

## JURY DEMAND

2      Plaintiff demands a trial by jury on all causes of action so triable.

3

4    Dated:    March 29, 2021                    Respectfully submitted,

5                                               LEXINGTON LAW GROUP

6

7                                               _/s/ Howard Hirsch_____

8                                               Howard Hirsch (State Bar No. 213209)
                                                Ryan Berghoff (State Bar No. 308812)
9                                               Meredyth Merrow (State Baw No. 328337)
                                                LEXINGTON LAW GROUP
10                                              503 Divisadero Street
                                                San Francisco, CA 94117
11                                              Telephone: (415) 913-7800
                                                Facsimile: (415) 759-4112
12                                              hhirsch@lexlawgroup.com
                                                rbergoff@lexlawgroup.com
13                                              mmerrow@lexlawgroup.com

14
                                                Attorneys for Plaintiff
15                                              GREENPEACE, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

FIRST AMENDED COMPLAINT – CASE NO. 3:21-CV-00754-MMC