1   LEXINGTON LAW GROUP
    Howard Hirsch, State Bar No. 213209
2   Ryan Berghoff, State Bar No. 308812
    Meredyth Merrow, State Bar No. 328337
3   503 Divisadero Street
    San Francisco, CA 94117
4   Telephone: (415) 913-7800
    Facsimile: (415) 759-4112
5   hhirsch@lexlawgroup.com
    rberghoff@lexlawgroup.com
6   mmerrow@lexlawgroup.com

7   LAW OFFICE OF GIDEON KRACOV
    Gideon Kracov, State Bar No. 179815
8   801 S. Grand Ave., 11th Floor
    Los Angeles, CA 90017
9   Telephone: (213) 629-2071
    Facsimile: (213) 623-7755
10  gk@gideonlaw.net

11  Attorneys for Plaintiff
    GREENPEACE, INC.
12

13

14              UNITED STATES DISTRICT COURT

15        NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

16

17
    GREENPEACE, INC.,                  Case No. 3:21-CV-00754-MMC
18
                    Plaintiff,         **SECOND AMENDED COMPLAINT**
19
           v.
20
    WALMART INC,
21
                    Defendant.
22

23

24

25

26

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

Plaintiff Greenpeace, Inc. ("Plaintiff" or "Greenpeace"), based on information, belief, and investigation of its counsel, except for information based on knowledge, hereby alleges:

**INTRODUCTION**

1.     The problems associated with plastic pollution are increasing on a local, national, and global scale.  This affects the amount of plastic in the ocean, in freshwater lakes and streams, on land, and in landfills.  Nearly 90% of plastic waste is not recycled, with billions of tons of plastic becoming trash and litter.[1]  According to a recent study, at least 1.2 to 2.5 million tons of plastic trash from the United States were dropped on lands, rivers, lakes and oceans as litter, were illegally dumped, or were shipped abroad and then not properly disposed of.[2]  As people are becoming more environmentally conscientious due to the harms caused by plastic pollution, manufacturers and distributors of plastic products or packaging are labeling their products as recyclable and environmentally beneficial, without maintaining any information substantiating the validity of such representations.  Seeking to take advantage of peoples' concerns, defendant Walmart, Inc. ("Defendant") manufactures or distributes a variety of single-use plastic products and packaging that are advertised or labeled as recyclable, without maintaining records that substantiate whether such products and packaging are actually recyclable.

2.     This Complaint seeks to remedy Defendant's unlawful and unfair business practices with respect to its failure to substantiate its recycling representations on plastic products or plastic packaging that are: (A) sold under Defendant's own private label brands;[3] (B) labeled as "recyclable"; and (C) either made from plastic #3-7, unidentified plastic, or packaged in a plastic

---

[1] Tom Udall and Alan Lowenthal, *Op-Ed: More than 90% of U.S. plastic waste is never recycled. Here's how we can change that*, L.A. TIMES (Feb. 21, 2020, 3:01 AM) https://www.latimes.com/opinion/story/2020-02-21/plastic-waste-never-recycled-u-s (last accessed Dec. 7, 2020).

[2] Associated Press, *Study: 1 to 2 million tons a year of U.S. plastic trash goes astray*, L.A. TIMES (Oct. 30, 2020, 11:03 AM) https://www.latimes.com/world-nation/story/2020-10-30/study-1-to-2-million-tons-of-us-plastic-trash-goes-astray (last accessed Dec. 7, 2020).

[3] Examples of Defendant's private label brands include, but are not limited to: Great Value, Allswell, Atheletic Works, Bonobos, Equate, EV1, Everstart, George, Holiday Time, Mainstays, Marketside, No Boundaries, Onn, Ozark Trail, Parent's Choice, Scoop, SwissTech, Time and Tru, and Wonder Nation.

DOCUMENT PREPARED ON RECYCLED PAPER

shrink sleeve (the "Products").[4]  The Products are manufactured or distributed by Defendant and advertised or labeled as recyclable.  However, the Products are not in fact recyclable because people do not have access to recycling programs that accept the Products, the Products cannot be separated or recovered from the general waste stream and sorted into the correct materials bale by material recovery facilities ("MRFs"), and there are no end markets to reuse the Products or to convert the Products into a material that can be reused or used in manufacturing or assembling another item.  Despite Defendant's extensive advertising and labeling of the Products as recyclable, most of the Products typically end up in landfills, incinerators, communities, or the natural environment.

3.     Under California's Environmental Marketing Claims Act (the "EMCA"), anyone who manufactures or distributes a consumer good and represents in advertising or on the label that it is not harmful to, or is beneficial to, the natural environment, through the use of such terms as "environmentally safe," "ecologically friendly," or other like terms, must maintain written records supporting the validity of any such representation.  Business & Professions Code § 17580(a).  The term "recyclable" is a term that represents that a product or packaging is not harmful to, or is beneficial to, the natural environment, and is therefore covered under Business & Professions Code § 17580(a).  In fact, the EMCA specifically requires companies to maintain information and documentation as to whether such products or packaging conform with the uniform standards contained in the Federal Trade Commission Guidelines for Environmental

---

[4]Non-exclusive examples of the Products include, but are not limited to: Great Value Organic Cinnamon Applesauce Cups, 24 oz, 6 Count, Walmart #556055661, UPC No. 0-7874213534-2, Product No. 136051; Great Value Diced Mangos In 100% Juice, 4 oz, 4 Count, Walmart #562987172, UPC No. 0-7874215803-7, Product No. 142059; Great Value Organic Diced Peaches & Pears, 16 oz., 4 Count, Walmart #562987178, UPC No. 0-7874223615-5, Product No. 142059; Great Value Premium Forks, 48 Count, Walmart #438491, UPC No. 0-7874211675-4, Product No. 042499; Great Value Premium Clear Cutlery Knives, 48 Count, Walmart #438505, UPC No. 0-7874211670-9, Product No. 042499; Great Value Premium Assorted Silver Cutlery, 36 count, Walmart #565175504; Great Value Snack Cups, 9 oz, 80 Count, Walmart #443461, UPC No. 0-681131925532, Manufacturer No. 6386717; Great Value Everyday Party Cups, 18 oz, 20 Count, Walmart #443482, UPC No. 0-78742049090, Manufacturer No. 6386484; Great Value Extra Virgin Olive Oil Cooking Spray, 7 oz., 3 Pack, UPC No. 0-7874206043-9, Product No. 928333; Great Value Ultimate Fresh Scent Booster, Blooming Lavender, 14.8 oz, Walmart #575777817, UPC No. 0-7874233153-9, Product No. 03604; and Great Value Plastic Party Cups, 18 oz, 120 Count, Walmart #557007144, UPC No. 0-7874218708-2, Product No. 437462.

1    Marketing Claims (the "Green Guides") for use of the terms "recycled" or "recyclable." *Id*. §

2    17580(a)(5).  In addition to documents regarding whether the consumer good conforms with the

3    Green Guides, the EMCA also requires that companies maintain the following records in written

4    form supporting the validity of their recyclable representations: (1) the reasons why a company

5    believes the representation to be true; (2) any significant adverse environmental impacts directly

6    associated with the production, distribution, use, and disposal of the consumer good; (3) any

7    measures that are taken by the company to reduce the environmental impacts directly associated

8    with the production, distribution, and disposal of the consumer good; and (4) violations of any

9    federal, state, or local permits directly associated with the production or distribution of the

10   consumer good. *Id*., § 17580(a)(1)-(4). The California Legislature declared its intent that the

11   information and documentation supporting the validity of any environmental marketing claims

12   shall be fully disclosed to the public, and information and documentation maintained pursuant to

13   Business & Professions Code § 17580 must be furnished to any member of the public upon

14   request. *Id*., § 17580(b), (d).

15       4.    The Green Guides also require marketers to ensure that their claims are supported

16   by a reasonable basis prior to making the claim.  16 C.F.R. § 260.2.  A reasonable basis is defined

17   as competent and reliable scientific evidence, such as "tests, analyses, research, or studies that

18   have been conducted and evaluated in an objective manner by qualified persons and are generally

19   accepted in the profession to yield accurate and reliable results." *Id*.  "Such evidence should be

20   sufficient in quality and quantity based on standards generally accepted in the relevant scientific

21   fields, when considered in light of the entire body of relevant and reliable scientific evidence, to

22   substantiate that each of the marketing claims is true." *Id*.

23       5.    Greenpeace has requested on numerous occasions that Defendant substantiate that

24   the Products are recyclable in California or elsewhere in the United States.  However, Defendant

25   has not provided any documentation in written form substantiating the recycling representations

26   on the labels of the Products.  Nor has Defendant provided any competent and reliable scientific

27   evidence, such as tests, analyses, research or studies that have been conducted and evaluated in an

28   objective matter by qualified persons, to substantiate that the Products are recyclable.  Defendant

1   thus violated and continues to violate California's Unfair Competition Law ("UCL"), Business

2   and Profession Code § 17200, *et seq.*, based on unlawful and unfair acts and practices because

3   Defendant sells Products advertised or labeled as recyclable but has not and cannot substantiate

4   that the Products are recyclable pursuant to the EMCA and the Green Guides.

5        6.      Plaintiff has no adequate remedy at law for the injuries currently being suffered as

6   an award of monetary damages would not prohibit Defendant's unsubstantiated recycling

7   representations.  If an injunction is not granted, Plaintiff will suffer irreparable injury because it

8   will continue to spend money, staff time and other organizational resources to combat

9   Defendant's unsubstantiated representations that the Products are recyclable in California and to

10  inform the public that the Products are not recyclable in California.  In addition, plastic pollution

11  caused by Defendant's sale of the Products in California and the resulting harms to California

12  waters, coasts, communities, and marine life will continue to negatively impact Greenpeace's

13  efforts to protect these critical resources.  California residents may also contaminate the recycling

14  stream by unknowingly placing the Products in their recycling bins, preventing legitimately

15  recyclable products from being recycled.  Thus, Plaintiff seeks an order enjoining Defendant's

16  unlawful and unfair acts and practices in California, which serves the public interest by protecting

17  the environment and the integrity of the recycling stream and by preventing Defendant from

18  gaining an unfair advantage over companies that can substantiate that the products they sell are

19  recyclable.

