Patrick L. Oot (*pro hac vice* granted)
SHOOK, HARDY & BACON L.L.P.
1800 K Street, N.W., Suite 1000
Washington, DC  20006
Tel: 202.783.8400 | Fax: 202.783.4211
oot@shb.com

Eva M. Weiler (SBN:  233942)
SHOOK, HARDY & BACON L.L.P.
Jamboree Center
5 Park Plaza, Suite 1600
Irvine, California  92614-2546
Tel: 949.475.1600 | Fax: 949.475.0016
eweiler@shb.com

M. Kevin Underhill (SBN:  208211)
Steve Vieux (SBN:  315133)
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, California  94105
Tel: 415.544.1900 | Fax: 415.391.0281
kunderhill@shb.com
svieux@shb.com

Attorneys for Defendant Walmart Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

| | |
|---|---|
| GREENPEACE, INC., | Case No.:  3:21-cv-00754 MMC |
| Plaintiff, | Judge: Hon. Maxine M. Chesney |
| | Courtroom: 7 |
| vs. | |
| WALMART INC., | **WALMART INC.'S NOTICE OF MOTION AND MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |
| Defendant. | |
| | Date:   Dec. 17, 2021 |
| | Time:  9:00 a.m. |
| | Complaint filed Dec. 16, 2020 |
| | First Am. Compl. filed Mar. 29, 2021 |
| | Second Am. Compl. filed Oct. 15, 2021 |

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 2

FACTS ALLEGED ............................................................................................................ 3

LEGAL STANDARD.......................................................................................................... 7

ARGUMENT ...................................................................................................................... 8

I.     Greenpeace Still Does Not Allege Facts Showing It "Lost Money or Property as a
       Result of" the Alleged Misconduct, No Matter How It Characterizes Its Claims. ............. 8

       A.     The challenged conduct still consists of alleged misrepresentations to
              consumers, and Greenpeace cannot base a claim on third-party reliance.............. 9

       B.     Greenpeace does not allege it "lost money or property as a result of" any other
              unlawful or unfair practices. ............................................................................... 10

              1.     Greenpeace does not allege it lost money due to a failure to
                     substantiate.............................................................................................. 11

              2.     The UCL does not allow "organizational standing." ................................ 13

              3.     Greenpeace has not adequately alleged organizational standing. ............. 17

II.    Both of Greenpeace's UCL Causes of Action Would Fail for Other Reasons as Well.... 20

       A.     "Recyclability" claims are not subject to the substantiation requirement under
              current law. ........................................................................................................ 20

       B.     Private parties cannot enforce substantiation requirements in any event, at
              least under the circumstances here..................................................................... 21

       C.     Greenpeace does not allege facts showing it is unlawful or unfair to label the
              products as "recyclable," with or without substantiation..................................... 22

III.   Greenpeace Still Alleges No Facts Showing It Is Entitled to Injunctive Relief, the
       Only Form of Relief It Seeks. ........................................................................................ 23

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Am. Diabetes Assoc. v. United States Dept. of the Army,*
    938 F.3d 1147 (9th Cir. 2019) ...............................................................................17

*Amalgamated Transit Union, Loc. 1756, AFL–CIO v. Superior Ct.,*
    46 Cal. 4th 993 (2009) ........................................................................8, 13, 14, 15, 16

*Animal Legal Def. Fund v. LT Napa Partners LLC,*
    234 Cal. App. 4th 1270 (2015) .............................................................................14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................................7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................7

*California Med. Assoc. v. Aetna Health of Cal.,*
    491 P.3d 1045 (Cal. July 28, 2021) .......................................................................17

*California Med. Assoc. v. Aetna Health of Cal., Inc.,*
    63 Cal. App. 5th 660 (2021) .............................................................................15, 17

*Californians for Disability Rts. v. Mervyn's LLC,*
    39 Cal. 4th 223 (2006) ........................................................................................8, 14

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) .................................................................................................23

*Daro v. Superior Court,*
    151 Cal. App. 4th 1079 (2007) .............................................................................12

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ...............................................................................................23

*El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev.,*
    959 F.2d 742 (9th Cir. 1992) ................................................................................18

*Ely Holdings Ltd. v. O'Keeffe's, Inc.,*
    No. 18-cv-06721-JCS, 2019 WL 3779197 (N.D. Cal. Aug. 12, 2019) ........................10

*Freeman v. ABC Legal Servs., Inc.,*
    877 F. Supp. 2d 919 (N.D. Cal. 2012) ..............................................................23, 24

*Friends of the Earth v. Sanderson Farms, Inc.,*
    992 F.3d 939 (9th Cir. 2021) ......................................................................17, 18, 19

*Greenpeace, Inc. v. Walmart Inc.,*
    No. 3:21-cv-00754-MMC, 2021 WL 4267536 (N.D. Cal. Sept. 20, 2021).....................3, 8, 9, 10

*Hall v. Time Inc.*,
    158 Cal. App. 4th 847 (2008) ...................................................................................14, 15

*Huynh v. Quora, Inc.*,
    No. 5:18-CV-07597-BLF, 2020 WL 7495097 (N.D. Cal. Dec. 21, 2020) ...................................23

*In Defense of Animals v. Sanderson Farms, Inc.*,
    No. 20-cv-05293-RS, 2021 4243391 (N.D. Cal. Sept. 17, 2021) ........................................18, 19

*Jiles v. US Bank NA*,
    No. CV 12-10397-SJO, 2013 WL 12134143 (C.D. Cal. Feb. 11, 2013)......................................10

*Johns v. Bayer Corp.*,
    No. 09-CV-1935-AJB-DHB, 2013 WL 1498965 (S.D. Cal. Apr. 10, 2013) ..............................21

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ..................................................................................7, 9

*Kwikset Corp. v. Superior Ct.*,
    51 Cal. 4th 310 (2011) ....................................................................................8, 14, 15

*La Asociación de Trabajadores de Lake Forest v. City of Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010) .........................................................................................18

*Law Offices of Mathew Higbee v. Expungement Assistance Servs.*,
    214 Cal. App. 4th 544 (2013) ........................................................................................13

*LegalForce RAPC Worldwide P.C. v. DeMassa*,
    No. 18-cv-00043-MMC, 2020 WL 4747909 (N.D. Cal. Aug. 17, 2020) .....................................10

*Mayron v. Google LLC*,
    54 Cal. App. 5th 566, 574 (2020) ...............................................................................11, 12

*Mier v. CVS Pharmacy, Inc.*,
    No. SACV 2001979-DOC-ADS, 2021 WL 1559367 (C.D. Cal. Mar. 22, 2021) ..........................21

*Nat'l Council Against Health Fraud Inc. v. King Bio Pharms. Inc.*,
    107 Cal. App. 4th 1336 (2003) .......................................................................................21

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ..........................................................................................7

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) .........................................................................................23

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*,
    17 Cal. 4th 553 (1998) ..................................................................................................8

*Swearingen v. Pacific Foods of Oregon, Inc.*,
    No. 13-cv-04157-JD, 2014 WL 3767052 (N.D. Cal. July 31, 2014)...........................................9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Statutes**

15 U.S.C. § 45 .................................................................................................................6

Cal. Bus. & Prof. Code § 17500 .....................................................................................6

Cal. Bus. & Prof. Code § 17508 ...................................................................................21

Cal. Bus. & Prof. Code § 17508.5 ................................................................................20

Cal. Bus. & Prof. Code § 17580 ...................................................................................20

Cal. Bus. & Prof. Code § 17580.5 ..................................................................................6

Cal. Bus. & Prof. Code § 17203 ...................................................................................24

Cal. Bus. & Prof. Code § 17204 ...............................................................................8, 10

Cal. Code Civ. Proc. § 382 ......................................................................................15, 16

Cal. Pub. Res. Code § 42355.5 .....................................................................................20

**Rules**

Fed. R. Civ. P. 8(a) ..........................................................................................................7

Fed. R. Civ. P. 9(b) .....................................................................................................7, 10

Fed. R. Civ. P. 12(b)(6)....................................................................................................1

**Other Authorities**

16 C.F.R. § 260.1 *et seq.*................................................................................................5

16 C.F.R. § 260.12(a)...................................................................................................5, 22

16 C.F.R. § 260.12(b)(1)..............................................................................................6, 22

1995 Cal. Legis. Serv. Ch. 642 .....................................................................................20

Sen. Committee Report on S.B. 426 (Mar. 27, 1995) (attached as Ex. A)........................20

2021 Cal. Legis. Serv. Ch. 507 .....................................................................................20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on December 17, 2021, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Maxine M. Chesney in the United States Courthouse, Courtroom 7, 19th Floor, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Walmart Inc. will and hereby does move for an order dismissing Plaintiff's Second Amended Complaint with prejudice.