20                              **PARTIES**

21       7.      Plaintiff Greenpeace Inc. is a non-profit, public interest organization established

22  pursuant to section 501(c)(4) of the Internal Revenue Code, and headquartered in Washington,

23  D.C.  Greenpeace has worked to combat plastic pollution, to protect California coasts and marine

24  life from myriad harms related to plastic pollution, and to ensure that companies do not falsely

25  tout the environmental benefits of their products when none exist.  Greenpeace has standing to

26  bring this action because Defendant's conduct of representing in advertising or on the label of the

27  Products that the Products are recyclable in California without being able to substantiate whether

28  the Products are in fact recyclable in California has frustrated Greenpeace's mission to ensure that

Products labeled as environmentally beneficial actually benefit the environment and has caused Greenpeace to spend money, staff time, and other organizational resources in California in response to that frustration of purpose.  Thus, Greenpeace has lost money or property and has suffered an injury in fact due to Defendant's unlawful and unfair acts.

8.      Greenpeace was formed in 1971 as a global, independent campaigning organization that uses peaceful protest and creative communication to expose global environmental problems and promote solutions that are essential to a green and peaceful future. Greenpeace campaigns are science-based and centered on the core values of justice, equity, and inclusion.  Greenpeace pursues its mission through research, reports, surveys, policy proposals, government outreach and lobbying, coalition building and allyship, advocacy, education, public demonstrations and rallies, protests, litigation, and press and public outreach.  Greenpeace also has many supporters with whom Greenpeace communicates through blog posts, social media, emails, phone calls, text messages, webinars, and dedicated supporter mobilization.

9.      A core aspect of Greenpeace's mission is to educate the public with respect to important environmental issues, such as recycling.  Nearly every Greenpeace campaign involves educating the public on the causes, impacts, and alternatives to products or processes that damage public health, the environment, or human rights.  Examples of such Greenpeace campaigns include, but are not limited to, educating the public with respect to the hazards of bleached paper products, chemical additives in plastic toys and household products, mercury in fish, and ozone-depleting substances in refrigerators.

10.      As part of its many educational campaigns, for over three decades Greenpeace has engaged in various efforts to expose corporate greenwashing to prevent consumer product companies from representing their goods as environmentally friendly or benign without adequate substantiation.  Greenpeace has worked tirelessly to expose examples of corporate greenwashing to protect people from products advertised as environmentally friendly when such products harm the environment instead.  Greenpeace has led campaigns against oil companies, electronic manufacturers, and consumer good corporations and retailers for touting the environmental benefits of their products when, in fact, the products manufactured and sold by such companies

DOCUMENT PREPARED ON RECYCLED PAPER

caused significant environmental harm.  Greenpeace advocates to prevent corporate greenwashing and educates the public on such greenwashing so that people have the information available to make informed decisions about the environmental impacts of their purchases.

11.     Greenpeace has been working to prevent the proliferation of plastic pollution for nearly four decades.  Greenpeace has had numerous campaigns related to plastic pollution, including but not limited to educating people on greenwashing statements that certain plastic was biodegradable or recyclable when it was not, exposing the shipment of plastic waste to developing countries, seeking to replace polyvinyl chloride plastic with less toxic alternatives, exposing the health problems associated with incinerating plastic, and reducing or eliminating single-use plastic packaging because of its impacts on the marine ecosystem, the climate, communities, and human health.

12.     Greenpeace's campaigns related to plastic holistically focus on the lifecycle of plastic, from the harmful feedstock chemicals used to make plastic to the sheer amount of single-use plastic generated and ultimately discarded.  Greenpeace cares deeply about the proliferation of plastic because it has witnessed the harmful effects of plastic pollution on various ecosystems and human health.  The goals of Greenpeace's climate and oceans campaigns call for solutions that include drastically reducing the use of single-use plastic and finding alternatives to plastic products and packaging, reusing plastic products when no other alternatives are available, and properly recycling products if they cannot be eliminated or reused.

13.     Greenpeace's campaigns related to plastic pollution also include educating the public about false or unsubstantiated environmental marketing claims, such as informing the public about the low amount of plastic that is actually recycled and instead ends up in landfills, incinerators, communities, or the natural environment.  Thus, while investigating the low recycling rates of plastic products, Greenpeace has simultaneously analyzed recyclable representations present on the labels of products sold by major retailers and manufacturers. Greenpeace has spent, and continues to spend, substantial time and money engaging with retailers and consumer product companies to seek substantiation regarding representations that products are recyclable, to encourage them to reduce the amount of non-recyclable plastic used in their

products and packaging, and to discourage them from representing that products are recyclable when they are not.  Many of these campaign activities have been based in California, and many of those California-based activities have been directed at Defendant.

14.     A company's size and scope affect its plastic footprint, and due to Defendant's large volume of products made from or packaged in plastic, Greenpeace determined that Defendant is responsible for a substantial amount of plastic pollution.  In late 2018, Greenpeace began research on the plastic and recycling policies and practices of Defendant and other retailers, leading to the June 2019 release of Packaging Away the Planet.[5]  Packaging Away the Planet was a report published by Greenpeace, including significant input from Greenpeace's California-based staff, that evaluated the plastic footprint of major U.S. grocery retailers, including Defendant. During the time period that Greenpeace was preparing the Packaging Away the Planet report, Greenpeace spent money, staff time, and other resources organizing its supporters to raise awareness of Defendant's contribution to the proliferation of plastic pollution.  For example, on February 6, 2019, Greenpeace organized a "day of action" in which supporters photographed Defendant's plastic pollution in Los Angeles, California and St. Petersburg, Florida to highlight the amount of single-use plastic pollution generated by Defendant.  Greenpeace also created a petition and paid for it to be circulated on Facebook through Facebook Ads requesting Defendant to "ditch plastic packaging" and sent out numerous posts to its Twitter followers regarding Defendant's failure to reduce single-use plastic.  Greenpeace spent approximately $43,430 on the advertisements, which included advertisements in California.

15.     Greenpeace's investigation of Defendant's recycling representations has largely been based in California.  Greenpeace has five staff members located in California that were heavily involved in investigating Defendant, seeking substantiation that the Products are recyclable, and exposing Defendant's practice of misrepresenting the recyclability of the

---

[5] David Pinsky and James Mitchell, *Packaging Away the Planet: U.S. Grocery Retailers and the Plastic Pollution Crisis*, GREENPEACE REPORTS, June 11, 2019, https://www.greenpeace.org/usa/reports/packaging-away-the-planet-2019/ (last accessed Mar. 25, 2021).

DOCUMENT PREPARED
ON RECYCLED PAPER

1   Products, including its Senior Oceans Campaigner (formerly the Senior Plastics Campaigner),

2   two National Mobilization Organizers, Senior National Organizer, and Program Operations

3   Specialist.  Each one of these staff members spent a significant amount of time in California to

4   counter Defendant's unsubstantiated recycling representations present on the labels of Products it

5   sold in California.  For example, Greenpeace's California-based staff drafted a survey which was

6   sent by Greenpeace staff from California to various companies, including Defendant.  That survey

7   asked Defendant to respond to questions regarding its plastic use policies and practices, including

8   questions regarding its labeling practices with respect to the recyclability of single-use plastics.

9   Following that survey, California-based Greenpeace staff had other written and verbal

10  communications with Defendant regarding its responses to the survey.  Defendant's responses to

11  the survey did not substantiate that the Products are recyclable pursuant to the EMCA or the

12  Green Guides.

13        16.     For example, Greenpeace's Senior Plastics Campaigner spent scores of hours of

14  his time engaging with Defendant on plastics issues, including communications to determine

15  whether Defendant could substantiate that the Products are recyclable and to discourage

16  Defendant from labeling the Products as recyclable without substantiation.  Greenpeace's Senior

17  Plastics Campaigner—who was based in Oakland, California from September 2017 to January

18  2021—was the lead author on Greenpeace's Packaging Away the Planet report, which included a

19  ranking of Defendant's plastic pollution footprint.  The Senior Plastics Campaigner

20  communicated with Defendant to share the survey mentioned above, answer questions, provide

21  updates, and seek clarification on issues related to Defendant's plastic footprint and its

22  substantiation of recyclable claims.  In October 2019, Greenpeace's Senior Plastics Campaigner

23  sent an email from California to Defendant explicitly discussing the issues related to Defendant's

24  unsubstantiated recycling representations and informing Defendant that its labels do not meet the

25  standards in the Green Guides.  Accordingly, Greenpeace's Senior Plastics Campaigner, as well

26  as Greenpeace's other California-based staff members, diverted a significant amount of time in

27  California to engage with Defendant with respect to its unsubstantiated recycling representations

28  instead of spending their time on Greenpeace's multitude of other plastic pollution campaigns.

17.     Efforts expended on persuading Defendant to substantiate its recycling claims and comply with its own public commitments and legal obligations comes at the expense of Greenpeace's capacity to work with other corporations or advance its policy objectives. Greenpeace actively engages with dozens of companies about plastic packaging via reports like Shopping for Plastic[6] and The Climate Emergency Unpacked,[7] through direct dialogue with corporate executives, and through multi-stakeholder fora such as the Ocean Plastic Leadership Network.  Greenpeace also plays a significant role in policy advocacy at the state, federal, and global level.  For instance, Greenpeace helped pass several plastic bills in California in 2021. Greenpeace is heavily involved in federal legislation to establish a national bottle deposit program, to implement the Basel Convention, and to pass the Break Free From Plastic Pollution Act.  Greenpeace is also campaigning for a Global Plastic Treaty through the United Nations. The resources that Greenpeace has diverted specifically investigating and communicating with Defendant has come at the expense of spending money, staff time and other organizational resources on all these other projects and campaigns.

18.     Greenpeace's Truth in Recyclable Labels Campaign involves the participation of Greenpeace's entire plastic campaign team, including several California-based staff.  That campaign, which is ongoing, seeks to ensure that corporate marketing efforts aimed at representing the recyclability of products and packaging to people are accurate, legal, and substantiated.  Greenpeace uncovered evidence of problematic marketing claims with respect to recyclability in California and elsewhere in the United States involving several retailers and consumer goods companies, including Defendant.  Greenpeace staff in California shared documentation with companies and set up conversations to discuss its findings and to ensure appropriate changes were made.

---

[6] *Shopping for Plastic: The 2021 Supermarket Plastic Ranking,* GREENPEACE, https://www.greenpeace.org/usa/shopping-for-plastic-2021/ (last accessed October 14, 2021).