Walmart moves to dismiss under Federal Rule of Civil Procedure 12(b)(6) on the following grounds: (1) Greenpeace's UCL claims fail because it has not lost money or property as a result of Walmart's alleged conduct; (2) the claims also fail because Greenpeace has not alleged facts showing Walmart violated an applicable law or engaged in any unfair practice; and (3) Greenpeace has not alleged facts showing it would have a right to injunctive relief, the only form of relief it seeks. The SAC should be dismissed without further leave to amend.

# INTRODUCTION

Finding that Greenpeace's UCL claims were based on allegations that Walmart deceived consumers, this Court held that Greenpeace lacks standing and dismissed all three of its UCL causes of action. In response, Greenpeace has amended its complaint to drop the deceptive-practice cause of action and minimize use of the word "consumers." That does not change the result.

First, Greenpeace still does not allege UCL standing. Regardless of whether it claims to be targeting "deceptive," "unlawful," or "unfair" practices, Greenpeace still does not allege *it* "lost money or property as a result of" such practices. Despite the amendments, Greenpeace still alleges Walmart deceives consumers by using the term "recyclable." But as the Court's order recognized, Greenpeace cannot base a UCL claim on that alleged harm because any resulting economic loss would have been suffered by someone other than Greenpeace. Further, Greenpeace's new focus on "substantiation" makes no difference. Whether harm was caused by a statement that was "deceptive" or one that was "unsubstantiated"—concepts Greenpeace does not distinguish—any loss suffered as a result would have been suffered by someone else. Greenpeace's attempt to *create* standing by pointing to "losses" it *chose* to incur fundamentally conflicts with the amended UCL.

Second, the "unlawful" and "unfair" claims—just like the "deceptive" claims before them— would fail even if Greenpeace had standing. Greenpeace's focus on the "substantiation" requirement of Business & Professions Code section 17580 is misplaced. That law does not, as Greenpeace asserts, require advertisers to maintain records that substantiate recyclability claims. The Legislature recently passed a bill that would do so, but that law is not yet in effect, is not retroactive, and much of it does not apply until January 2024 at the earliest. Even if the substantiation requirement did apply, Greenpeace does not allege facts showing Walmart violated it, and there is no precedent for allowing a private plaintiff to use the UCL to enforce such requirements in any event. Beyond that, Greenpeace does not allege facts showing that representing the products as recyclable is unlawful or unfair. Greenpeace asks the Court to rewrite the FTC Green Guides, not apply them as written.

Finally, Greenpeace again has not alleged facts showing that it is entitled to injunctive relief, the only kind of relief it seeks. For that reason as well, the Court should dismiss the Second Amended Complaint without further leave to amend.

**FACTS ALLEGED**

The Second Amended Complaint is not materially different from the complaint this Court dismissed. *See Greenpeace, Inc. v. Walmart Inc.*, No. 3:21-cv-00754-MMC, 2021 WL 4267536 (N.D. Cal. Sept. 20, 2021) (ECF No. 40). The complaints' introductory paragraphs highlight this:

- Previously, Greenpeace alleged that as "**consumers** become increasingly aware of plastic pollution, they are increasingly susceptible to **marketing claims**" that plastic products are recyclable, claims Walmart allegedly makes "[s]eeking to take advantage of **consumers'** concerns...."

- Now, Greenpeace alleges that as "**people** are becoming more environmentally conscious" about plastic pollution, manufacturers are increasingly "**labeling [plastic] products as recyclable**," claims Walmart allegedly makes "[s]eeking to take advantage of **people's** concerns...."

First Am. Compl. ¶ 1, Second Am. Compl. ¶ 1 (emphases added). Comparing the two complaints yields many similar examples. This is the same theory as before. Greenpeace now emphasizes its allegation that Walmart cannot "substantiate" whether products are recyclable, but this allegation is also nothing new. *See, e.g.*, FAC ¶¶ 32, 40, 54; SAC ¶¶ 1, 2, 4–6, 36, 50. And again, the change in terminology does not change the nature of the case, which is still founded on the contention that Walmart is deceiving consumers. *Compare, e.g.*, FAC ¶ 51 (alleging that "[i]n its haste to lure customers," Walmart makes recyclability "claims that are false, misleading, and deceptive") *with* SAC ¶ 50 (alleging that "[i]n its haste to lure customers," Walmart makes recyclability "representations" that are "unsubstantiated").

Greenpeace still has not identified a single consumer who was deceived, however, or pleaded any facts specifying how or when any particular consumer might have been deceived. As in the FAC, Greenpeace does not contend the "recyclable" representation is literally false. It contends the representation is misleading because third parties do not recycle the products often enough. That is, Greenpeace alleges the products are "not in fact recyclable" because (1) some people may lack "access to recycling programs" that accept these products; (2) the products cannot be separated and sorted correctly by recycling facilities; and (3) there are no "end markets" for reusing or converting the products. SAC ¶ 2.

Greenpeace has never alleged that Walmart had anything to do with these market conditions. Rather, Greenpeace attributes low recycling rates partly to increased production of new plastics by

"major oil and natural gas companies," causing prices to fall to the point that recycled plastics are no longer competitive. SAC ¶ 45. As a result, recycling facilities no longer have an incentive to recycle plastic because there are "almost no buyers" for the recycled products. *Id*. Greenpeace also attributes the problem to China's decision to sharply limit its import of recyclable materials. *Id*. ¶¶ 47–48. This policy took effect in January 2018, allegedly causing China's plastic imports to drop by 99 percent. *Id*. ¶ 48 & n.41.[1] For this reason, too, "[r]ecycling companies can no longer sell many types of used plastic at prices that cover their transportation and processing costs, providing them with no incentive to do so." *Id*. ¶ 48. Again, Greenpeace does not allege that these issues are Walmart's fault. Greenpeace asserts only that because Walmart is "aware of peoples' [*sic*] interests in protecting the environment," it has "increased its advertising and labeling of Products as recyclable," despite the "widespread acknowledgement that end markets for plastic waste have been shrinking...." *Id*. ¶ 50. The SAC still does not allege any facts that show what Walmart might have known about these market conditions at any particular time. After all, if market forces dictate recycling rates as Greenpeace alleges, then those rates will fluctuate constantly.[2] The SAC still alleges no facts to show what Walmart might have known or when.

Though the SAC again alleges deception, it still does not specify exactly which products' labels are allegedly deceptive. It targets all products (A) sold under Walmart's private-label brands, (B) labeled as "recyclable," and (C) "made from plastics #3–7 or unidentified plastic" or packaged in any plastic shrink sleeve. SAC ¶ 2. It provides two "non-exclusive" lists of some of the enormous number of brands and products this definition would include. *See id*. nn. 3 & 4. The phrase "plastics #3–7" refers to the practice of describing types of plastic by number. *See id*. ¶¶ 43–44. Greenpeace is not targeting plastics #1 and 2, which it describes as "the most recyclable," though it also alleges

---

[1] Greenpeace alleges China "announced" the National Sword Policy in February 2017 and that "[o]ne year after China's National Sword Policy," its plastics imports dropped by 99 percent. SAC ¶ 48. As Greenpeace's sources clarify, whenever the policy was announced, it did not take effect (was not "instituted" or "enacted") until January 2018. *See id*. n. 41 (citing and linking to sources).

[2] For example, Greenpeace's sources state that after China's policy took effect in January 2018, other countries increased their plastics imports, and the market responded in other ways. *See* Cheryl Katz, "Piling Up: How China's Ban on Importing Waste Has Stalled Global Recycling," Yale Env. 360 (Mar. 7, 2019) (cited at SAC ¶ 48 n.41). For this and other reasons, "[w]hether China's ban leads to increased plastic pollution in the environment remains to be seen," and "if proper alternatives are found, plastic pollution could actually decrease." *Id*.

those plastics are recycled at rates as low as 13 percent. *Id*. ¶ 44. Greenpeace targets only plastics #3–7, alleging these are "rarely, if ever recycled." *Id*.

The complaint includes images of the labels of only a few of these products. SAC ¶¶ 51, 56, 58, 60. It does not allege when these particular images were taken. Three of the labels bear a disclaimer telling consumers they should "Check Locally" to determine recyclability because the products are "[n]ot recycled in all communities." *Id*. ¶¶ 51, 56, 58. All the labels direct consumers to other sources of information about recycling, including Walmart's own website and *www.how2recycle.info*. Both sites contain information about recyclability, what the label claims are intended to convey, some of the limitations on recycling programs, and whether particular materials can be recycled in particular communities and if so, where. *See, e.g.*, *https://how2recycle.info/check-locally* (last visited Nov. 9, 2021) (providing links that allow consumers to search for local recycling information by zip code and material type). Greenpeace does not allege which if any particular communities' recycling programs are deficient.