[7] Joan O'Callaghan, Rachel Head, *The Climate Emergency Unpacked: How Consumer Goods Companies Are Fueling Big Oil's Plastic Expansion,* GREENPEACE REPORTS, September 2021, https://www.greenpeace.org/usa/reports/the-climate-emergency-unpacked/ (last accessed October 14, 2021)

DOCUMENT PREPARED
ON RECYCLED PAPER

19.     For instance, in August 2019, Greenpeace hired a recycling consultant for its Truth in Recyclable Labels Campaign.  The contract for the consultant ran from August 8, 2019 to December 31, 2019, and Greenpeace paid the consultant $25,000 for her work.  The consultant's deliverables included: (1) a recycling briefing document (in PowerPoint) which describes the U.S. federal regulatory approach, existing product industry programs, recycling market changes, current lawsuits and the technical basis for claiming deceptive labeling; and (2) campaign briefs (in PowerPoint with photos) to enable Greenpeace to engage with product and retail companies to correct labeling of plastic products.  For the second deliverable, Greenpeace requested that the consultant identify three companies to investigate based on egregious and unsubstantiated labeling practices on plastic products that are not recyclable.  Defendant was subsequently identified as one of the three companies to target, and the consultant and Greenpeace staff (including California-based Greenpeace staff) spent a significant amount of time and resources analyzing and investigating Defendant's unsubstantiated recyclability representations on the labels of Products sold in California.  Approximately 15% of the consultant's time was dedicated to investigating Defendant.

20.     Greenpeace spent money, staff time, and other organizational resources managing the consultant.  For example, Greenpeace's Oceans Campaign Director was responsible for managing the consultant and dedicated at least ten hours of his time working with the consultant to investigate Defendant's unsubstantiated recycling representations.  Greenpeace's Oceans Campaign Director and the consultant had several discussions regarding conducting research on retailers and manufacturers large enough to be significant players in addressing the plastic pollution crisis, including Defendant.

21.     On October 6, 2019, as part of the work for Greenpeace under the contract, the consultant visited a Walmart store located at 30491 Av. De Las Flores, Rancho Santa Margarita, CA 92688.  The consultant took numerous photographs of the Products, including the following: Great Value Organic Cinnamon Applesauce Cups, 24 oz, 6 Count, Walmart #556055661, UPC No. 0-7874213534-2, Product No. 136051; Great Value Diced Mangos In 100% Juice, 4 oz, 4 Count, Walmart #562987172, UPC No. 0-7874215803-7, Product No. 142059; Great Value

Organic Diced Peaches & Pears, 16 oz., 4 Count, Walmart #562987178, UPC No. 0-7874223615-5, Product No. 142059; Great Value Premium Forks, 48 Count, Walmart #438491, UPC No. 0-7874211675-4, Product No. 042499; Great Value Premium Clear Cutlery Knives, 48 Count, Walmart #438505, UPC No. 0-7874211670-9, Product No. 042499; Great Value Premium Assorted Silver Cutlery, 36 count, Walmart #565175504; Great Value Snack Cups, 9 oz, 80 Count, Walmart #443461, UPC No. 0-681131925532, Manufacturer No. 6386717; Great Value Everyday Party Cups, 18 oz, 20 Count, Walmart #443482, UPC No. 0-78742049090, Manufacturer No. 6386484; Great Value Extra Virgin Olive Oil Cooking Spray, 7 oz., 3 Pack, UPC No. 0-7874206043-9, Product No. 928333; Great Value Ultimate Fresh Scent Booster, Blooming Lavender, 14.8 oz, Walmart #575777817, UPC No. 0-7874233153-9, Product No. 03604; and Great Value Plastic Party Cups, 18 oz, 120 Count, Walmart #557007144, UPC No. 0-7874218708-2, Product No. 437462.

22.    On October 27, 2019, the consultant prepared a 20-page PowerPoint report for Greenpeace required by her contract that included many of the photographs taken at the Walmart store located in Rancho Santa Margarita, CA.  The report was based on the consultant's investigation in California.  Greenpeace staff located in California then spent a significant amount of time reviewing the report and further investigating Defendant in California.

23.    Based on the consultant's work and the time spent by Greenpeace staff members, including the staff members located in California, Greenpeace determined that Defendant frustrated Greenpeace's purpose by touting the environmental benefits of the Products without substantiating the validity of such environmental benefits.  But for the report prepared by the consultant based on unsubstantiated recyclable representations on the labels of Products sold by Defendant in California and the time spent by Greenpeace staff members located in California, Greenpeace would not have included Defendant in its Truth in Recyclable Labels Campaign.  Thus, Greenpeace diverted money, staff time, and other organizational resources to fund and manage the consultant and further investigate Defendant's unsubstantiated recycling representations, which would have been used for Greenpeace's other campaigns and projects, including its other plastic campaigns.

24.     Greenpeace has also published reports and surveys documenting the low recycling rates of various plastic products, including a comprehensive U.S. Survey of Plastics Recyclability entitled Circular Claims Fall Flat, published on February 18, 2020 (the "CCFF Report").[8]  The CCFF Report is a thorough survey of plastic product waste collection, sortation, and reprocessing in the United States to determine the legitimacy of recyclable claims and labels on single-use plastic products.  The survey was based on current conditions in October 2019 to January 2020 and U.S. Federal Trade Commission guidelines.  The survey directly evaluated Defendant's recyclability labels and Defendant's packaging design guides for recyclability, as well as numerous other recycling guides.  A portion of the CCFF Report analyzes the recyclability of single-use plastic in California, which was prepared with the help of Greenpeace staff located in California.

25.     After initially spending money, staff time, and other organizational resources to specifically investigate Defendant's recyclable representations in California, Greenpeace diverted additional resources to inform Defendant that the Products are not recyclable and to request that Defendant substantiate the validity of its recycling representations.  For instance, in February 2020, Greenpeace's Senior Plastics Campaigner drafted and sent an email in California to Defendant regarding the implications of the CCFF Report, which described the low rate of recyclability for products that Defendant labeled as recyclable.  From California, Greenpeace's Senior Plastics Campaigner then arranged for a meeting with Defendant and various other retailers at an industry conference to discuss recyclable representations on plastic products and afford Defendant an opportunity to substantiate its recycling representations.  Greenpeace has since published press releases identifying Defendant's unsubstantiated recyclable representations to inform the public of such issues.

---

[8] John Hocevar, *Circular Claims Fall Flat: Comprehensive U.S. Survey of Plastics Recyclability*, GREENPEACE REPORTS, Feb. 18, 2020, https://www.greenpeace.org/usa/wp-content/uploads/2020/02/Greenpeace-Report-Circular-Claims-Fall-Flat.pdf (last accessed Dec. 7, 2020).

26.     Because Greenpeace's mission involves preventing companies from touting the environmental benefits of their products without substantiating the validity of such environmental benefits, Defendant's unsubstantiated representations that its Products are recyclable in California and elsewhere in the United States has frustrated Greenpeace's purpose.  Defendant's continued use of unsubstantiated recyclability representations serves to confuse the public about plastic products and packaging and gives them a false sense that they are doing something good for the environment when they purchase Defendant's Products and then place them into their recycling bins.  Defendant's frustration of Greenpeace's purpose has forced Greenpeace to spend money, staff time, and other organizational resources pressuring Defendant to substantiate the validity of the recyclable representations on the labels of the Products or to stop using such representations. Greenpeace also spent a significant amount of money, staff time, and other organizational resources to educate its supporters, the public, and the media that a Product labeled by Defendant as recyclable is unsubstantiated and unlikely to be recycled in California or elsewhere in the United States.  Greenpeace would have used its money, staff time, and organizational resources on other campaigns or projects related to plastic pollution, but the large number of Defendant's unsubstantiated recycling representations in California required Greenpeace to focus its attention on Defendant's actions in California.  These actions have caused Greenpeace to lose money or property and it has therefore suffered an injury in fact.

27.     Absent relief from this Court, Plaintiff will suffer irreparable injury because it will continue to spend money, staff time, and other organizational resources to combat Defendant's unsubstantiated recycling representations in California and to inform the public that the Products are not recyclable in California.  In addition, plastic pollution caused by Defendant's sale of the Products in California and the resulting harms to California waters, coasts, communities, and marine life will continue to negatively impact Greenpeace's efforts to protect these critical resources.  California residents may also contaminate the recycling stream by unknowingly placing the Products in their recycling bins, preventing legitimately recyclable products from being recycled.  Thus, relief from this Court is in the public interest by protecting the environment and the integrity of the recycling stream and is necessary to further Greenpeace's

DOCUMENT PREPARED
ON RECYCLED PAPER

-13-

1    mission of prohibiting companies from touting the environmental benefits of their products

2    without substantiating the validity of such environmental benefits.

3        28.    Defendant Walmart, Inc. is a Delaware corporation with its principal place of

4    business in Bentonville, Arkansas.  Defendant Walmart, Inc. manufactures, distributes, markets,

5    and sells the Products in California.  Defendant has a significant presence in California, with 142

6    Supercenters, 71 Discount Stores, 78 Neighborhood Markets and other small formats, and 29

7    Clubs.[9]  In total, Defendant has 320 locations in California, making California its third largest

8    market.

9                        **JURISDICTION AND VENUE**

10       29.    By removing this case to federal court, Defendant has alleged that this Court has

11   jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1441.  *See*

12   Notice of Removal, filed Jan. 29, 2021 [ECF Docket No. 1].

13       30.    This Court has jurisdiction over Defendant because it is a corporation or other

14   entity that has sufficient minimum contacts in California, is a citizen of California, or otherwise

15   intentionally avails itself of the California market either through the distribution, sale or

16   marketing of the Products in the State of California or by having a facility located in California so

17   as to render the exercise of jurisdiction over it by the California courts consistent with traditional

18   notions of fair play and substantial justice.  Because California is Defendant's third largest market

19   with approximately 320 locations, Defendant purposefully directs its activities toward California

20   and purposefully avails itself of the privileges of conducting activities in California.

21       31.    In addition, the claims in this case arise out of Defendant's California-related

22   activities.  Defendant markets and sells the Products in California at its 320 California locations

23   as well as its website, which sells the Products to California residents.  While Defendant

24   represents in advertising or on the label of the Products that that the Products are recyclable in

25

26   _____
     [9] *Walmart Inc. Form 10-K for Fiscal Year Ended Jan. 31, 2021*, EDGAR U.S. S.E.C. Ann. Rep.
27   202, Commission File No. 001-06991 at p. 24, available at:
     https://www.sec.gov/ix?doc=/Archives/edgar/data/104169/000010416921000033/wmt-
28   20210131.htm#.