In line with its new emphasis on an allegedly "unlawful practice," Greenpeace has expanded certain allegations about the FTC's Green Guides (16 C.F.R. § 260.1 *et seq.*) and California's Environmental Marketing Claims Act (Cal. Bus. & Prof. Code § 17580). *See, e.g.*, SAC ¶¶ 3–5, 35–36, 68–70, 78–80. The basic argument remains the same as before: that the term "recyclable" is misleading according to the Green Guides standard. But Greenpeace's argument radically reinterprets those Guides. According to the Guides, a product or package is recyclable, and can be labeled as such, if it "***can be*** collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item." 16 C.F.R. § 260.12(a) (emphasis added). Greenpeace does not allege the products and packaging it targets *cannot* be collected, separated, or otherwise recovered by recycling facilities. It alleges that, at the moment—and because of market forces outside of Walmart's control—they *are not being* recycled at acceptable rates by recycling facilities, or that it may not be profitable for those facilities to accept them. It does not allege they *cannot* be recycled.

Beyond that, the Green Guides standard is based on *access* to recycling facilities, not a percentage of what those facilities recycle. The Guides allow marketers to make recyclable claims,

without limitation, if at least 60% of targeted customers have access to facilities that can recycle the item at issue. 16 C.F.R. § 260.12(b)(1). The Guides tell marketers to qualify recyclable claims—for example, by saying "this product may not be recyclable in your area"—if less than 60% of targeted customers have access to such facilities. *Id*. § 260.12(b)(2). Greenpeace does not allege that *all* California consumers lack access to recycling facilities that accept the products for recycling and are capable of recycling them, nor does it identify any particular community that lacks such access. Instead, Greenpeace's argument hinges on reports that *some* recycling facilities are failing to recycle plastic products and packaging they accept because of allegedly decreasing market demand for certain types of recycled plastic.

Many of the amended allegations assert that the EMCA and Green Guides require advertisers to maintain information that substantiates their marketing claims. *See* SAC ¶¶ 3–5, 13, 15, 16, 17, 25, 35–36, 64–65. Greenpeace has rewritten the "unlawful practice" cause of action to minimize references to deception; it now alleges Walmart broke the law by failing to maintain records necessary to substantiate the allegedly deceptive claims. *Compare* FAC ¶¶ 76–84 (alleging violations of 15 U.S.C. § 45 (the FTC Act), Cal. Bus. & Prof. Code § 17500, and Cal. Bus. & Prof. Code § 17580.5) *with* SAC ¶¶ 66–74 (alleging violation of Cal. Bus. & Prof. Code § 17580). It has rewritten the "unfair practice" cause of action in a similar way. *Id*. ¶¶ 75–84.

Greenpeace alleges it has asked Walmart "on numerous occasions" to "substantiate" that the products are recyclable, but does not make clear what it means. SAC ¶¶ 5, 70. It does not allege it ever made some sort of formal demand for "substantiation" (the cited authorities set forth no specific procedures in any event). Elsewhere it refers to a survey it sent to companies including Walmart (*id*. ¶ 15), emails it sent discussing "issues related to ... unsubstantiated recycling representations" (*id*. ¶¶ 16, 25), and a "pre-suit demand" in August 2020 "informing [Walmart] that its Products are not recyclable" (*id*. ¶ 70). It complains that Walmart has not produced "documentation in written form" or "competent and reliable scientific evidence" substantiating its claims. *Id*. ¶ 5; *see also id*. ¶¶ 15 (alleging Walmart's responses to Greenpeace's survey "did not substantiate that the Products are recyclable"). The SAC does not specify what records Greenpeace believes Walmart was legally required to produce or what records would have satisfied Greenpeace had Walmart produced them.

Few of Greenpeace's amendments relate to the reason the Court dismissed the FAC: the failure to plead facts showing Greenpeace "lost money or property as a result of" the alleged misconduct. As before, Greenpeace does not allege it was misled by the allegedly deceptive labels. Greenpeace contends it was harmed because it decided to focus on Walmart's "recyclable" claims as part of its organizational mission to protect the environment, and, to do so, "spent" or "diverted" staff time and effort that might otherwise have been devoted to something else. SAC ¶¶ 7, 26 (alleging frustration of Greenpeace's "mission" or "purpose"); 13–26 (describing expenditures Greenpeace allegedly made). Most of the amendments on this issue involve adding the words "substantiated" or "unsubstantiated," or using these to replace references to deception. For example, Greenpeace now alleges not that it diverted resources to determine whether Walmart was making false claims, but that it diverted resources to "determine whether [Walmart] could substantiate" the claims. *See, e.g.*, SAC ¶ 16. It alleges these resources also represent something it "lost ... as a result" of Walmart's actions.

As before, Greenpeace seeks only injunctive relief. It has dropped the specific demand that the Court order a "corrective advertising and information campaign," though it still asks the Court to "implement whatever measures are necessary" to remedy the alleged misconduct. SAC at p. 42 (prayer for relief). The only specific injunctive relief Greenpeace demands is that the Court order Walmart to "substantiate the validity of [its] recycling representations" and/or enjoin it from "making unsubstantiated recycling representations." *Id.*

## LEGAL STANDARD

A complaint must provide "fair notice" of the plaintiff's claims and the grounds on which they rest, as well as enough facts to set forth a plausible claim for relief. Fed. R. Civ. P. 8(a); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Labels, conclusions, and recitations of legal elements are not "facts" and need not be accepted as true. *Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. Any claims grounded in fraud must also be pleaded with particularity. Fed. R. Civ. P. 9(b); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125–26 (9th Cir. 2009); *see Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (claims grounded in fraud must comply with Rule 8 and Rule 9(b)).

**ARGUMENT**

**I.    Greenpeace Still Does Not Allege Facts Showing It "Lost Money or Property as a Result of" the Alleged Misconduct, No Matter How It Characterizes Its Claims.**

UCL actions may be brought only by a person who "has lost money or property as a result of" the defendant's alleged conduct. *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 320–21 (2011); Cal. Bus. & Prof. Code § 17204. "As a result of" means "caused by," and when a UCL claim is grounded in fraud, that means actual reliance. *Kwikset*, 51 Cal. 4th at 326; *Greenpeace*, 2021 WL 4267536, at *1. These requirements stem from the 2004 amendments to the UCL, which eliminated the much-abused ability to bring UCL actions on behalf of the "general public." *See Kwikset*, 51 Cal. 4th at 317 (noting amendments were meant "to eliminate standing for those who have not engaged in any business dealings with would-be defendants...."); *Amalgamated Transit Union, Loc. 1756, AFL–CIO v. Superior Ct.*, 46 Cal. 4th 993, 1000 (2009) (noting amendments were motivated by abuse of UCL's broad standing provision). Before 2004, nonprofit groups (or anyone else) could and did freely bring UCL actions "in the public interest" to redress alleged harm to other people. *See, e.g.*, *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553 (1998). That is no longer the case. *See Californians for Disability Rts. v. Mervyn's LLC*, 39 Cal. 4th 223, 227, 234 (2006).

This Court previously dismissed Greenpeace's causes of action under all three prongs of the UCL—for "unlawful" and "unfair" as well as "deceptive" practices—because Greenpeace did not allege "it took action in reliance on the truth of Walmart's representations." 2021 WL 4267536, at *2–3. Greenpeace has responded to the Court's order by minimizing, though not eliminating, references to deception and reliance in the SAC. But the contention that Walmart is deceiving consumers into buying non-"recyclable" products is still at the heart of Greenpeace's case. And even if Greenpeace had completely purged the concepts of deception and reliance from the SAC, Greenpeace still does not allege facts showing that *it* "lost money or property as a result of" the "unlawful" or "unfair" practices. It alleges that it *chose to spend* time and effort on investigating and eventually suing Walmart as part of its mission to protect the environment. To allow a plaintiff to create standing in that way would be fundamentally inconsistent with limitations on UCL standing.