1  California, Defendant has failed to substantiate that representation in California or elsewhere.

2  Greenpeace has spent significant money, staff time, and other organizational resources in

3  California to counter Defendant's unsubstantiated recyclability representations on Products sold

4  in California.  Thus, Greenpeace's claim that Defendant represents in advertising or on the label

5  of the Products that that the Products are recyclable in California when, in fact, the Products are

6  not recyclable in California and Defendant has not substantiated that the Products are recyclable

7  in California arise out of Defendant's activities in California.

8        32.     Venue in the County of Alameda is proper pursuant to 28 U.S.C. § 1391(a)

9  because Defendant is a resident of this District pursuant to 28 U.S.C. § 1391(c), and because a

10  substantial part of the events or omissions giving rise to the claim occurred in this District.

11        33.     **Intradistrict Assignment (L.R. 3-2(c) and (d) and 3-5(b))**:  This action arises in

12  Alameda County, in that a substantial part of the events which give rise to the claims asserted

13  herein occurred in Alameda County.  Pursuant to L.R. 3-2(c), all civil actions which arise in

14  Alameda County shall be assigned to the San Francisco Division or the Oakland Division.

15                                                        **LEGAL BACKGROUND**

16        34.     In light of the significant amount of plastic that is advertised and labeled as

17  recyclable but instead ends up in landfills, incinerators, communities, and the natural

18  environment, the Legislature of the State of California has declared that "it is the public policy of

19  the state that environmental marketing claims, whether explicit or implied, should be

20  substantiated by competent and reliable evidence to prevent deceiving or misleading consumers

21  about the environmental impact of plastic products."  Cal. Pub. Res. Code § 42355.5.  The policy

22  is based on the Legislature's finding that "littered plastic products have caused and continue to

23  cause significant environmental harm and have burdened local governments with significant

24  environmental cleanup costs."  *Id*. § 42355.

25        35.     Similar to the public policy declared in the California Public Resources Code, the

26  EMCA and the Green Guides require companies to substantiate environmental marketing claims.

27  Under the EMCA, "Any person who represents in advertising or on the label or container of a

28  consumer good that the consumer good that it manufactures or distributes is not harmful to, or is

DOCUMENT PREPARED
ON RECYCLED PAPER

-15-

beneficial to, the natural environment, through use of such terms as 'environmental choice,' 'ecologically friendly,' 'earth friendly,' 'environmentally friendly,' 'ecologically sound,' 'environmentally sound,' 'environmentally safe,' 'ecologically safe,' 'environmentally lite,' 'green product,' or any other like term, shall maintain in written form in its records…information and documentation supporting the validity of the representation."   Business & Professions Code § 17580(a).  The term "recyclable" is a term that represents that a product or packaging is not harmful to, or is beneficial to, the natural environment, and is therefore covered under Business & Professions Code § 17580(a).  In fact, the EMCA specifically requires companies to maintain information and documentation as to whether such products or packaging conform with the uniform standards contained in the Green Guides for use of the terms "recycled" or "recyclable." *Id*. § 17580(a)(5).  In addition to documents regarding whether the consumer good conforms with the Green Guides, the EMCA requires that companies maintain the following records in written form supporting the validity of their recyclable representations: (1) the reasons why a company believes the representation to be true; (2) any significant adverse environmental impacts directly associated with the production, distribution, use, and disposal of the consumer good; (3) any measures that are taken by the company to reduce the environmental impacts directly associated with the production, distribution, and disposal of the consumer good; and (4) violations of any federal, state, or local permits directly associated with the production or distribution of the consumer good.  *Id*., § 17580(a)(1)-(4). The California Legislature declared its intent that the information and documentation supporting the validity of any environmental marketing claims shall be fully disclosed to the public, and information and documentation maintained pursuant to Business & Professions Code § 17580 must be furnished to any member of the public upon request.  *Id*., § 17580(b), (d).

36.     The Green Guides also require marketers to ensure that their claims are supported by a reasonable basis prior to making the claim.  16 C.F.R. § 260.2.  A reasonable basis is defined as competent and reliable scientific evidence, such as "tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results."  *Id*.  "Such evidence should be

-16-

DOCUMENT PREPARED ON RECYCLED PAPER

1  sufficient in quality and quantity based on standards generally accepted in the relevant scientific

2  fields, when considered in light of the entire body of relevant and reliable scientific evidence, to

3  substantiate that each of the marketing claims is true." *Id.*

4      37.    Under the Green Guides, "A product or package shall not be marketed as

5  recyclable unless it can be collected, separated, or otherwise recovered from the waste stream

6  through an established recycling program for reuse or use in manufacturing or assembling another

7  item." 16 C.F.R. § 260.12(a).  This definition encompasses the three prongs of recyclability that

8  are commonly used in the solid waste industry: (1) accessibility of recycling programs ("through

9  an established recycling program"); (2) sortation for recovery ("collected, separated, or otherwise

10  recovered from the waste stream"); and (3) end markets ("for reuse or use in manufacturing or

11  assembling another item").  The California Public Resources Code similarly defines recycling as

12  "the process of collecting, sorting, cleansing, treating, and reconstituting materials that would

13  otherwise become solid waste, and returning them to the economic mainstream in the form of raw

14  material for new, reused, or reconstituted products which meet the quality standards necessary to

15  be used in the marketplace." Cal. Pub. Res. Code § 40180.

16      38.    Defendant has published its own Recycling Playbook that defines recyclability in a

17  similar manner.[10]  The Playbook defines recyclability as a system of stages: "(1) Collection

18  (collection available for a substantial majority of consumers); (2) Sortation (packages are

19  separated and aggregated for further processing); (3) Processing (commercial processes recover

20  material); (4) End-Market (the recycled material is used in new products); and (5) Recycling Rate

21  (at least 30% recycling rate achieved for over 400 million inhabitants)."  Thus, Defendant's own

22  interpretation of recyclability requires access to recycling programs, sortation, and end markets.

23      39.    As reflected in the Green Guides' language and regulatory history, the FTC does

24  not consider a product to be recyclable unless it is actually recycled.  For instance, the Green

25

26  [10] *The Recycling Playbook,* WALMART, INC., last updated Oct. 25, 2019,
    https://www.walmartsustainabilityhub.com/media-library/document/recycling-playbook-
27  november-2019/_proxyDocument?id=0000016e-384f-d8af-a96e-beff25150000 (last accessed on
    Dec. 7, 2020).

28

DOCUMENT PREPARED
ON RECYCLED PAPER

Guides provide that: (1) "[i]f any component significantly limits the ability to recycle the item, any recyclable claim would be deceptive;" and (2) "an item that is made from recyclable material, but, because of its shape, size, or some other attribute, is not accepted in recycling programs, should not be marketed as recyclable." 16 C.F.R. §§ 260.12(a) and (d); *see also id.*, § 260.12(d), Examples 2 and 6. And in promulgating the current recycling definition that encompasses accessibility, sortation, and end markets, the FTC clarified that "[f]or a product to be called recyclable, there must be an established recycling program, municipal or private, through which the product *will be* converted into, or used in, another product or package." *See* 63 Fed. Reg. 84, 24247 (May 1, 1998) (emphasis added). As the FTC has stated, "while a product may be technically recyclable, if a program is not available allowing consumers to recycle the product, there is no real value to consumers." *Id.*, at 24243.

## BACKGROUND FACTS

40.     In the past decade humans across the globe have produced 8.3 billion metric tons of plastic, most of it in disposable products and packaging that ends up as trash or pollution.[11] Of the 8.3 billion metric tons produced, 6.3 billion metric tons have become plastic waste and only 9% of that has been recycled.[12] A third of the single-use plastic generated ends up in the natural environment, accounting for 100 million metric tons of plastic pollution in 2016.[13] Current estimates suggest that there are over 150 million tons of plastics in the ocean.[14] The Environmental Protection Agency estimates that Americans alone disposed of 35.7 million tons

---

[11] Roland Geyer, et al., *Production, use, and fate of all plastics ever made*, SCIENCE ADVANCES, Jul. 19, 2017, https://plasticoceans.org/wp-content/uploads/2018/05/Production_use_and_fate_of_all_plastics_ever_made.pdf (last accessed Dec. 7, 2020).

[12] *Id.*

[13] *No Plastic in Nature: Accessing Plastic Ingestion From Nature to People*, WWF, June 2019, https://d2ouvy59p0dg6k.cloudfront.net/downloads/plastic_ingestion_web_spreads.pdf at p. 6 (last accessed Dec. 7, 2020).

[14] *The New Plastics Economy Rethinking the Future of Plastics*, ELLEN MACARTHUR FOUNDATION AND MCKINSEY & COMPANY (2016), https://plasticoceans.org/wp-content/uploads/2018/05/EllenMacArthurFoundation_TheNewPlasticsEconomy_Pages.pdf at p. 17 (last accessed Dec. 7, 2020).

of plastic in 2018, 91.3% of which was not recycled.[15]  While California had a goal to achieve a 75% recycling rate by 2020, California's recycling rate is actually in decline.  According to CalRecycle, in 2014 California's recycling rate was 50%, dropping to 47% in 2015 and down to 44% in 2016.[16] According to the California Statewide Commission on Recycling Markets and Curbside Recycling, the state's recycling rate dropped to 37% in 2019.[17]

41.     Recent investigations into the proliferation of plastic pollution plaguing the natural environment have revealed that the plastics industry has known for decades that most products and packaging made from plastic would not be recycled.  On September 11, 2020, National Public Radio ("NPR") published an investigation illustrating the plastic industry's decades-long awareness that recycling would not keep plastic products or packaging out of landfills, incinerators, communities, or the natural environment.[18]  In a 1974 speech, one industry insider stated "there is serious doubt that [recycling plastic] can ever be made viable on an economic basis."[19]  Larry Thomas, former president of the Society of the Plastic Industry (known today as the Plastics Industry Association), told NPR that "if the public thinks that recycling is working, then they are not going to be as concerned about the environment."[20]  The NPR investigative report details the length and expense that the plastics industry went to deceive the public that plastic was easily recyclable, despite knowledge that the cost of recycling would never be economical.  Similarly, a recent Canadian Broadcasting Corporation news report describes that

---

[15] 15 EPA, *2018 Advancing Sustainable Materials Management: Facts and Figures Report –* Tables and Figures. (https://www.epa.gov/sites/production/files/2021-01/documents/2018_tables_and_figures_dec_2020_fnl_508.pdf (last accessed Feb. 14, 2021).