**A.      The challenged conduct still consists of alleged misrepresentations to consumers, and Greenpeace cannot base a claim on third-party reliance.**

As this Court pointed out, where the conduct challenged in a UCL action consists of alleged misrepresentations to consumers, a plaintiff must plead and prove actual reliance on the misrepresentations. *Greenpeace*, 2021 WL 4267536, at *1. That is so even if the plaintiff also labels essentially the same allegations as "unlawful" or "unfair" practices. *See, e.g.*, *Kearns*, 567 F.3d at 1127 (holding court did not err in analyzing UCL deceptive- and unfair-practice claims together; both were based on the same "course of fraudulent conduct" and failed for the same reasons); *Swearingen v. Pacific Foods of Oregon, Inc.*, No. 13-cv-04157-JD, 2014 WL 3767052, at *2 (N.D. Cal. July 31, 2014) (holding actual-reliance requirement applies to unlawful prong if "the predicate unlawfulness is misrepresentation and deception"). That is why the Court's previous order dismissed all three of Greenpeace's causes of action, not just the deceptive-practice claim: Greenpeace's failure to allege reliance (and therefore causation) defeated all three. *Greenpeace*, 2021 WL 4267536, at *1.

Greenpeace's decision to drop the deceptive-practice claim is therefore puzzling because that alone changes nothing. Greenpeace does not allege in its two remaining claims that it relied on the alleged misrepresentations, but it has *never* alleged that. Just as before, its claims are based on an alleged course of fraudulent conduct towards *consumers* that purportedly harms consumers or the environment—yet the complaint still does not contain a single particularized allegation (as to reliance or otherwise) pertaining to any such consumer. The superficial amendments to Greenpeace's remaining claims do not change this fundamental problem.

For example, the FAC alleged that "consumers" who are "aware of the problems associated with plastic pollution" are "susceptible to marketing claims" about recyclability that Walmart makes "[s]eeking to take advantage of consumers' concerns" to sell products. FAC ¶ 1 (lines 9–12). The SAC alleges that because "people" are "environmentally conscientious" about plastic pollution, Walmart labels products as recyclable "[s]eeking to take advantage of people's concerns" to sell products. SAC ¶ 1. This is the same theory as before. Similarly, Greenpeace makes the same allegations about why it is supposedly misleading to label the products as "recyclable" (as it seeks to redefine that term). *See, e.g.*, SAC ¶¶ 2, 37–39, 41, 44–50, 54. And the SAC still includes terms like

"deception," "mislead," and "misrepresent." *See, e.g.*, *id.* at ¶¶ 7 (alleging Greenpeace works to ensure companies do not "falsely tout" environmental benefits), 15 (alleging it seeks to expose Walmart's "practice of misrepresenting the recyclability of the Products"), 19 (alleging consultant worked on "the technical basis for claiming deceptive labeling"), 26 (alleging Walmart intends marketing to "confuse the public" and give them "a false sense that they are doing something good" when they recycle), 54 (one of several paragraphs discussing "deceptive" recycling claims). The SAC ultimately rests on the same allegations of consumer deception as before.

The SAC therefore fails for the same reason the FAC did: Greenpeace does not allege *it* was deceived, and cannot assert UCL standing based on alleged deception of a third party. *Greenpeace*, 2021 WL 4267536, at *1; *see also, e.g.*, *LegalForce RAPC Worldwide P.C. v. DeMassa*, No. 18-cv-00043-MMC, 2020 WL 4747909, at *4–5 (N.D. Cal. Aug. 17, 2020) (dismissing UCL deceptive-practice and unfair-practice claims alleging plaintiff's competitor was deceiving consumers. A showing of reliance may not be required if, in fact, a UCL unlawful- or unfair-practice claim does not involve deception. But Greenpeace's remaining causes of action still do.

The SAC also fails simply because Greenpeace has not complied with Rule 9(b). Even if a plaintiff could base a UCL claim on allegations of third-party deception, Rule 9(b) would still require the circumstances to be pleaded with particularity. *See, e.g.*, *Ely Holdings Ltd. v. O'Keeffe's, Inc.*, No. 18-cv-06721-JCS, 2019 WL 3779197, at *4–5 (N.D. Cal. Aug. 12, 2019) (rejecting argument that distinction between first-party and third-party reliance "is sufficient to remove a claim from the scope of Rule 9(b)."); *Jiles v. US Bank NA*, No. CV 12-10397-SJO, 2013 WL 12134143, at *4 (C.D. Cal. Feb. 11, 2013) (dismissing because allegations of fraud "against both parties and non-parties to the lawsuit" were not pleaded with particularity). Assuming fraud could ever be pleaded with particularity when the alleged victim is not a party, Greenpeace has not done it here.

**B.      Greenpeace does not allege it "lost money or property as a result of" any other unlawful or unfair practices.**

Even if Greenpeace's remaining causes of action did not involve alleged deception, it would still lack standing because it has not alleged facts showing it "lost money or property as a result of" anything Walmart did. Cal. Bus. & Prof. Code § 17204.

**1.      Greenpeace does not allege it lost money due to a failure to substantiate.**

To the extent that Greenpeace attempts to allege that the "unlawful" or "unfair" practice was failing to substantiate its recyclability claims—that is, not the allegedly deceptive nature of the claims but the failure to produce documents or evidence upon request—the SAC is virtually devoid of facts. Greenpeace says that "on numerous occasions" it has asked Walmart to "substantiate" its claims." SAC ¶ 5. If it is implying it made some formal request for information pursuant to statute, it does not actually allege that (and Walmart is not aware of any such request or any such formal procedure). The SAC mentions only a survey Greenpeace sent to various companies including Walmart (*id*. ¶ 15), emails it sent Walmart discussing "issues related to ... unsubstantiated recycling representations" (*id*. ¶¶ 16, 25), and a "pre-suit demand" it sent in August 2020 "informing [Walmart] that its Products are not recyclable" (*id*. ¶ 70). Greenpeace does not explain exactly what it was asking for or what it believed it was legally entitled to get, simply complaining generally that Walmart has not produced any "documentation in written form" or "competent and reliable scientific evidence" substantiating its claims. *Id*. ¶ 5. Its own allegations show that Walmart *has* engaged with it on this topic, responding to written questions and engaging in "other written and verbal communications" on the subject of recyclability. *Id*. ¶ 15. But more importantly here, Greenpeace pleads no facts showing it lost any money *as a result of* Walmart's alleged failure to provide written documentation or "scientific evidence" upon request. "It is not enough that a plaintiff lost money; to have standing, there must be a causal link between the unlawful practice and the loss." *Mayron v. Google LLC*, 54 Cal. App. 5th 566, 574 (2020).

To the extent that Greenpeace makes any effort to tie specific expenditures to "substantiation" attempts, it alleges it spent money to determine whether Walmart had the required documents. That could not establish causation. For example, it alleges it paid staff members to contact Walmart and ask for materials, which they did in late 2019. SAC ¶¶ 16, 19. Greenpeace alleges they got no response or that the response "did not substantiate" Walmart's claims (for reasons the SAC does not explain). *Id*. ¶¶ 5, 15, 23. But if those expenditures were made *before* Greenpeace learned Walmart would not provide substantiation, as it alleges, then such expenditures could not have *resulted from* the lack of substantiation. This is money Greenpeace alleges it spent to

ask the questions, not as a result of the answers. *See, e.g.*, *Mayron*, 54 Cal. App. 5th at 574–75 (holding plaintiff lacked standing because allegations suggested that he would have spent the money even if defendant had complied with the law); *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1098 (2007) (holding causation not shown where plaintiff would have suffered the same harm whether or not defendant complied).

Further, just because expenditures might have been made *after* a request for substantiation would not necessarily mean they *resulted from* the response. And here, the SAC shows Greenpeace made the "substantiation requests" only to further a strategy it had developed long before: to contend that Walmart and other retailers were making plastic-recyclability claims that had become improper due to changes in market conditions.

For example, the SAC mentions a report published in June 2019 in which Greenpeace made the same charges it makes now. *Id.* ¶ 14 & n. 5 (citing "Packaging Away the Planet: U.S. Grocery Retailers and the Plastic Pollution Crisis"); *see* "Packaging Away the Planet" at p. 15 (arguing that retailers like Walmart "can no longer hide behind recycling" and that "recyclable" labels ignore "broken recycling systems"). The later expenditures Greenpeace cites for substantiation involve money it paid consultants for work done to support this strategy, not to "investigate" anything. *See id.* ¶¶ 19 (alleging Greenpeace hired consultant in August 2019 to work on campaign to "correct labeling of plastic products"); 16 (alleging another consultant contacted Walmart in October 2019 to discuss "the issues related to Defendant's unsubstantiated recycling representations and inform[ ] defendant that its labels do not meet the standards in the Green Guides"). The latter allegation is especially telling. Greenpeace does not allege it paid the consultant to seek substantiation, but rather to "inform" Walmart that, in Greenpeace's view, Walmart was making claims it could not substantiate—something Greenpeace attributes to market conditions that have concerned it for some time and which allegedly existed years before the actions it describes in the complaint. *See* SAC ¶¶ 41 (alleging doubts about recyclability go back decades), 49 (alleging that "the writing has been on the wall" about recycling policy in China since 2013). In short, Greenpeace does not allege facts showing these expenditures could represent money Greenpeace "lost ... as a result of" any alleged failure by Walmart to comply with laws requiring it to provide "substantiation."