[16] *California's Statewide Recycling Rate,* CALRECYCLE, last updated Mar. 3, 2020, https://www.calrecycle.ca.gov/75percent/recyclerate (last accessed Dec. 7, 2020).

[17] California Statewide Commission on Recycling Markets and Curbside Recycling Policy Recommendations, CALRECYCLE, https://drive.google.com/drive/folders/17URSu4dubsoX4qV0qH3KciSWZhV595o5 (last accessed Feb. 14, 2021).

[18] Lara Sullivan, *How Big Oil Misled The Public Into Believing Plastic Would be Recycled.* NPR.ORG (Sep. 11, 2020, 5:00 AM), https://www.npr.org/2020/09/11/897692090/how-big-oil-misled-the-public-into-believing-plastic-would-be-recycled (last accessed Dec. 7, 2020).

[19] *Id.*

[20] *Id.*

DOCUMENT PREPARED
ON RECYCLED PAPER

1  even the recycling logo was used as a marketing tool to improve the image of plastics after

2  environmental backlash in the 1980s.[21]  "There was never an enthusiastic belief that recycling

3  was ultimately going to work in a significant way," yet the plastics industry spent millions on ads

4  to deceive the public as to the efficacy of recycling.[22]

5        42.        After decades of industry deception that plastic products and packaging are

6  recyclable, people have recently become even more aware of the problems associated with single-

7  use plastics polluting the oceans and the natural environment.  The staggering amount of plastic

8  pollution accumulating in the environment is accompanied by an array of negative side effects.

9  For example, plastic debris is frequently ingested by marine animals and other wildlife, which can

10  be injurious, poisonous, and deadly.[23]  Floating plastic is also a vector for invasive species,[24] and

11  plastic that gets buried in landfills can leach harmful chemicals into ground water that is absorbed

12  by humans and other animals.[25]  Plastic litter on the streets and in and around our parks and

13  beaches also degrades the quality of life for residents and visitors.  Scientists have also discovered

14  that plastic releases large amounts of methane, a powerful greenhouse gas, as it degrades.[26]  Thus,

15

16

17

---

18  [21] *Recycling was a lie – a big lie – to sell more plastic, industry experts say*, CBC.CA, Sep. 23, 2020, https://www.cbc.ca/documentaries/the-passionate-eye/recycling-was-a-lie-a-big-lie-to-sell-more-plastic-industry-experts-say-1.5735618 (last accessed Dec. 7, 2020).

19  [22] *Id*.

20  [23] Amy Lusher, et al., *Microplastics in Fisheries and Aquaculture: Status of knowledge on their occurrence and implications for aquatic organisms and food safety*, FAO Fisheries and

21  Aquaculture Technical Paper No. 615, Rome, Italy, 2017 http://www.fao.org/3/a-i7677e.pdf (last accessed Dec. 7, 2020).

22  [24] *Report on Marine Debris as a Potential Pathway for Invasive Species*, NOAA, March 2017, Silver Spring, MD; https://marinedebris.noaa.gov/sites/default/files/publications-

23  files/2017_Invasive_Species_Topic_Paper.pdf (last accessed Dec. 7, 2020)

24  [25] Emma L. Teuten, et *al., Transport and release of chemicals from plastics to the environment and to wildlife*, PHILIOS TRANS R. SOC. LOND. B. BIOL. SCI, July. 27, 2009,

25  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2873017/ (last accessed Dec. 7, 2020).

26  [26] Sarah-Jeanne Rover, et al., *Production of methane and ethylene from plastic in the environment*, Aug. 1, 2018, PLoS ONE 13(8) e0200574,

27  https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0200574 (last accessed Dec. 7, 2020).

28

DOCUMENT PREPARED
ON RECYCLED PAPER

1  plastic pollution contributes to global climate change, which affects California in the form of

2  extreme drought, sea level rise, and more frequent and severe wildfires.[27]

3       43.    There are various types of plastic resin that are used to produce single-use plastic

4  products and packaging.  All rigid plastic bottles and containers sold in California are required to

5  include a molded label code that indicates the resin used to produce the plastic bottle or container.

6  Cal. Pub. Res. Code § 18015.  The code generally consists of a number placed inside a triangle to

7  reflect the resin used to make the bottle or container.  *Id.*

8       44.    PET (plastic #1) and HDPE (plastic #2) are widely considered to be the most

9  recyclable forms of plastic; however, studies indicate that even products and packaging made

10  from these resins often end up in landfills, incinerators, communities, or the natural

11  environment.[28]  This is because MRFs and plastic reprocessing plants in the United States cannot

12  collect, sort, and process the sheer volume of plastic that is generated by consumer product

13  companies on an annual basis.[29]  The labor and cost required to collect, sort, grind, melt, and

14  reconstitute the approximately 35 million tons of single-use plastic produced in the United States

15  every year is insurmountable.  A recent Greenpeace study revealed that U.S. plastic reprocessing

16  facilities can process no more than 23% of PET#1 plastic produced each year and no more than

17  13% of HDPE#2.[30]  More alarmingly, plastics #3-7, which are widely considered to be low-value

18  plastics, are rarely, if ever recycled.  The Greenpeace study revealed that MRFs can process only

19  a negligible percentage of plastics #3-7.[31]  Additionally, reprocessing plastic creates a significant

20  amount of plastic waste that must be landfilled or incinerated.  According to the National

21  —————————————————

22  [27] *What Climate Change Means for California*, U.S. EPA, Aug. 2016, EPA 430-F-16-007,
https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-ca.pdf (last accessed Dec. 7, 2020)

23  [28] *Facts and Figures about Materials, Waste and Recycling*, U.S. EPA,
24  https://www.epa.gov/facts-and-figures-about-materials-waste-and-recycling/plastics-material-specific-data (last accessed Dec. 7, 2020).

25  [29] Michael Corkery, *As Costs Skyrocket, More U.S. Cities Stop Recycling,* N.Y. TIMES, Mar. 16,
26  2019, https://www.nytimes.com/2019/03/16/business/local-recycling-costs.html (last accessed Dec. 7, 2020).

27  [30] John Hocevar, *supra* note 6.
[31] *Id.*

28

DOCUMENT PREPARED
ON RECYCLED PAPER

1    Association for PET Container Resources ("NAPCOR"), processing "easy-to-recycle" PET

2    bottles results in 28% material loss.[32]

3          45.    Due to the availability of cheap raw materials to make "virgin plastic," there is

4    essentially no market demand for most types of recycled plastic.  Virgin plastic is derived from

5    oil and natural gas and has a higher quality than recycled plastic.  Recognizing the market

6    potential from plastic production, major oil and natural gas companies have greatly expanded

7    their petrochemical operations to increase production of plastic resins and products, which drives

8    down the price of virgin plastic.[33]  As a result, using virgin plastic to produce plastic products or

9    packaging is cheaper than using recycled plastic.  Recycling facilities no longer have an incentive

10   to collect, sort, clean and reprocess waste plastic because there are almost no buyers of the

11   resulting plastic, pellets, or scrap materials.

12         46.    Historically, recycling facilities in the United States shipped plastic scrap to China

13   and other countries in the Far East for recycling.  But millions of pounds of that exported plastic

14   waste was never recycled.[34]  Instead, this plastic was burned or dumped into waterways, where it

15   was carried into the ocean.[35]  For years, tons of plastic that U.S. consumers dutifully sorted and

16   transported to recycling facilities ultimately ended up in the ocean or the natural environment.

17

18

19   [32] NAPCOR, Report on Postconsumer PET Container Recycling Activity in 2017,
20   https://napcor.com/wp-content/uploads/2018/11/NAPCOR_2017RateReport_FINAL.pdf (last
     accessed Feb. 14, 2021)

21   [33] *Fueling Plastics: Fossils, Plastics, & Petrochemical Feedstocks*. CIEL.ORG (Sep. 2017)
22   https://www.ciel.org/wp-content/uploads/2017/09/Fueling-Plastics-Fossils-Plastics-
     Petrochemical-Feedstocks.pdf (last accessed Dec. 7, 2020).
23   [34] Kara Lavender Law, et al. *The United States' contribution of plastic waste to land and ocean*,
     SCI. ADV., Oct. 30, 2020, Vol. 6, no. 44.   https://advances.sciencemag.org/content/6/44/eabd0288
24   (last accessed Feb 24, 2021)

25   [35] Christopher Joyce, *Where Will Your Plastic Trash Go Now that China Doesn't Want it?*,
     NPR.ORG (Mar. 13, 2019, 4:28 PM ET),
26   https://www.npr.org/sections/goatsandsoda/2019/03/13/702501726/where-will-your-plastic-trash-
     go-now-that-china-doesnt-want-it (last accessed Dec. 7, 2020); *see also Discarded: Communities
27   on the Frontlines of the Global Plastic Crisis,* GAIA, Apr. 2019, https://wastetradestories.org/wp-
     content/uploads/2019/04/Discarded-Report-April-22.pdf (last accessed Dec. 7, 2020).

28

DOCUMENT PREPARED
ON RECYCLED PAPER

1   For example, in 2015 China's Yangtze River ranked highest for plastic entering the oceans.[36]

2   That year, 333,000 tons of plastic were deposited into the ocean from the Yangtze River, more

3   than double the amount for the river with the next highest amount.[37]

4       47.    In February 2013, based on the high amounts of low-value and contaminated

5   plastics shipped there, China enacted Operation Green Fence, an aggressive inspection effort

6   aimed at curtailing the amount of contaminated "recyclables" and waste that was being sent to

7   China.[38]  China began inspecting 70 percent of imported containers filled with "recyclables" and

8   started cracking down on shippers and recyclers for shipping low-value and contaminated plastic

9   waste.[39]  Despite manufacturers' and recyclers' awareness of China's refusal to accept low-value

10  and contaminated plastic, the U.S. continued to export most of its plastic waste to China.  By

11  2016, the U.S. was exporting almost 700,000 tons a year of plastic waste to China.[40]

12      48.    In February 2017, in response to the continued shipment of low-value and

13  contaminated plastic waste, China announced its National Sword policy, which banned the

14  importation of certain solid waste and set strict contamination limits on recyclable material.

15  Because of the National Sword policy, end markets for recycling plastics #3-7 have essentially

16  vanished.[41]  One year after China's National Sword Policy, China's plastics imports plummeted

17

18

19  [36] Laurent C.M. Lebreton, et al., *River plastic emissions to the world's oceans*, NAT. COMMUN.