Greenpeace also alleges at one point that Walmart's alleged failure to comply with laws requiring substantiation gives it "an unfair advantage over its competitors," who Greenpeace asserts *do* comply (without identifying any that do so). SAC ¶ 81. That allegation might be relevant if one of Walmart's competitors were bringing this action (*and* could demonstrate it was seeking restitution and not damages, which are not recoverable under the UCL). *See, e.g., Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 564–65 (2013) (holding plaintiff adequately alleged it lost money as a result of competitor's violation of statute forbidding unauthorized practice of law). Greenpeace of course is not one of those competitors, again showing it is trying to base its own UCL standing on vague allegations of harm to someone else. For that matter, what Greenpeace means is that Walmart would have an unfair advantage over its competitors *in marketing to consumers*. *See* SAC ¶ 81 (asserting that Walmart has an unfair advantage because its competitors' "advertising and labeling" allegedly do not use the term "recyclable"). This further demonstrates that Greenpeace's case is still founded on allegations that Walmart deceives consumers, which is the reason the Court dismissed the FAC.

### 2.     The UCL does not allow "organizational standing."

What Greenpeace is really seeking to do is establish that it has "organizational standing" to sue under the UCL because it spent money to further its mission of protecting the environment. As also discussed in prior briefing (*see* ECF Nos. 26, 30), the UCL does not allow that.

The California Supreme Court has expressly held that the federal doctrine of "associational standing," which allows an association to pursue an action based on the standing of its members, conflicts with the amended UCL. *Amalgamated Transit*, 46 Cal. 4th at 1002–04. Because the UCL requires the *plaintiff* to have lost money or property as a result of the defendant's conduct, a group purporting to represent its members cannot do so under the UCL, even if the members assign their claims to it. *Id.* at 1002. Allowing this would confer standing on the uninjured assignee "in direct violation of the express statutory requirement ... that a private [UCL action] be brought *exclusively*" by the injured party. *Id.* (emphasis in original).

Greenpeace relies instead, as it did in the FAC, on the theory that it has suffered injury because the alleged unlawful or unfair practices have "frustrated Greenpeace's mission" to protect

the natural environment and "caused" it to spend resources "in response to that frustration of purpose." SAC ¶ 7; *see id*. ¶¶ 16 (alleging Greenpeace's staff "diverted time" to engaging with Walmart), 17 (alleging it diverted unspecified "resources" to "all [its] other projects and campaigns" to investigate Walmart), 23 (alleging it "diverted money, staff time, and other organizational resources" to "fund and manage [a] consultant" who investigated Walmart). But like associational standing, organizational standing is a federal doctrine that conflicts with the amended UCL. If an association cannot use the UCL to redress harm to *its own members* (*Amalgamated Transit*, 46 Cal. 4th at 1002–04), it makes little sense to allow an organization to use the UCL to redress harm to "the general public," a much more attenuated claim (and one that Prop 64 was designed in part to prevent). That too conflicts with the requirement that private UCL actions be brought "exclusively" by an injured party. *Cf. Californians for Disability Rights*, 39 Cal. 4th at 234 (holding Prop 64 amendments applied retroactively even though they could "be viewed as defeating CDR's civic or philosophical interest in enforcing the UCL as an uninjured, volunteer plaintiff.").

The California Supreme Court has never held that "organizational standing" can be a basis for a UCL action. Greenpeace presumably will again rely on the *ALDF* case, but that provides no support for its claim here. *See Animal Legal Def. Fund v. LT Napa Partners LLC*, 234 Cal. App. 4th 1270, 1277–84 (2015). In *ALDF*, the Court of Appeal considered unlawful-practice claims against a restaurant that served *fois gras* in violation of a state statute. *Id*. at 1275–76. ALDF paid an investigator to visit the restaurant and sued after he was served *fois gras*. *Id*. at 1276. The restaurant brought an anti-SLAPP motion, arguing that it was serving *fois gras* as a protest and so was engaging in protected conduct. *Id*. at 1277. The court held the motion was properly denied because (in part) ALDF had shown it had a probability of prevailing on standing. *Id*. at 1278–84. But in asserting that organizational standing could support a UCL claim, the court relied on federal authority, not an analysis of California law. It did not mention *Amalgamated Transit* and did not apply *Kwikset*. *ALDF*, 234 Cal. App. 4th at 1280–81. Instead, it relied ultimately on a 2005 federal decision that *Kwikset* did not even cite. *See id*. (citing *S. Cal. Hous. Rts. Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1068–69 (C.D. Cal. 2005)). The court apparently reasoned that because *Kwikset* cited a case (*Hall v. Time Inc.*, 158 Cal. App. 4th 847, 854–55 (2008))

that had in turn cited *Housing Rights*, the California Supreme Court must have been endorsing everything in the latter decision. *See id.* (acknowledging *Kwikset* did not address the issue, but claiming it "did express some approval for that proposition through its approving citation to *Hall*.") That conclusion does not follow. Had the California Supreme Court meant to approve of organizational standing in *Kwikset*, it would have said so, especially in view of its decision just two years before in *Amalgamated Transit*. But the proposition was not even at issue in *Kwikset*.

*ALDF* is also inconsistent with the more recent decision in *California Med. Assoc. v. Aetna Health of Cal., Inc.*, 63 Cal. App. 5th 660 (2021). In *CMA*, the association brought a UCL claim against Aetna, seeking to enjoin a policy that allegedly restricted referrals to out-of-network providers. 63 Cal. App. 5th at 662. CMA alleged Aetna marketed insurance plans as allowing unrestricted use of out-of-network providers, but then tried to deter member physicians from making referrals to those providers. *Id.* Because CMA did not itself have any contract with Aetna, it could not allege it was directly harmed by this conduct. It therefore needed another basis for its action.

CMA argued it had standing to bring a "nonclass representative action" seeking injunctive relief, citing California cases that allowed this under Code of Civil Procedure section 382. *Id.* at 662–63. The Court of Appeal made short work of that, pointing out that the case law CMA relied on had "developed many years before the electorate passed Proposition 64 in 2004...." *Id.* at 663. And in *Amalgamated Transit*, it noted, the California Supreme Court held that associational standing was inconsistent with the amended UCL, so that following the amendments, "all unfair competition law actions seeking relief on behalf of others ... must be brought as class actions." *Id.* at 666 (quoting *Amalgamated Transit*, 46 Cal. 4th at 1005). The *CMA* court also noted that two years later, *Kwikset* emphasized the new requirement that a UCL plaintiff must be able to show personal, direct economic harm caused by the alleged misconduct. *Id.* These cases defeated CMA's argument: "[T]he decisions in *Amalgamated Transit* and *Kwikset* require an association such as CMA to produce evidence that CMA itself, and not just its members, lost money or property" to bring a UCL action, and "the cases recognizing an association may have standing to assert its members' *non*-UCL claims do not apply here." *Id.* at 667.

CMA also argued—just as Greenpeace does here—that it was actually suing on its *own* behalf, citing *ALDF* for the proposition that "diversion of its resources is a sufficient injury to confer standing under the UCL." *CMA*, 63 Cal. App. 5th at 667. CMA alleged that it advocates on behalf of physicians throughout California, "and carries out its mission through legislative, legal, regulatory, economic, and social advocacy." *Id*. at 664. It had been "forced to expend significant time and resources" on an "investigation and review of [Aetna's] wrongdoing," planning a strategy to counter it, and responding to public inquiries about it. *Id*. It provided a declaration in which a senior vice-president testified that "'preventing conduct that interferes with the physician-patient relationship' is part of CMA's core mission," and that it had been "especially active in advocacy and education on issues" like those described in its complaint. *Id*. After learning about and investigating Aetna's conduct, he testified CMA had determined that the conduct was "frustrating CMA's purpose of protecting physicians and the public." *Id*. at 665. He estimated CMA had "diverted" 200 to 250 hours of staff time to Aetna's conduct. *Id*. Citing this and *ALDF*, CMA argued this was sufficient.