20  Jun. 7, 2017, 8:15611, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5467230/ (last accessed
    Dec. 7, 2020).

21  [37] *Id.*

22  [38] *What Operation Green Fence Has Meant for Recycling*, WASTE 360,
    https://www.waste360.com/business/what-operation-green-fence-has-meant-recycling (last

23  accessed Dec. 7, 2020).

24  [39] *Id.*

    [40] Christopher Joyce, *supra* note 34.

25  [41] Liz Zarka, *Recycling's Sword of Damocles*, EAST BAY EXPRESS, Mar. 21, 2019,
    https://m.eastbayexpress.com/oakland/recyclings-sword-of-damocles/Content?oid=26354842

26  (last accessed Dec. 7, 2020); *see also* Cheryl Katz., *Piling Up: How China's Ban on Importing
    Waste Has Stalled Global Recycling*, YALE ENVIRONMENT 360, Mar. 7, 2019,

27  https://e360.yale.edu/features/piling-up-how-chinas-ban-on-importing-waste-has-stalled-global-
    recycling (last accessed Dec. 7, 2020).

28

by 99 percent.[42]  Following enactment of the National Sword Policy other countries in the Far

East followed suit by banning imports of low-value and contaminated plastics that had long been

polluting their environments.[43]  In May 2019, 187 countries decided to significantly restrict

international trade in plastic scrap and waste to help address the improper disposal of plastic

pollution, which are known as the Basel Convention Plastic Waste Amendments.[44]  The Basel

Convention Plastic Waste Amendments prohibit export of mixed plastic waste to countries who

are not members of the Organization for Economic Co-operation and Development.[45]  Due to

increased regulations and restrictions on importing plastic waste, recycling companies can no

longer sell many types of used plastic at prices that cover their transportation and processing

costs, providing them with no incentive to do so.

49.     The writing has been on the wall that China would refuse to accept low-value and

contaminated plastic waste since 2013.  Nonetheless, aware of peoples' interests in protecting the

environment, Defendant has increased its advertising and labeling of Products as recyclable in

California and elsewhere in the United States.  Defendant has done so despite widespread

acknowledgment that end markets for plastic waste have been shrinking and that the majority of

plastic labeled as recyclable in California and other regions in the United States ends up in

---

[42] Cheryl Katz, *supra* note 40.

[43] *Why Some Countries Are Shipping Back Plastic Waste*, BBC News, https://www.bbc.com/news/world-48444874 (last accessed February 9, 2021); *see also International Policies Affecting Global Commodity Markets*, Cal Recycle, https://www.calrecycle.ca.gov/markets/nationalsword/globalpolicies (last accessed February 9, 2021).

[44] *New International Requirements For The Export And Import of Plastic Recyclables And Waste*, U.S. EPA,  last updated February 17, 2021, https://www.epa.gov/hwgenerators/new-international-requirements-export-and-import-plastic-recyclables-and-waste#:~:text=the%20Basel%20Convention.-,What%20are%20the%20Basel%20plastic%20scrap%20and%20waste%20amendments%3F,mos t%20plastic%20scrap%20and%20waste.&text=Prior%20notice%20and%20consent%20is%20req uired%20for%20Basel%20Y48,hazardous%20plastic%20scrap%20and%20waste (last accessed February24, 2021).

[45] *Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and Their Disposal*, open for signature Mar. 23, 1989, adopted May 5, 1992, U.N.T.S. vol. 1673, Amendments to Annexes II, VII and IX, *Plastic Waste Amendments*, effective Jan. 1, 2021, http://www.basel.int/Implementation/Plasticwaste/PlasticWasteAmendments/Overview/tabid/842 6/Default.aspx (last accessed Feb. 24, 2021).

Document Prepared
on Recycled Paper

SECOND AMENDED COMPLAINT – CASE NO. 3:21-CV-00754-MMC

1    landfills, incinerators, communities, and the natural environment.  Defendant has announced that

2    it is working with its suppliers to achieve 100% recyclable, reusable, or industrially compostable

3    packaging for all its private brand products by 2025.[46]

4        50.    In its haste to lure customers to environmentally friendly products and packaging,

5    Defendant is making unsubstantiated representations regarding the recyclability of its Products.

6        51.    Below are examples of unsubstantiated recyclable representations on the labels of

7    Products made from plastics #3-7 sold by Defendant in California:





---

[46] *Environmental Highlights*, WALMART, INC.,
https://corporate.walmart.com/esgreport/environmental#our-environmental-goals, (last accessed
Dec. 7, 2020); *see also Walmart Announces New Plastics Packaging Waste Reduction
Commitments*, WALMART, INC., https://corporate.walmart.com/newsroom/2019/02/26/walmart-
announces-new-plastic-packaging-waste-reduction-commitments. (last accessed Dec. 7, 2020).

DOCUMENT PREPARED
ON RECYCLED PAPER

-25-

SECOND AMENDED COMPLAINT – CASE NO. 3:21-CV-00754-MMC





52.     Products made from plastics #3-7 are not recyclable in California because such

Products are rarely, if ever, recycled.  The inability for MRFs in California and elsewhere in the

United States to recycle plastics #3-7 is well documented.[47]  According to survey data, less than

---

[47] John Hocevar, *supra* note 6; *America's 'recycled' plastic waste is clogging landfills, survey finds*. THE GUARDIAN, Feb. 18, 2020, https://www.theguardian.com/us-news/2020/feb/18/americas-recycled-plastic-waste-is-clogging-landfills-survey-finds (last accessed Dec. 7, 2020); *Americans' plastic recycling is dumped into landfills, investigation shows*, THE GUARDIAN, Jun. 21, 2019, https://www.theguardian.com/us-news/2019/jun/21/us-plastic-recycling-landfills (last accessed Dec. 7, 2020); Gwynn Guilford, *A lot of US plastic isn't actually being recycling since China put up its Green Fence*, QUARTZ, Sep. 16, 2013, https://qz.com/122003/plastic-recycling-china-green-fence/ (last accessed Dec. 7, 2020).

5% of polypropylene ("PP" or plastic #5) tubs are reprocessed into recyclable material.[48]  To the extent they sort them at all, the majority of MRFs in California and elsewhere in the United States group plastics #3-7 into bales of mixed plastic because such plastics have little value, especially when compared to plastics #1 and #2.  Thus, MRFs do not sort individual materials, such as PP or polystyrene ("PS" or plastic #6), into separate bales.  And since the value of plastics #3-7 is so low, there is no end market to reuse such plastic or convert such plastic into reusable material that can be used to manufacture or assemble other goods.  Ultimately, the majority of plastics #3-7 in California and elsewhere in the United States are sent to landfills.  For example, ReThink Waste, a public agency that operates the Shoreway MRF in San Carlos, California stated that "plastics #3-7 are all versions of hard plastic that are very difficult to recycle," because "there is currently no market for the material when it is deconstructed."[49]  The Shoreway MRF continues to accept plastics #3-7 but states that the collected material is sent to a landfill.[50]

53.     The California Legislature recently convened a Statewide Commission on Recycling Markets and Curbside Recycling, which published a report concluding that only three plastic item types meet the definition of recyclability in California: Plastic #1 PET Bottles without shrink sleeves or other non-recyclable components, Plastic #2 HDPE bottles (natural) without shrink sleeves or other non-recyclable components, and Plastic #2 HDPE bottles (color) without shrink sleeves or non-recyclable components.[51]  No products or packaging made from plastic #3-7 are included in California's list of recyclable items.

54.     Although California MRFs may still accept plastics #3-7, the reality is that the Products are not recycled in California.  One reason MRFs accept items even though they are not recyclable is due to pressure from local authorities to meet solid waste diversion goals.  This phenomenon has been recognized by the FTC.  In promulgating the most recent version of the

---

[48]John Hocevar, *supra* note 6.

[49] *Id*. at p. 8.

[50] *Id*.

[51] *Id*. at 97.

DOCUMENT PREPARED
ON RECYCLED PAPER

Green Guides, the FTC stated (under the heading "Packages Collected for Public Policy Reasons but Not Recycled"), "The Commission agrees that unqualified recyclable claims for categories of products that municipal recycling programs collect, but do not actually recycle, may be deceptive. To make a non-deceptive unqualified claim, a marketer should substantiate that a substantial majority of consumers or communities have access to facilities that will actually recycle, not accept and ultimately discard, the product.  As part of this analysis, a marketer should not assume that consumers or communities have access to a particular recycling program merely because the program will accept a product."[52]  Thus, although some of the Products may be accepted for recycling by some curbside programs in California, MRFs do not collect, sort, and separate such low-value plastics because there is no end market to reuse such items or convert them into reusable material.

55.     In light of significant evidence that Products made from plastic #3-7 are not recyclable in California or elsewhere in the United States, it is unsurprising that Defendant has not been able to substantiate the validity of its recycling representations on Products made from plastic #3-7.

56.     Defendant also sells Products that do not contain a RIC and are therefore made from unidentified plastic.  Nonetheless, Defendant also states that these Products are recyclable. Below is an example of an unsubstantiated recycling label on a Product sold by Defendant in California that is made from an unidentified plastic:

---

[52] FED. TRADE COMM'N, The Green Guides Statement of Basis and Purpose, (2012) available at: https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf (referenced in 77 Fed. Reg. 197, 62122 (Oct. 11, 2012)), at pp. 174-175.

DOCUMENT PREPARED ON RECYCLED PAPER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19





20      57.     Because these Products do not contain an RIC, it is impossible to determine what

21  type of plastic resin the Products are made from or whether the plastic is recyclable.  Regardless

22  of what type of plastic these Products are made from, Defendant must substantiate the validity of

23  its recycling representations on Products made from unidentified plastic.