The Court of Appeal disagreed. *Id*. at 668–69. It said *ALDF* was "distinguishable" because that case did not involve a "representative action," saying ALDF did not purport to be advocating on behalf of or providing services to members, if it even had members. *Id*. It had been arguing, the court suggested, only that it was directly injured by the restaurant's violation of the ban on sales of foie gras. *Id*. CMA, on the other hand, was admittedly advocating on behalf of others, and the staff time and resources it allegedly "diverted" to dealing with Aetna were typical of its normal operations. *Id*. "If we were to apply *ALDF* to this case," the court held, "then any organization acting consistently with its mission to help its members through legislative, legal and regulatory advocacy could claim standing based on its efforts to address its members' injuries. The 2004 amendments to the UCL eliminated such representational standing," as *Amalgamated Transit* confirmed. *Id*. at 668–69. The court went on to hold that the federal authorities that CMA cited—the same line of authority Greenpeace has relied on here—were "neither binding on this Court nor instructive" as to associational or organizational standing. *Id*. at 669. Only one of them even considered a UCL claim, the court pointed out, and that one—the *Housing Rights* case mentioned in *ALDF*—predated the relevant California Supreme Court cases and so offered "little guidance." *Id*.

*ALDF* is distinguishable because, as shown above, despite Greenpeace's amendments its claims are still ultimately based on allegations that others are being deceived. ALDF's action had nothing to do with deception; it argued only that the defendant was violating a prohibition on selling foie gras. Here, Greenpeace's action, and its alleged "injury," still turns on its allegations that labeling products as "recyclable" deceives other people. If *ALDF* applied on those facts, any organization could declare a mission of protecting consumers from false (or "unsubstantiated") advertising, and then bring a UCL action based on injury to that mission. That would be functionally indistinguishable from the situation before Prop 64 passed. Setting that distinction aside, *CMA* suggests *ALDF* was wrongly decided. Though the *CMA* court noted ALDF had not been advocating on behalf of its members (if any), that does not mean it approved of the holding. And whether ALDF had members is not the issue; the issue is that UCL standing requires an actual economic loss to the plaintiff as a result of the defendant's conduct. Otherwise, "any organization acting consistently with its mission to help its members through legislative, legal and regulatory advocacy could claim standing based on its efforts to address its members' injuries," which the 2004 UCL amendments do not allow. *CMA*, 63 Cal. App. 5th at 668–669. The same is true if one replaces "members" with "the general public," which is Greenpeace's approach here. There is no reason to believe the California Supreme Court would endorse this approach to UCL standing.[3]

### 3.    Greenpeace has not adequately alleged organizational standing.

Even if organizational standing were viable under the UCL, Greenpeace has not alleged the necessary facts to establish it. Under federal precedent, organizations may be able to establish standing if they "alter their resource allocation to combat the challenged practices, but not when they go about their business as usual." *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942–43 (9th Cir. 2021) (punctuation omitted); *see also, e.g.*, *Am. Diabetes Assoc. v. United States Dept. of the Army*, 938 F.3d 1147, 1154–55 (9th Cir. 2019). They must have "expended additional resources that they would not otherwise have expended, and in ways they would not have expended

---

[3] The California Supreme Court has granted review in *CMA*, but denied the plaintiff's request to depublish the Court of Appeal's decision. *California Med. Assoc. v. Aetna Health of Cal.*, 491 P.3d 1045 (Cal. July 28, 2021). As the Court specifically noted, pending review that decision may still be cited for its persuasive value and to establish a conflict in authority between appellate districts to allow trial courts "to choose between sides of any such conflict." *Id.*

them." *Friends of the Earth*, 992 F.3d at 942 (citing *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015)). An organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociación de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). "It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.*; *see El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev.*, 959 F.2d 742, 748 (9th Cir. 1992) (organizations had standing where challenged policy "*require[d]* [them] to expend resources ... they otherwise would spend in other ways") (modifications added). In short, an organization must do more than merely allege it chose to allocate resources in a particular way to pursue its "business as usual." Otherwise, there would be no meaningful limits on organizational standing.

As in the FAC, Greenpeace's current standing allegations describe only business as usual. Greenpeace has long "worked to combat plastic pollution" in California and elsewhere, work that has included educating "people" about "statements that certain plastic was ... recyclable when it was not...." SAC ¶¶ 7, 11. The campaigns have by no means been limited to California or Walmart. *Id.* ¶¶ 7–14. To the contrary, for the "Packaging Away the Planet" report Greenpeace evaluated 20 retailers for its "2019 Supermarket Plastics Scorecard" (it gave all 20 a failing grade), and as mentioned above, the report specifically discussed the same concerns now expressed in this lawsuit. *Id.* ¶ 14 & n.5. While Greenpeace again asserts that its actions toward Walmart came "at the expense" of other projects and campaigns, it again pleads no facts to support that assertion. *Id.* ¶¶ 17, 23.

The Ninth Circuit held similar allegations insufficient in *Friends of the Earth*. The court noted that the plaintiff advocacy groups had been engaged in various initiatives to further the stated goal (reducing antibiotic use in animal agriculture) for years before they targeted the defendant. *Friends of the Earth*, 992 F.3d at 942–43. Once the defendant came to their attention, the groups "simply continued what they were already doing—publishing reports on and informing the public of various companies' antibiotic practices." *Id.* This was not enough to confer standing. *Id.*

And despite bolstering their allegations, those plaintiffs had no better luck the next time they sued that defendant—which they did almost immediately. *See In Defense of Animals v. Sanderson*

1    *Farms, Inc.*, No. 20-cv-05293-RS, 2021 4243391, at *1 (N.D. Cal. Sept. 17, 2021) (noting court was

2    experiencing "deja vu" because plaintiffs had also been parties in *Friends of the Earth*). The

3    plaintiffs added even more allegations about what resources they diverted to target that particular

4    defendant, hoping to solve the standing problem. *Id*. But as Judge Seeborg held, they were simply

5    missing the point because these were resources they had *chosen* to spend:

6            [O]rganizational standing requires an injury to the organization itself, not merely its
             interests. An organization's entirely voluntary action cannot confer standing, no
7            matter its quality or quantity. *The organization must be forced to respond to prevent
             injury*.... Even if the Plaintiffs had transformed themselves entirely into anti-
8            Sanderson advocates, they would not have standing because it would not have been
             due to any injury by Sanderson. Thus, despite their efforts to manufacture standing,
9            Plaintiffs still do not have a leg to stand on. They have missed the forest for the trees.

10   *Id*. (emphasis added). The new "diversion of resources" allegations were much like those

11   Greenpeace makes here: the plaintiffs alleged, in general terms, that they diverted staff time and

12   resources to a campaign to "counteract the effects of Sanderson's conduct," including investigating

13   and publicizing that conduct. *Id*. at *2. They alleged these efforts diverted time and resources from

14   other campaigns. *Id*. But none of this made a difference, because to have organizational standing,

15   "plaintiffs must show they would have suffered some other injury if they had not diverted resources

16   to fix the problem.... The organization must be 'forced' into acting because the defendant affected its

17   operations." *Id*. at *4 (citing some of the "numerous cases" that make this point). Merely alleging

18   that the defendant "frustrate[d] their mission in a general sense" was not enough. *Id*.

19           Greenpeace's allegations here are insufficient for the same reasons. As Judge Seeborg noted,

20   to accept the argument that an organization has standing "by virtue of investigating conduct or

21   starting a new campaign against someone who frustrates its general mission" would effectively

22   nullify standing requirements. *Id*. "Just as an individual cannot gin up standing by researching and

23   tweeting about something that indirectly makes his or her life harder, neither can an organization."

24   *Id*. Without concrete facts showing the organization was *forced* to divert resources, including

25   "specific averments about what it would have done with its time and money otherwise," this

26   standing argument fails. *Id*. at *5. Greenpeace has alleged no such facts.

27

28

**II.**      **Both of Greenpeace's UCL Causes of Action Would Fail for Other Reasons as Well.**

    **A.**      **"Recyclability" claims are not subject to the substantiation requirement under current law.**

Even if Greenpeace had standing, its new emphasis on "substantiation" would not save its complaint. To begin, the substantiation requirement does not apply to "recyclability" claims—it applies to claims that a consumer good "is not harmful to, or is beneficial to, the natural environment," for example by using terms like "environmentally safe," "green product," or "any other like term." Cal. Bus. & Prof. Code § 17580(a). While Greenpeace asserts that "recyclable" is one such "like term" (*see* SAC ¶¶ 3, 35, 68, 79), there is no case law saying so. If this assertion were true, the Legislature would not have needed to amend the statute to specifically include "recyclable" claims, which it did barely a month ago. *See* 2021 Cal. Legis. Serv. Ch. 507 (S.B. 343) (West) (filed Oct. 5, 2021). Under the new law—which is not retroactive—the substantiation requirement will apply to claims that involve "the use of a chasing arrows symbol or by otherwise directing a consumer to recycle the consumer good...." SB 343, § 1 (amending section 17580(a)). Similarly, current law includes a legislative declaration that "environmental marketing claims" should be truthful and accurate. Cal. Pub. Res. Code § 42355.5. SB 343 adds a declaration that "claims related to the recyclability of a product or packaging" should also be truthful and accurate. SB 343, § 4 (renumbering current section and adding new subsection). This also shows the Legislature views "environmental marketing" and "recyclable" claims differently, bolstering the interpretation above.