24      58.     Some of Defendant's Products are packaged in a shrink sleeve that prevent the

25  Products from being recyclable in California and elsewhere in the United States.  Below is an

26  example of an unsubstantiated recyclable representation on a Product packaged in a shrink sleeve

27  sold by Defendant in California:

28

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20



21    59.    These Products are not recyclable in California and elsewhere in the United States

22  because the plastic shrink sleeve cannot be recycled.  The Green Guides are clear: "if any

23  component significantly limits the ability to recycle the item, any recyclable claim would be

24  deceptive.  An item that is made from recyclable material, but because of its shape, size or some

25  other attribute is not accepted in recycling programs, should not be marketed as recyclable."  16

26  C.F.R. § 260.12(d).  Here, these Products are packaged in a shrink sleeve that is not recyclable

27  and that is difficult and dangerous to remove.  The shrink sleeves are wrapped tightly around the

28  Products, thereby requiring people to use a knife or sharp object to cut the shrink sleeve free from

the Products.  Due to the difficulty in removing the shrink sleeves, most people are unwilling to remove the shrink sleeves from the Products prior to placing the Products in their recycling bins. Furthermore, most people believe that if their municipality offers recycling services, then all products marketed as "recyclable" can be recycled.  Thus, most people will place the Products in the recycling bin without removing the shrink sleeve under the false impression that the Products can be recycled, when the Products cannot in fact be recycled with the plastic shrink sleeve.  This is problematic because few, if any, recycling programs in California and elsewhere in the United States accept Products with shrink sleeves for recycling, Products with shrink sleeves cannot be sorted because they are made from mixed materials, and shrink sleeves contaminate the recycling stream and may damage recycling machinery.  Due to these issues, there is no end market for Products with shrink sleeves and most of these Products end up in landfills, incinerators, communities, or the natural environment.  In sum, Defendant must substantiate the validity of its recycling representations on Products packaged in a shrink sleeve.

60.     Lastly, Defendant sells numerous Products packaged in plastic film that contain a store drop-off representation despite the limited availability of such programs in California and elsewhere in the United States.  Below is an example of an unsubstantiated recyclable representation on such a Product sold by Defendant in California:



1
2
3
4
5
6
7
8
9
10



11      61.     These Products cannot be recycled by established recycling programs.  Rather, the

12  packaging must be dropped off at participating stores.  This is because plastic bags and film

13  cannot be separated for recycling.  The Green Guides specifically warn about plastic trash bags:

14  "Because trash bags ordinarily are not separated from other trash at the landfill or incinerator for

15  recycling, they are highly unlikely to be used again for any purpose.  Even if the bag is

16  technically capable of being recycled, the claim is deceptive since it asserts an environmental

17  benefit where no meaningful benefit exists."  16 C.F.R. § 260.3(c), Example 2.  Although the fine

18  print representations on these Products communicate that the Products must be "dropped off" to

19  be recyclable, many of Defendant's stores in California do not accept the Products for recycling.

20  In the past, California required supermarkets of a certain size to maintain a plastic carryout bag

21  collection bin, but that rule expired on January 1, 2020.  *See* California Public Resources Code §

22  42257.  Consequently, many retail stores in California, including Defendant's stores, no longer

23  accept plastic bags for drop-off recycling.  For instance, according to an informal survey, 0 of 8

24  of Defendant's stores in South Orange County, California have takeback bins to recycle plastic

25  film.  According to Defendant's own data, it only provides access to in-store plastic bag and film

26
27
28

DOCUMENT PREPARED
ON RECYCLED PAPER

1    recycling bins in approximately half of its stores (Defendant maintains roughly 5,353 retail stores

2    nationwide, but only provides drop-off locations at approximately 2,900 locations).[53]

3           62.     In addition, a 2017 report on Film Recycling Investment found that only 7% of

4    retail bags that are available for recycling are returned by residents for recycling.[54]  That report

5    further found that of the approximately 300 million pounds of plastic film that reprocessing

6    facilities receive a year, only 10 million pounds (approximately 3%) are able to be marketed due

7    to the poor quality of plastic film and the lack of recycling markets for such low-value plastic.

8    Due to the lack of recycling markets for plastic film, 93% of California MRFs do not even accept

9    it, and the reprocessing facilities that do accept it do not have the capacity to recycle large

10   quantities of plastic film.  Based on these data, even if more people returned plastic bag film for

11   drop-off recycling, California MRFs do not have the capacity to sort and recycle it.  Ultimately,

12   Products packaged in plastic film are not accepted by most MRFs nor can they be collected,

13   sorted, or separated from the general waste stream.  Consequently, there is no end market to

14   recycle such Products in California.  Accordingly, it is not surprising that Defendant has been

15   unable to substantiate the validity of its recycling representations on Products packaged in plastic

16   film.

17          63.     One of the major problems associated with making unsubstantiated recycling

18   representations on the labels of the Products is that this can lead to contaminating the recycling

19   stream with unrecyclable materials that will hinder the ability of recycling facilities to process

20   items that are legitimately recyclable.  For instance, according to the Recycling Partnership,

21   "plastic bags cause MRF operators to shut down the recycling line many times a day to cut off

22   bags that have wrapped around equipment.  This maintenance shut down reduces throughput for a

23   facility, raises cost of labor to sort materials and maintain equipment, increases waste coming out

24

25   [53] *2020 Environmental, Social and Governance Report*, WALMART, INC.,
     https://cdn.corporate.walmart.com/90/0b/2271_5fd34947927eed86a72c788e/walmart-esg-report-
26   2020.pdf, (last accessed Dec. 7, 2020).

27   [54] *Film Recycling Investment Report*, prepared by RSE USA, THE CLOSED LOOP FOUNDATION
     (2017), at p. 19.

28

DOCUMENT PREPARED
ON RECYCLED PAPER

of the MRF, and puts workers at risk of injury when they are performing maintenance."[55]  By

making unsubstantiated recycling representations that encourage people to place the Products in

their recycling bins, Defendant is contaminating the recycling stream with unrecyclable materials

that prevents legitimately recyclable materials from being recycled.  Environmentally motivated

people who purchase the Products in the belief that they are recyclable are thus unwittingly

hindering recycling efforts.

64.     Greenpeace's mission is to protect the natural environment and expose

environmental harms to the public.  Given that many people actively seek to purchase recyclable

products because they are environmentally conscientious, Defendant's unsubstantiated recyclable

representations on the labels of the Products have frustrated Greenpeace's mission.  Greenpeace

has spent money, staff time, and other organizational resources, in response to this frustration of

purpose by evaluating the problems associated with the proliferation of plastic pollution,

investigating Defendant's unsubstantiated recyclable representations in California, publishing a

report on Defendant's recyclable label initiative, requesting that Defendant substantiate its

recycling representations, and informing its supporters and the public in California with respect to

Defendant's unsubstantiated recycling labels.  Most of this work was conducted in California by

Greenpeace's California-based staff.

65.     Plaintiff seeks an order requiring Defendant to substantiate its recycling

representations or an order enjoining Defendant from making unsubstantiated representations

regarding the recyclability of its Products in California.  If an injunction is not granted, Plaintiff

will suffer irreparable injury because it will continue to spend money, staff time and other

organizational resources to combat Defendant's unsubstantiated representations that the Products

are recyclable in California and to inform the public that the Products are not recyclable in

California.  Thus, Plaintiff has no adequate remedy at law for the injuries currently being suffered

as an award of monetary damages would not prohibit Defendant's unsubstantiated recycling

---

[55] Asami Tanimoto, *West Coast Contamination Initiative Research Report*, THE RECYCLING PARTNERSHIP, Apr. 2020, https://recyclingpartnership.org/wp-content/uploads/2020/04/The-Recycling-Partnership_WCCI-Report_April-2020_Final.pdf at p. 13 (last accessed Dec. 7, 2020).

statements in California.  In addition, plastic pollution caused by Defendant's sale of the Products in California and the resulting harms to California waters, coasts, communities, and marine life will continue to negatively impact Greenpeace's efforts to protect these critical resources. California residents may also contaminate the recycling stream by unknowingly placing the Products in their recycling bins, preventing legitimately recyclable products from being recycled. Accordingly, an injunction requiring Defendant to substantiate its recycling representations or prohibiting Defendant's unsubstantiated recycling representations will serve the public interest.

## FIRST CAUSE OF ACTION

**(Plaintiff Alleges Violations of California Business & Professions Code § 17200, *et seq*. Based on Commission of Unlawful Acts)**

66.     Plaintiff incorporates by reference the allegations set forth above.

67.     The violation of any law constitutes an unlawful business practice under Business & Professions Code § 17200.

68.     Defendant's conduct violates the EMCA, which makes it unlawful for any person to make any unsubstantiated environmental marketing claim.  Pursuant to the EMCA, "Any person who represents in advertising or on the label or container of a consumer good that the consumer good that it manufactures or distributes is not harmful to, or is beneficial to, the natural environment, through use of such terms as 'environmental choice,' 'ecologically friendly,' 'earth friendly,' 'environmentally friendly,' 'ecologically sound,' 'environmentally sound,' 'environmentally safe,' 'ecologically safe,' 'environmentally lite,' 'green product,' or any other like term, shall maintain in written form in its records…information and documentation supporting the validity of the representation."  Business & Professions Code § 17580(a).  The term "recyclable" is a term that represents that a product or packaging is not harmful to, or is beneficial to, the natural environment, and is therefore covered under Business & Professions Code § 17580(a).  In fact, the EMCA specifically requires companies to maintain information and documentation as to whether such products or packaging conform with the uniform standards contained in the Green Guides for use of the terms "recycled" or "recyclable."  *Id*. § 17580(a)(5). In addition to documents regarding whether the consumer good conforms with the Green Guides,

DOCUMENT PREPARED
ON RECYCLED PAPER

the EMCA requires that companies maintain the following records in written form supporting the

validity of their recyclable representations: (1) the reasons why a company believes the

representation to be true; (2) any significant adverse environmental impacts directly associated

with the production, distribution, use, and disposal of the consumer good; (3) any measures that

are taken by the company to reduce the environmental impacts directly associated with the

production, distribution, and disposal of the consumer good; and (4) violations of any federal,

state, or local permits directly associated with the production or distribution of the consumer

good.  *Id.*, § 17580(a)(1)-(4). The California Legislature declared its intent that the information

and documentation supporting the validity of any environmental marketing claims shall be fully

disclosed to the public, and information and documentation maintained pursuant to Business &

Professions Code § 17580 must be furnished to any member of the public upon request.  *Id.*, §

17580(b), (d).