For that matter, from 1990 until 1995, the Business & Professions Code *did* expressly refer to "recyclable" claims, but the Legislature repealed that provision. 1995 Cal. Legis. Serv. Ch. 642 (S.B. 426) (West) (filed Oct. 6, 1995) (repealing Cal. Bus. & Prof. Code § 17508.5). It did so because the definition of "recyclable" it used—that a product could be "conveniently recycled" in any county with a population over 300,000—was so vague it was unenforceable. *See* Sen. Committee Report on S.B. 426 (Mar. 27, 1995) (attached as Ex. A). As the report pointed out, there had been multiple efforts to redefine "recyclable" in a way that might prove workable, reflecting an ongoing and nationwide debate about what that term should mean, but all those efforts had failed. *Id.* For that and other reasons, the Legislature simply repealed the measure. *Id.* Again, therefore, the legislative

history supports the interpretation that the existing substantiation requirement does not apply to "recyclability" claims.[4]

**B.      Private parties cannot enforce substantiation requirements in any event, at least under the circumstances here.**

It is also unclear whether any private party could enforce section 17580's substantiation requirement, even assuming it had UCL standing to do so. It *is* clear that private parties cannot sue to enforce the similar provision that requires substantiation of certain advertising claims more generally. *See, e.g.*, *Nat'l Council Against Health Fraud Inc. v. King Bio Pharms. Inc.*, 107 Cal. App. 4th 1336, 1345 (2003) (holding that "[p]rivate plaintiffs are not authorized to demand substantiation for advertising claims" under Business & Professions Code section 17508). Under that statute, only prosecuting authorities may do so. Cal. Bus. & Prof. Code § 17508(b)–(d). As the court noted in *King Bio*, this limitation is "certainly rational" because it "prevents undue harassment of advertisers" by a potentially unlimited number of private parties, and "is the least burdensome method of obtaining substantiation for advertising claims." 107 Cal. App. 4th at 1345.

This specific limitation does not appear in section 17580, as it stands or as amended by SB 343. But as *King Bio* also held, to allow private parties to sue under the UCL to help force advertisers to "substantiate" marketing claims would violate public policy by improperly shifting the burden of proof from plaintiffs to defendants. *Id*. at 1344–48. That is, the plaintiff always has the burden of proof and to plead facts sufficient to state a claim. A defendant may eventually need to come forward with "substantiating" evidence to defeat a properly pleaded complaint, but a plaintiff cannot sue without the necessary facts and simply demand that the defendant "either 'put up or shut up.'" *Mier v. CVS Pharmacy, Inc.*, No. SACV 2001979-DOC-ADS, 2021 WL 1559367, at *4 (C.D. Cal. Mar. 22, 2021); *see also, e.g.*, *Johns v. Bayer Corp.*, No. 09-CV-1935-AJB-DHB, 2013 WL 1498965, at *48 (S.D. Cal. Apr. 10, 2013) (citing cases). Given the weakness of Greenpeace's allegations here, and to the extent that it claims to be suing only to force Walmart to provide (unspecified) information substantiating its claim, public policy should bar its attempt to enforce the

---

[4] If the requirement did apply, it would incorporate the FTC standards, not the standard Greenpeace seeks to impose here. As discussed below, Greenpeace does not allege facts showing Walmart violated the FTC standards.

substantiation provisions of section 17580 (or the Green Guides). The policy underlying the requirement can best be furthered by leaving enforcement to prosecuting authorities.

**C.**   **Greenpeace does not allege facts showing it is unlawful or unfair to label the products as "recyclable," with or without substantiation.**

Greenpeace's lawsuit also fails because it has not alleged facts showing that labeling the products as "recyclable," with or without "substantiation," is an unlawful or unfair practice.

Both causes of action allege that Walmart does not comply with the standards for "recyclable" claims under FTC's Green Guides. SAC ¶¶ 69–71, 79–80. According to the Green Guides, "[a] product or package shall not be marketed as recyclable unless it *can be* collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item." 16 C.F.R. § 260.12(a) (emphasis added). But Greenpeace does not allege that any of the challenged products *cannot* be "collected, separated, or otherwise recovered ... for reuse or use in manufacturing or assembling another item." It alleges only that, after recent changes in the market, this does not happen often enough. *See, e.g.*, SAC ¶¶ 44 (alleging plastics #3–7 are now "rarely, if ever, recycled"); 45–48 (alleging this is because of market conditions including expanded production of "virgin plastic" by oil companies and decisions by the People's Republic of China); 52 (alleging "the majority of plastics #3–7"—but not all—are sent to landfills); 54 (conceding that some recycling facilities in California accept such plastics). But under the Green Guides, as Greenpeace concedes, a marketer can make "recyclable" claims so long as "a substantial majority" of consumers or communities "have access to" recycling facilities. *Id.* ¶ 54; *see* 16 C.F.R. § 260.12(b)(1) (claim can be made so long as "*recycling facilities are available to* a substantial majority of consumers or communities where the item is sold," emphasis added). A "substantial majority" means at least 60 percent. *Id.* Greenpeace does not allege facts showing this standard is not being met in California as a whole or in any particular community.

Greenpeace is essentially asking the Court to rewrite the Green Guides to require marketers to ensure certain products are *actually being* placed into recycling bins by consumers and recycled by independent facilities at rates acceptable to Greenpeace. And if, as Greenpeace claims, recycling rates depend on ever-changing market conditions, this new duty would impose a heavy and

continuing burden on retailers. Not only is this interpretation of the Green Guides wrong, it has drastic implications for the consumer goods industry as a whole, because similar labeling is used by other retailers and brands across the country. *See* How2Recycle, https://how2recycle.info ("The How2Recycle label was created to provide consistent and transparent on-package recycling information to consumers in North America."). While this litigation may fit within Greenpeace's stated goal to discourage the use of plastic, it goes well beyond what federal and California law require of retailers. And ironically, since the challenged labels educate consumers about which items can be recycled, removing the labels could lead to *more* plastic ending up in landfills. Even Greenpeace concedes that at least some of the challenged plastics are being recycled under current marketing conditions. If consumers stop depositing these products into collection bins, none of it will be recycled.

## III.    Greenpeace Still Alleges No Facts Showing It Is Entitled to Injunctive Relief, the Only Form of Relief It Seeks.

Finally, even if Greenpeace had otherwise stated a claim, it has not alleged facts showing that it has a right to injunctive relief. It could not and does not seek restitution, the only form of monetary relief authorized by the UCL. But that does not mean it is "absolved from also demonstrating that [it] is entitled to seek an injunction" under the standards that apply to such relief in any case. *Freeman v. ABC Legal Servs., Inc.*, 877 F. Supp. 2d 919, 925 (N.D. Cal. 2012). It has not done so here.

Because a UCL action is equitable, remedies are limited to restitution and injunctive relief. "Traditional equitable principles" apply when seeking such relief. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020) (holding this is true where plaintiff seeks restitution); *see, e.g.*, *Huynh v. Quora, Inc.*, No. 5:18-CV-07597-BLF, 2020 WL 7495097, at *19 (N.D. Cal. Dec. 21, 2020) (same for injunctive relief, collecting cases). Prospective injunctive relief requires a plaintiff to show, among other things, that (1) it will suffer irreparable injury if the injunction is not granted, that legal remedies will be inadequate, (3) that the balance of hardships weighs in plaintiff's favor, and (4) that the public interest warrants the injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (plaintiff must show a "real or immediate threat that the plaintiff will be wronged again" in the future).

Greenpeace alleges in both remaining causes of action that "injunctive relief is specifically authorized under Business & Professions Code § 17203." SAC ¶¶ 74, 84. That is true, but a plaintiff must still allege facts showing entitlement to such relief. Greenpeace still has not done so. As discussed above, it cannot assert standing based on allegations of injuries to third parties or to "the environment" in the abstract. *See, e.g.*, *Freeman v. ABC Legal Servs.*, 877 F. Supp. 2d 919, 927 (N.D. Cal. 2012) (holding injunctive relief not warranted because even if allegations showed conduct might harm others in the future, they did not show it would harm "*these* Plaintiffs") (emphasis in original). And Greenpeace still alleges no concrete facts supporting any claim for injunctive relief on its own behalf.