69. The Green Guides also require marketers to ensure that their claims are supported

by a reasonable basis prior to making the claim.  16 C.F.R. § 260.2.  A reasonable basis is defined

as competent and reliable scientific evidence, such as "tests, analyses, research, or studies that

have been conducted and evaluated in an objective manner by qualified persons and are generally

accepted in the profession to yield accurate and reliable results."  *Id.*  "Such evidence should be

sufficient in quality and quantity based on standards generally accepted in the relevant scientific

fields, when considered in light of the entire body of relevant and reliable scientific evidence, to

substantiate that each of the marketing claims is true."  *Id.*

70. Under the Green Guides, "A product or package shall not be marketed as

recyclable unless it can be collected, separated, or otherwise recovered from the waste stream

through an established recycling program for reuse or use in manufacturing or assembling another

item."  16 C.F.R. § 260.12(a).  Here, the Products are not recyclable because people do not have

access to recycling programs that accept the Products, the Products cannot be separated or

recovered from the general waste stream and sorted into the correct materials bale by MRFs, and

there are no end markets to reuse the Products or to convert the Products into a material that can

be reused or used in manufacturing or assembling another item.  Greenpeace has requested on

DOCUMENT PREPARED
ON RECYCLED PAPER

numerous occasions that Defendant substantiate that the Products are recyclable in California or elsewhere in the United States.  Greenpeace sent Defendant a pre-suit demand on August 18, 2020, informing Defendant that its Products are not recyclable and requesting that Defendant contact Plaintiff to discuss resolution of the matter short of litigation.  At no point has Defendant provided written records supporting the validity of its recycling representations on the labels of the Products.

71.     By failing to substantiate the validity of its recycling representations with respect to the Products under the EMCA and the Green Guides, Defendant has engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Business & Professions Code § 17200.

72.     Plaintiff has no adequate remedy at law for the injuries currently being suffered as an award of monetary damages would not prohibit Defendant's unlawful acts.  If an injunction is not granted, Plaintiff will suffer irreparable injury because it will continue to spend money, staff time and other organizational resources to combat Defendant's unsubstantiated representations that the Products are recyclable in California and to inform the public that the Products are not recyclable in California.  In addition, plastic pollution caused by Defendant's sale of the Products in California and the resulting harms to California waters, coasts, communities, and marine life will continue to negatively impact Greenpeace's efforts to protect these critical resources. California residents may also contaminate the recycling stream by unknowingly placing the Products in their recycling bins, preventing legitimately recyclable products from being recycled. Accordingly, an injunction requiring Defendant to substantiate its recycling representations or prohibiting Defendant's unsubstantiated recycling representations will serve the public interest.

73.     Defendant manufactures or distributes the Products and represents in advertisements or on the labels of the Products that the Products are recyclable.  Defendant's representations that the Products are recyclable are prominent on all of Defendant's marketing, advertising, and labeling materials for the Products in California.  Because part of Greenpeace's mission involves preventing companies from touting the environmental benefits of their products without substantiating the validity of such environmental benefits, Greenpeace spent money, staff

time, and other organizational resources investigating Defendant's unsubstantiated recycling representations and requesting that Defendant substantiate the validity of such representations. But for Defendant's unsubstantiated recycling representations in California and elsewhere in the United States, Greenpeace would have used that money, staff time, and organizational resources for other campaigns, including its other plastic campaigns.  Greenpeace has thus suffered injury in fact and lost money or property as a direct result of Defendant's unsubstantiated recycling representations occurring in California.

74.     An action for injunctive relief is specifically authorized under Business & Professions Code § 17203.

Wherefore, Plaintiff prays for judgment against Defendant, as set forth hereafter.

## SECOND CAUSE OF ACTION

**(Plaintiff Alleges Violations of California Business & Professions Code § 17200, *et seq.*
Based on Unfair Acts and Practices)**

75.     Plaintiff incorporates by reference the allegations set forth above.

76.     Under California Business & Professions Code § 17200, any business act or practice that is unethical, oppressive, unscrupulous, or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

77.     Defendant has engaged and continues to engage in conduct which is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.  This conduct includes, but is not limited to, advertising and labeling the Products as recyclable in California without substantiation.  By advertising and labeling the Products as recyclable without substantiating whether the Products are actually recyclable, Defendant's conduct, as described herein, far outweighs the utility, if any, of such conduct.

78.     Defendant has engaged and continues to engage in conduct that violates the legislatively declared policy of Cal. Pub. Res. Code § 42355.5.  Under the California Public Resources Code, the Legislature of the State of California has declared that "it is the public policy of the state that environmental marketing claims, whether explicit or implied, should be substantiated by competent and reliable evidence to prevent deceiving or misleading consumers

DOCUMENT PREPARED
ON RECYCLED PAPER

about the environmental impact of plastic products."  Cal. Pub. Res. Code § 42355.5.  The policy

is based on the Legislature's finding that "littered plastic products have caused and continue to

cause significant environmental harm and have burdened local governments with significant

environmental cleanup costs."  *Id*. § 42355.  It is unfair for Defendant to represent that the

Products are recyclable without substantiation, in direct violation of the California Legislature's

declared public policy.

79.     Defendant's conduct also violates the policy of the EMCA.  Under the EMCA,

anyone who manufactures or distributes a consumer good and represents in advertising or on the

label that it is not harmful to, or is beneficial to, the natural environment, through the use of such

terms as "environmentally safe," "ecologically friendly," or other like terms, must maintain

written records supporting the validity of any such representation.  Business & Professions Code

§ 17580(a).  The term "recyclable" is a term that represents that a product or packaging is not

harmful to, or is beneficial to, the natural environment, and is therefore covered under Business &

Professions Code § 17580(a).  In fact, the EMCA specifically requires companies to maintain

information and documentation as to whether such products or packaging conform with the

uniform standards contained in the Green Guides for use of the terms "recycled" or "recyclable."

*Id*. § 17580(a)(5).  In addition to documents regarding whether the consumer good conforms with

the Green Guides, the EMCA requires that companies maintain the following records in written

form supporting the validity of their recyclable representations: (1) the reasons why a company

believes the representation to be true; (2) any significant adverse environmental impacts directly

associated with the production, distribution, use, and disposal of the consumer good; (3) any

measures that are taken by the company to reduce the environmental impacts directly associated

with the production, distribution, and disposal of the consumer good; and (4) violations of any

federal, state, or local permits directly associated with the production or distribution of the

consumer good.  *Id*., § 17580(a)(1)-(4). The California Legislature declared its intent that the

information and documentation supporting the validity of any environmental marketing claims

shall be fully disclosed to the public, and information and documentation maintained pursuant to

Business & Professions Code § 17580 must be furnished to any member of the public upon

DOCUMENT PREPARED
ON RECYCLED PAPER

request.  *Id.*, § 17580(b), (d).  It is unfair for Defendant to represent that the Products are recyclable without substantiation, violating the California Legislature's intent that information and documentation supporting the validity of environmental marketing claims shall be fully disclosed to the public.

80.     Defendant's conduct also violates the policy of the Green Guides.  The Green Guides require marketers to ensure that their claims are supported by a reasonable basis prior to making the claim.  16 C.F.R. § 260.2.  A reasonable basis is defined as competent and reliable scientific evidence, such as "tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results."  *Id.*  "Such evidence should be sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that each of the marketing claims is true."  *Id.*  It is unfair for Defendant to represent that the Products are recyclable without a reasonable basis.

81.     Defendant gains an unfair advantage over its competitors, whose advertising and labeling must comply with the EMCA, the Green Guides, and the legislatively declared policy of Cal. Pub. Res. Code § 42355.5.  By committing the acts alleged above, Defendant has engaged in unfair business acts and practices which constitute unfair competition within the meaning of California Business & Professions Code § 17200.

82.     Plaintiff has no adequate remedy at law for the injuries currently being suffered as an award of monetary damages would not prohibit Defendant's unsubstantiated recycling representations. If an injunction is not granted, Plaintiff will suffer irreparable injury because it will continue to spend money, staff time and other organizational resources to combat Defendant's unsubstantiated representations that the Products are recyclable in California and to inform the public that the Products are not recyclable in California.  In addition, plastic pollution caused by Defendant's sale of the Products in California and the resulting harms to California waters, coasts, communities, and marine life will continue to negatively impact Greenpeace's efforts to protect these critical resources.  California residents may also contaminate the recycling

stream by unknowingly placing the Products in their recycling bins, preventing legitimately recyclable products from being recycled.  Thus, Plaintiff seeks an order enjoining Defendant's unfair acts and practices in California, which serves the public interest by protecting the environment and the integrity of the recycling stream and by preventing Defendant from gaining an unfair advantage over companies that can substantiate that the products they sell are recyclable.

83.    Defendant manufactures or distributes the Products and represents in advertisements or on the labels of the Products that the Products are recyclable.  Defendant's representations that the Products are recyclable are prominent on all of Defendant's marketing, advertising, and labeling materials for the Products in California.  Because part of Greenpeace's mission involves preventing companies from touting the environmental benefits of their products without substantiating the validity of such environmental benefits, Greenpeace spent money, staff time, and other organizational resources investigating Defendant's unsubstantiated recycling representations and requesting that Defendant substantiate the validity of such representations.  But for Defendant's unsubstantiated recycling representations in California and elsewhere in the United States, Greenpeace would have used that money, staff time, and organizational resources for other campaigns, including its other plastic campaigns.  Greenpeace has thus suffered injury in fact and lost money or property as a direct result of Defendant's unsubstantiated recycling representations occurring in California.

84.    An action for injunctive relief is specifically authorized under California Business & Professions Code § 17203.

Wherefore, Plaintiff prays for judgment against Defendant, as set forth hereafter.

1

## **PRAYER FOR RELIEF**

2          WHEREFORE, Plaintiff has no adequate remedy at law and prays for judgment and relief

3   against Defendant as follows:

4          A.      That the Court preliminarily and permanently enjoin Defendant from conducting

5   its business through the unlawful or unfair business acts or practices, and other violations of law,

6   described in this Complaint;

7          B.      That the Court order Defendant to substantiate the validity of the recycling

8   representations in advertising or on the labels of the Products;

9          C.      That the Court enjoin Defendant from making unsubstantiated recycling

10  representations in advertising or on the labels of the Products;

11         D.      That the Court order Defendant to implement whatever measures are necessary to

12  remedy the unlawful or unfair business acts or practices, and other violations of law described, in

13  this Complaint;

14         E.      That the Court grant Plaintiff its reasonable attorneys' fees and costs of suit

15  pursuant to California Code of Civil Procedure § 1021.5, the common fund doctrine, or any other

16  appropriate legal theory; and

17         F.      That the Court grant such other and further relief as may be just and proper.

18

19  Dated:   October 15, 2021              Respectfully submitted,

20                                         LEXINGTON LAW GROUP

21

22                                         _/s/ Howard Hirsch_

23                                         Howard Hirsch (State Bar No. 213209)
                                           Ryan Berghoff (State Bar No. 308812)
24                                         Meredyth Merrow (State Baw No. 328337)

25                                         Attorneys for Plaintiff
                                           GREENPEACE, INC.
26

27

28