It repeatedly alleges it will suffer "irreparable injury" if no injunction is issued because "it will continue to spend money, staff time, and other organizational resources to combat Defendant's unsubstantiated representations," making the same conclusory statement (in almost identical paragraphs) each time. SAC ¶ 6, 27, 65, 72, 82. That is not the case, as discussed above, because Greenpeace is not being *forced* to make those expenditures. It could avoid this "injury" by just choosing not to make them anymore. In any event, Greenpeace does not explain why those injuries would be "irreparable." It also alleges, as it did in the FAC, that without an injunction plastic pollution will "continue to negatively impact" the environment (*ibid*), but that will be true, unfortunately, whether this Court enters an injunction in this case or not. And, of course, no injunction by this Court could affect the market conditions that Greenpeace itself alleges are responsible for low plastic recycling rates in the first place. For that matter, if market conditions change in the future—as one of Greenpeace's own sources suggests may happen—there would be no need for an injunction for that reason as well. *See id.* ¶ 38 n.41 (citing "Piling Up" article, which states that "[w]hether China's ban leads to increased plastic pollution in the environment remains to be seen," and "if proper alternatives are found, plastic pollution could actually decrease.").

As far as balancing the equities, anything that injunctive relief might add to Greenpeace's mission would be far outweighed by the enormous cost to Walmart of changing the labels of the huge number of products Greenpeace has targeted (an injunction the amended prayer for relief still demands), and whatever cost might be imposed by an order directing Walmart to "substantiate" its

recyclable claims. Especially given the uncertainty and continuing debate over what "recyclable" should mean, and the continuing fluctuations in the market, it is hard to know what sort of order the Court might craft to achieve the latter goal. The SAC offers no suggestions.

Finally, Greenpeace alleges that an injunction would be in the public interest only because granting one might help it educate consumers about what can and cannot be recycled in California. *See* SAC ¶¶ 6, 27, 65, 72, 82.) But it does not need an injunction for that purpose, either. It could simply work to educate consumers directly, as it claims to have been doing for decades. Granting an injunction would certainly encourage further litigation of this kind—by Greenpeace and many others—which is unlikely to be an efficient way to educate the public about recyclability, or to otherwise serve the public interest.

In short, Greenpeace has alleged no concrete facts showing it is entitled to injunctive relief, the only type of relief it seeks here.

### CONCLUSION

Because the Second Amended Complaint still does not allege facts showing that Greenpeace has standing to sue under the UCL, and for the other reasons set forth above, the Court should dismiss without further leave to amend.

Dated:  Nov. 10, 2021

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.


By:  */s/ M. Kevin Underhill*
Patrick Oot (*pro hac vice*)
Eva M. Weiler
M. Kevin Underhill
Steve Vieux

Attorneys for Defendant Walmart Inc.

# EXHIBIT A

Case 3:21-cv-00754-MMC   Document 45   Filed 11/10/21   Page 32 of 34

California Bill Analysis, S.B. 426 Sen., 3/27/1995, California Bill Analysis, S.B. 426...

CA B. An., S.B. 426 Sen., 3/27/1995


California Bill Analysis, Senate Committee, 1995-1996 Regular Session, Senate Bill 426

March 27, 1995
California Senate
1995-1996 Regular Session

SENATE COMMITTEE ON BUSINESS AND PROFESSIONS

Senator Daniel Boatwright, Chairman

BILL NO.:SB 426

AUTHOR:Leslie

As Amended: 3/20/95

HEARING DATE: March 27, 1995

FISCAL:Yes
   SUBJECT: Environmental Advertising - repealing existing state standards and, instead, make it unlawful to not conform with, or be inconsistent with, specified federal guidelines.

DIGEST:

Existing law makes it unlawful for any person to represent that any oconsumer good,o as defined, that it manufactures or distributes is oozone friendly, o:obiodegradable,o ophotodegradable,o orecyclable,o or orecycled,o unless that consumer good meets specified definitions in state law or definitions established in trade rules adopted by the Federal Trade Commission (FTC).

Existing law further requires a person who represents that a consumer good it manufactures or distributes is not harmful to, or is beneficial to, the natural environment through the use of specified terms, to maintain written records and documentation supporting the validity of that representation, and to provide that information upon request. (The specified terms are oecologically friendly, o oearth friendly,o oenvironmentally friendly,o oenvironmentally safe,o ogreen productoo or a like term.)

A violation of these laws is a misdeameanor, subject to criminal and civil penalties.

This bill would repeal all of these state environmental advertising provisions and, instead, make it unlawful for a person to make an environmental claim, whether explicit or implied, that does not conform to the standards or is not consistent with the examples contained in the Guides for Use of Environmental Marketing Claims published by the Federal Trade Commission on July 27, 1992.

FISCAL EFFECT:

Unknown. This is a fiscal bill. Violations of the provisions of the current law that would be repealed and the new prohibition that would be enacted are misdemeanors subject to both civil and criminal penalties. The bill contains a ocrimes and infractionso local cost reimbursement disclaimer.

COMMENTS:

1. This bill is sponsored by its author, and supported by various business groups, paper and product manufacturers, materials trade associations, and food industry businesses (see supporter list below). The proponents state that the bill would make

California Bill Analysis, S.B. 426 Sen., 3/27/1995, California Bill Analysis, S.B. 426...

Case 3:21-cv-00754-MMC   Document 45   Filed 11/10/21   Page 33 of 34

California law on environmental advertising claims consistent with a national standard that is being adopted by a number of other states. Proponents argue that since the adoption of Californiaos environmental advertising law (AB 3994, Sher - Chapter 1413 of 1990), there have been problems with the vagueness of its definition of orecyclableo which requires that a product can be oconveniently recycledo in every county in California with a population over 300,000. In fact, as a result of an appellate court decision, the provision has been declared to be constitutionally vague and unenforceable. Despite several legislative attempts to enact a constitutionally acceptable definition, no agreement has ever been reached by proponents of the original law and industry.

Proponents further point out that when California enacted its law, it was the first in the nation and there were no enforceable federal standards in place. However, such standards were subsequently developed in 1992 by the Federal Trade Commission with input from the National Association of Attorneys General. Given the stalemate that has left the California environmental advertising provisions unenforced, proponents argue that adherence to the FTC standards is preferable. Proponents further note that those standards are enforceable, as evidenced by a number of enforcement actions. Also, given that the containers on which the advertising claims are used for products shipped to many or all states, the proponents argue that it is more reasonable to have one nationwide standard to meet.

2. Prior legislation.

Besides the original bill that enacted Californiaos environmental advertising provisions (AB 3994, Sher - Chapter 1416 of 1990), there have been several subsequent measures: AB 144 (Sher, 1991 - died in Senate B&P Committee), AB 2496 (Sher, 1992 - died on Assembly Inactive File following passage in the Senate), and AB 1112 (Sher, 1994 - died in Senate Business and Professions Committee). Another bill, AB 227 (Sher) has been introduced this year to revise the definition of orecyclable. That billos definition generally would require that a product be accepted by more than 65% of the curbside collection programs in the state or be accepted for recycling wherever the product is sold. AB 227 is awaiting its first hearing in the Assembly.

One key issue in the debate surrounding advertising claims of orecyclableo is where one draws the line regarding how available actual recycling of the product is for a purchasing consumer (i.e., is a product only potentially or theoretically recyclable to an actual purchaser due to a lack/absence of actual recycling programs vs. the ready availability of such recycling to a significant percentage of purchasers). Of course, given the variability of recycling nationwide, ascertainment of that information may be difficult if the advertising claims are placed on the container for nationwide distribution by a manufacturer elsewhere in the country/world.

3. FTC guides.

The FTC guides contain general standards regarding advertising that makes general environmental benefit claims, that uses terms such as o recyclable,o compostable,o odegradable,o obiodegradable,o oozone safeo or oozone friendly,o or claims related to recycled content, source reduction (for solid waste).

 The FTC guides also contain several examples to explain what types of advertising fall within this standard and what considerations are involved in meeting the standards. Most pertinent to California and this bill, the FTC guide for use of the term orecyclableo states that a product or package should not be marketed as recyclable unless it o cano be collected, separated or otherwise recovered from the solid waste stream for subsequent use. The standards go on to say that claims of recyclability should be qualified to the extent necessary to avoid consumer deception about any limited availability of recycling programs and collection sites.

Support and Opposition: (As of 3/22/95 Noon)

 Support: American Forest and Paper Association
    California League of Food Processors (CLFP)
    Simpson Paper Company
    Mead Corporation
    Weyerhaeuser Company
    Jefferson Smurfit Corporation and Container Company

Kraft Foods, Inc.

California Grocers Association

California Chamber of Commerce

American Electronics Association

Grocery Manufacturers of America

Opposition: None received.

Consultant: Jay J. DeFuria

CA B. An., S.B. 426 Sen., 3/27/1995

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.